**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| VITOL INC., | |
| *Movant*, | |
| v. | Misc. Case No. 4:24-mc-00010 |
| VEGA CAPITAL LONDON LIMITED, et al. | |
| *Respondents*. | |
| MISH INTERNATIONAL MONETARY INC., on behalf of itself and all others similarly situated, | Civil Case No. 1:20-cv-04577 |
| *Plaintiff*, | (Related action pending in the United States District Court for the Northern District of Illinois) |
| v. | |
| VEGA CAPITAL LONDON, LTD., et al., | |
| *Defendants*. | |

**VEGA CAPITAL LONDON LIMITED AND ADRIAN SPIRES'
OPPOSITION TO VITOL INC.'S MOTION TO QUASH
THEIR SUBPOENA TO PRODUCE DOCUMENTS**

On April 20, 2020, within a few months of the onslaught of a global pandemic, the West

Texas Intermediate crude oil futures contract with a May 2020 expiration ("May WTI Contract")

traded at negative prices on the New York Mercantile Exchange ("NYMEX"). It was the first

time in the history of NYMEX that a WTI futures contract had traded at negative prices. Vega

Capital London Limited ("Vega") and Adrian Spires ("Spires") are now seeking to defend

themselves from a putative class action in the United States District Court for the Northern

District of Illinois accusing them and ten traders in the United Kingdom of causing those

negative prices. Their defense in that lawsuit, among other things, is that the operation of natural

1

laws of supply and demand (and not market manipulation) caused that price drop: in the beginning of the pandemic, there was a sharp drop in demand for oil and a vast over-supply of it. That lack of demand was particularly true for the May WTI Contract, which was in the penultimate day of trading and which required any holder at the expiry of the contract on April 21 to accept physical delivery of the oil in Cushing, Oklahoma. To make matters worse, storage space in Cushing, Oklahoma was nearly exhausted at the time, leaving few with a compelling reason to buy a May WTI Contract.

The putative class action against Vega and Spires is now in the midst of discovery. To prove (among other things) there was no demand in the marketplace on April 20 for the May WTI Contract and therefore no "artificial price," Vega and Spires issued narrowly-tailored subpoenas to 28 of the largest traders on NYMEX, including movant Vitol Inc. ("Vitol"). The subpoenas sought only documents "sufficient to show" how and when those companies traded the May WTI Contract on April 20 and 21, 2020. From the discovery responses of these 28 companies, Vega and Spires expect they will be able to prove that even the largest and most sophisticated participants in the market had little-to-no desire to purchase the May WTI Contract and that their relative lack of demand illustrates why the prices for this contract were negative on April 20.

Vitol, the world's largest independent oil trader, filed a motion to quash this subpoena, arguing that its documents are not relevant and contain protected confidential information, and that it would be unduly burdensome for Vitol to produce documents sufficient to show how it traded one futures contract on two days from nearly four years ago. For the reasons set forth below, the Court should deny Vitol's motion to quash and enforce the subpoena seeking a limited amount of information.

## BACKGROUND

I.     The May WTI Contract Is Traded at Negative Prices on April 20, 2020

On April 20, 2020, the May WTI Contract on NYMEX began the day trading at $17.73 per barrel, entered into negative prices at 1:08 pm (CT), and ultimately finished the trading day on 1:30 pm (CT) at -$37.63 per barrel. Ex. 1 at 1, 3, 8. Under the terms of the May WTI Contract, parties holding the futures contract were generally expected to sell it by the contract's expiry on April 21, 2020 or take physical possession of the oil in May. *Id.* at 2. Each contract is for a thousand barrels of oil. *Id.* at 6. The physical delivery requirement of the contract provided speculators holding the May WTI Contract with a strong incentive to sell the contract before its expiry on April 21.

The staff of the Commodity Futures Trading Commission prepared a lengthy interim report describing "the fundamental factors of supply, demand, and storage as well as technical trading factors surrounding the May Contract . . ." in April 2020. *Id.* at 2. The CFTC staff described how an "already oversupplied global crude oil market was hit with an unprecedented reduction in demand caused by the novel coronavirus pandemic" and how "[u]ncertainty over both the magnitude and duration of that loss of demand caused increased volatility to historic levels." *Id.* Among other things, there were concerns about whether "OPEC Plus or other global producers could respond quickly to the reduction in demand," *id.*, and whether there would be any storage available in Cushing, Oklahoma, where the May WTI Contract required oil to be delivered, *id.* Indeed, "[i]n or about late March and early April, NYMEX and some industry participants began preparing for the prospect of negative WTI crude oil prices, changing technology and pricing models to account for this contingency." *Id.* at 2-3.

However, after its lengthy review, the CFTC staff declined to "identify the root cause(s) of any price movement of the WTI Contract leading up to, on, or around April 20." *Id.* at 1 n.1. That task has been left to Vega, Spires, and the other parties in the Illinois case.

## II. A Putative Class Action Was Brought Against Vega, Spires, and Ten Traders in the Northern District of Illinois

Since August 2020, Mish International Monetary Inc. ("Mish"), a California company specializing in precious metals and rare coins, has been pursuing a putative class action against Vega. Mish later expanded its complaint to name Vega's owner, Adrian Spires, and ten traders as defendants in the case. Mish asserted eight claims against them, including a Sherman Act antitrust conspiracy claim and a number of Commodity Exchange Act market manipulation claims. Ex. 2 at ¶¶ 346-393.[1] This case is pending before the Honorable Manish S. Shah in the U.S. District Court for the Northern District of Illinois.

The Illinois case has a lengthy procedural history, including two decisions on motions to dismiss. *See Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 596 F. Supp. 3d 1076 (N.D. Ill. 2022); *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 648 F. Supp. 3d 980 (N.D. Ill. 2022). For purposes relevant here, for a market manipulation claim under 7 U.S.C. § 13(a)(2), a plaintiff must show "(1) the defendants possessed the ability to influence prices; (2) <u>an artificial price existed</u>; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *Mish Int'l Monetary Inc.*, 596 F. Supp. 3d at 1095 (emphasis added). For a Sherman Act claim, a plaintiff must prove "(1) defendants had a contract,

---

[1]     In its motion, Vitol attached the original complaint in the Illinois case. ECF 1-1. However, the original complaint has been amended twice since its filing, and Vega and Spires have provided the publicly available version of the current operative complaint, the Second Amended Complaint, attached as Ex. 2.

combination, or conspiracy ('an agreement'); (2) as a result, <u>trade in the relevant market was unreasonably restrained</u>; and (3) [the plaintiff was] injured." *Id.* at 1092 (emphasis added).

The case is now in the midst of merits and class certification discovery, and Vega and Spires intend to show, among other things, that no artificial price existed and there was no restraint of trade on the market for the May WTI Contract. To prove that no artificial price existed and that the lack of demand/over-supply of oil caused the drop in prices, Vega and Spires issued narrowly-tailored subpoenas to 28 of the largest traders in the NYMEX market. Those traders are the following: (1) Bank of China Limited; (2) Barclays Bank PLC; (3) BASF Intertrade Corporation; (4) BlackRock, Inc.; (5) BNP Paribas S.A.; (6) BP Products North America, Inc.; (7) Capital One National Association; (8) Chevron USA Inc.; (9) Citadel Securities LLC; (10) Citigroup Inc.; (11) ConocoPhillips Company; (12) ExxonMobil Oil Corporation; (13) Glencore Ltd.; (14) Goldman Sachs Group; (15) ING Capital Markets LLC; (16) JP Morgan Chase Bank NA; (17) Macquarie Inc.; (18) Mercuria Energy America LLC; (19) Mitsubishi International Corporation; (20) Morgan Stanley; (21) Nomura Securities International Inc.; (22) Pacific Investment Management Company; (23) Petrochina International (America) Inc.; (24) Phillips 66 Co. (25) Repsol Trading USA LLC; (26) Shell Trading (US) Company; (27) Socar Trading North America LLC; and (28) Vitol Incorporated. The purpose of serving subpoenas on these 28 large traders was to show that the lack of demand was evidence of a market-wide phenomenon and not merely anecdotal evidence that could be cast aside. The subpoenas were served on different types of large traders, including global financial institutions, multinational oil companies, commodities trading firms, and other large institutions.

Vega and Spires kept the Illinois federal district court informed of the 28 subpoena recipients, the nature of the subpoenas, and the reasons why those subpoenas were being

pursued.  ECF 1-4 at 3-5 (joint status report filed in the Illinois case on December 14, 2023); Ex.

3 at 4-9 (Vega's and Spires' publicly-available filed version of their January 5, 2024 motion to

extend deadlines).  Several subpoena recipients have made productions in response to the

subpoenas, and Vega and Spires are meeting and conferring with other subpoena recipients about

their responses to the subpoena.

The subpoena to Vitol contains nine document requests relating to the trading of the May

WTI Contract in April 2020, but only eight requests are at issue.[2]  ECF 1-5 at 14-15.  Those eight

requests can be grouped into the four categories below:

- Documents sufficient to show Vitol's trades in the May WTI Contract from April 20 to April 21, 2020, including the amount and timing of any trades and the amount of any short or long positions.  *Id.* at 14 (Requests 1-3).

- Documents sufficient to show whether Vitol knew or believed that the May WTI Contract could trade at negative prices and Vitol's trading strategy in connection with that contract.  *Id.* (Requests 4-6).

- Documents sufficient to show whether Vitol accepted (or considered accepting) the physical delivery of any oil covered by the May WTI Contract.  *Id.* at 15 (Request 7).

- Documents and communications between Vitol and third parties relating to the May WTI Contract.  *Id.* (Request 8).

## III.  **Vitol Files a Motion to Quash Vega and Spires' Subpoena**

On January 3, 2024, Vitol filed its motion to quash Vega and Spires' subpoena.  ECF 1.

Vitol has been described as "the world's largest independent oil trader" and reportedly earned $3

billion in profits in 2020.[3]  Vitol is well aware of the events of April 20, 2020:  in his 2020

---

[2]      Vitol's motion and objections state that it would not have any documents responsive to Vega's and Spires' ninth request for documents.  ECF No. 1 at 14.  Vega and Spires accept Vitol's representation that Vitol has no responsive documents and are not pursuing this request.

[3]      Ex. 4, Bloomberg, *World's Top Oil Trader Vitol Smashed Profit Record in 2020* (Mar. 16, 2021), at 1 (also available at https://www.bloomberg.com/news/articles/2021-03-16/world-s-top-oil-trader-vitol-smashed-profit-record-in-2020).

annual review of Vitol's performance, Vitol's chief executive officer, Russell Hardy, wrote that "[t]he extraordinary market conditions in the initial stages of [the Covid-19] lockdown and sudden drop in demand resulted in huge logistical challenges and market opportunities."[4] Referring to the May 2020 WTI Contract, Mr. Hardy acknowledged that "[f]or the first time, a major oil price benchmark turned negative," and concluded that "this was largely caused by an exceptional interaction of the physical and financial markets . . . ." *Id.* at 2 (emphasis added). At the end of 2020, Mr. Hardy reported that Vitol's trading of "[c]rude continues to represent our largest volumes." *Id.*

The *Bloomberg* news report described Vitol's record 2020 profits as an "indication of the bonanza that oil traders enjoyed in 2020, when the commodity plunged amid a Saudi-Russian price war in the early days of the pandemic[.]" Ex. 4 at 1. *Bloomberg* further reported that Vitol made "a significant chunk of its profits during the second quarter, when oil demand collapsed, allowing traders to buy cheap crude and store it, while locking in a profit by selling forward the oil on the futures market at higher prices." *Id.* Vitol continues to enjoy success: between 2020 and 2022, the company's net profits reportedly increased by 500% growing from a record $3 billion in 2020 to a record $15.1 billion in 2022, which "matched its combined earnings for the previous six years."[5]

---

[4]     Ex. 5 at 1 (also available at https://www.vitol.com/vitol-2020-volumes-and-review/ (last visited on Jan. 24, 2024).

[5]     Ex. 6, Reuters, *Trader Vitol Posts Record $15 bln Profit in 2022 on Energy Crisis*, Mar. 30, 2023 (available at https://www.reuters.com/article/idUSL4N3623W4/).

## STANDARD OF REVIEW

"The [Federal] Rules were intended to be liberally construed to encourage full and fair disclosure of the facts." *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, No. 3:10-CV-276-F, 2011 WL 13202145, at *3 (N.D. Tex. Sept. 14, 2011). Under Rule 45, "a party may serve a subpoena commanding a non-party 'to whom it is directed to . . . produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control." *Shields v. Elevated Energy Sols., LLC*, No. 3:19-CV-00390, 2020 WL 5658499, at *2 (S.D. Tex. Sept. 23, 2020). "A litigant is entitled to use a Rule 45 subpoena to 'obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense.'" *Shields*, 2020 WL 5658499, at *2.

When nonparties resist discovery sought by a valid subpoena, they have the burden of "show[ing] specifically how . . . each request" is objectionable. *See, e.g.*, *MC Trilogy Texas, LLC v. City of Heath, Texas*, No. 3:22-CV-2154-D, 2023 WL 8569018, at **1, 4 (N.D. Tex. Dec. 11, 2023); *Nasufi v. King Cable, Inc.*, No. 3:15-CV-3273-B, 2017 WL 3334110, at *4 (N.D. Tex. Aug. 4, 2017) ("'[A] non-party's Rule 45(d)(2)(B) objections to discovery requests in a subpoena are subject to the same prohibition on general or boiler-plate or unsupported objections[.]"). "Should the court determine that [the] subpoena is improper for some reason, modifying [it] is generally preferable to quashing it outright." *Defrates v. Podany*, No. 3:17-CV-1290-C, 2018 WL 9561795, at *2 (N.D. Tex. May 30, 2018).

## DISCUSSION

Vitol seeks to quash the subpoena in its entirety, arguing that the subpoena (1) seeks irrelevant information, (2) seeks discovery that can be "more easily obtained" from other sources,

(3) imposes an undue burden on Vitol, and (4) requires disclosure of "trade secrets and/or confidential commercial information."  ECF No. 1 at 6-14.  Each of these arguments is incorrect.

## I.    **Vega and Spires' Subpoena Seeks Relevant Information from Vitol**

First, Vega and Spires seek information that is directly relevant and narrowly tailored to the merits and class certification issues in the Illinois case.  On the merits, the subpoena seeks information that will help to establish that there was no artificial price for the May WTI Contract on April 20, 2020 and no restraint on trade.  As the world's largest independent oil trader, Vitol possesses important information on why there was not more demand for the May WTI Contract on April 20, 2020.  Why did a large oil trader like Vitol not purchase the May WTI Contract in greater amounts when the purchase price was zero?  When the price dropped to -$37.63 per barrel, a trader like Vitol theoretically could have purchased contracts covering a million barrels of oil and immediately made over $37 million from the transaction – even before selling the oil at some later point.  Why did Vitol not "buy" more at negative prices?  If they did purchase the May WTI Contract at zero or negative prices, why did Vitol and other similar companies not make these purchases in sufficient quantities to drive the price of oil futures contracts up?  The contemporaneous evidence of Vitol's activity sought by the subpoena (including its trading records and relevant email and text messages) will answer these questions.  Vega and Spires believe that the evidence from Vitol and others will (i) prove there was no significant demand for the May WTI Contract on April 20 amongst the largest traders; and (ii) demonstrate *why* there was no significant demand for that contract.  That evidence, in turn, will help prove in the Illinois case that there was no artificial price or restraint of trade on April 20.

In the same way, conducting this kind of discovery will help establish why the plaintiff's claims in the Illinois case are not typical and why individual issues will predominate over

common issues. *See, e.g.*, *Kohen v. Pacific Investment Mgt. Co.*, 571 F.3d 672, 679 (7th Cir. 2009) (suggesting that a class action defendant in a market manipulation case could "depose a random sample of class members to determine how many were net gainers from the alleged manipulation and therefore were not injured, and if it turns out to be a high percentage he could urge the district court to revisit its decision to certify the class."). The plaintiff in the Illinois case is a rare coin dealer whose website does not mention the trading of contracts for any oil futures commodities.[6] By contrast, Vitol is one of the world's largest oil traders which "trades 355 million tons of crude oil and products each year, which equates to approximately 7.4 million barrels per day." ECF 1 at 3. As its CEO has admitted, Vitol saw "market opportunities" in the "extraordinary market conditions . . . and sudden drop in demand" for crude oil during that time. Ex. 5 at 1. The requested discovery is relevant to assessing whether Mish's claims are typical of the putative class. *See Premium Plus Partners, L.P. v. Davis*, 2008 WL 3978340, at *4 (N.D. Ill. Aug. 22, 2008) (finding that use of a "variety of trading strategies" among investors in the treasury market precluded finding of typicality).

Vitol argues that its information cannot be relevant because the Illinois case is based on claims about the alleged trading activity of Vega traders – not Vitol. ECF No. 1 at 7-8. But that argument overlooks the nature of Vega's and Spires' defenses. If Vega and Spires were not allowed to subpoena or question large trading firms about their relative lack of demand for the May WTI Contract, Vega and Spires would be missing evidence important to their defense that there was no artificial price and no restraint of trade. Vitol's conclusory arguments rest on an overly narrow view of relevance not supported by the law. *See*, *e.g.*, *Camara v. Clayton Transp., Inc.*, No. 5:18-CV-143, 2019 WL 13190650, at *2 (S.D. Tex. Dec. 2, 2019) ("Relevancy is thus

---

[6]         https://www.mishinternational.com/company.html (last visited on January 22, 2024).

to be 'construed liberally to reach any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'").

Moreover, Vitol has already lost its relevance argument in another similar market manipulation and antitrust case, *In re Crude Oil Commodity Futures Litig.*, No. 11-cv-3600 (S.D.N.Y.). Plaintiffs in that class action sought documents that Vitol and other nonparty oil traders produced to the CFTC in connection with an underlying investigation of the WTI market on NYMEX. The district court ordered production over Vitol's objections, stating, in part:

> [T]he WTI market's alleged switch between contango and backwardation is central to Plaintiffs' manipulation and monopolization claims. Far from being irrelevant, documents indicating the perceptions and reactions of 'innocent' nonparty traders are highly probative of whether this phenomenon occurred and how it impacted the market. Information about the nonparties' activities before and after the alleged manipulation is also relevant to provide a benchmark for activity in a non-manipulated market.

*CFTC v. Parnon Energy, Inc.*, 2013 WL 5882921, at *3 (S.D.N.Y. Oct. 25, 2013), *aff'd*, 593 F. App'x 32, 36 (2d Cir. 2014). In a *Parnon*-related subpoena action in this District, the court adopted this analysis in denying a nonparty trader's motion to quash. *In re Subpoenas to Plains All American Pipeline, L.P.*, No. 13-mc-2975, 2014 WL 204447, at **4-5 (S.D. Tex. Jan. 17, 2014) (Miller, J.) ("[Nonparty's] role in the physical and futures market during the time period at issue, which would yield or could lead to the discovery of evidence regarding deliverable supplies and market conduct, is discoverable in the [underlying] enforcement and class actions.") (discussing *Parnon*).

These cases are consistent with precedent showing how the testimony of third party market participants can be relevant in a wide variety of circumstances. *See*, *e.g.*, *U.S. v. Pacilio*, 85 F.4th 450, 465 (7th Cir. 2023) (noting testimony of other futures traders showed in a fraud case whether defendants' trading practices were "contrary to the expectation of market

participants," and thus relevant to intent); *F.T.C. v. RAG-Stiftung*, 436 F. Supp. 3d 278, 312-13

(D.D.C. 2020) ("There is no science to weighing the factors at play in an antitrust analysis" and

[o]nly an examination of the real-world evidence—including ordinary course documents,

bidding data, and testimony from market participants—can supply an accurate picture of the

industry and competitive dynamics.").

Finally, it would be proportionate for Vitol to produce this discovery. ECF 1 at 8-9. The

WTI futures contract is "a commodity that is central to the functioning of the world economy,"

and litigation over whether a WTI contract had an artificial price on a historic day is "of national,

and indeed international, import." *In re Subpoenas to Plains All Am. Pipeline, L.P.*, 2014 WL

204447, at **5, 7. The amount of controversy is high: the Illinois plaintiff alleges the traders

associated with Vega made hundreds of millions of dollars in profit on April 20, 2020, and

demands, among other things, actual and treble damages on behalf of itself and the putative

class. Ex. 2 at ¶ 255, Prayer for Relief, ¶¶ J, K. The amount in controversy in the Illinois case

therefore exceeds $1 billion, which weighs in favor of discovery. *See*, *e.g.*, *State Farm Mut.*

*Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 255 F. Supp. 3d 700, 710 (E.D. Mich. 2017)

(finding proportionality factors "tip[ped] far towards" permitting the requested nonparty

discovery where, *inter alia*, the amount in controversy included treble damages and "the

potential for a multi-million dollar verdict"), *aff'd*, 2017 WL 3116261 (E.D. Mich. July 21,

2017).

## II.     The Discovery Cannot Be Obtained From Other Sources

The discovery sought by Vega and Spires, including the trading data sought by Requests

1 through 3, cannot be obtained from other sources. As Vega and Spires reported to the district

court in the Illinois case, other parties served subpoenas on CME Group Inc. (the owner of

NYMEX), seeking trading information for the May WTI Contract bought or sold on April 20, 2020. Ex. 3 at 3. CME initially produced the trading information in anonymized format and later produced unmasked information for some traders. *Id.* However, the CME represented to counsel for the ten traders in the Illinois case that it cannot necessarily track trader information to individual companies because traders trade through a process in which the individual traders are identified through their individual Tag50 ID and not necessarily through their corporate affiliation. *Id.* The subpoena to Vitol is the only way to obtain comprehensive information about Vitol's trading on April 20, 2020.

It is undisputed that the remaining requests seek discovery that cannot be obtained from another source, in whole or in part. ECF 1 at 3.

### III.   Compliance Would Not Impose an Undue Burden on Vitol

Compliance with the subpoena would not impose an undue burden on Vitol. To establish undue burden, Vitol "has the burden of proof to demonstrate 'that compliance with the subpoena would be 'unreasonable and oppressive.'" *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004). "This showing has been described as 'heavy,' and courts within [the Fifth Circuit] consider six particular factors when determining whether a subpoena is unduly burdensome: (1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed." *In re Subpoenas to Plains All American Pipeline, L.P.*, 2014 WL 204447, at *3 (internal citations omitted).

*Relevance and Need.* The evidence sought is relevant to central issues in the Illinois case, including whether the May WTI Contract was trading at an artificial price on April 20, 2020. The need for the discovery from Vitol is compelling because the information from the

largest traders can best prove why there was no significant demand for the May WTI Contract at zero or negative prices. *F.T.C. v. Thomas Jefferson Univ.*, 2020 WL 3034809, at *2 (E.D. Pa. June 5, 2020) (finding "compelling need for [subpoenaed] information, as it cannot be acquired from any of the parties").

**Breadth, Time Period, and Particularity.** The subpoena is narrowly tailored to obtain only information "sufficient to show" Vitol's trading of one product (the May WTI Contract) on two days. Requests 1 through 3 seek information about the basic characteristics of Vitol's trading of the May WTI Contract. Requests 4 through 8 seek information about Vitol's knowledge, communications, trading strategies, and purchases of crude oil with respect to the May WTI Contract on April 20, 2020, including when Vitol knew that prices could go negative. Each subpoena request is specific, discrete, and narrowly tailored in terms of subject matter and temporal scope. *In re Subpoenas to Plains All Am. Pipeline, L.P.*, 2014 WL 204447, at *7 (denying a motion to quash where the "CFTC has generally limited its requests to documents relating to a narrow subject matter and within a short period of time").

**Burden.** It is not necessarily clear how much time would be needed for Vitol to comply with the subpoena. Vitol's CEO, Russell Hardy, has made public statements addressing what happened on April 20, 2020, observing that "[f]or the first time, a major oil price benchmark turned negative," and concluding that "this was largely caused by an exceptional interaction of the physical and financial markets . . . ." Ex. 5 at 2. It is reasonable to expect that, before publishing the company's annual review and opining on the cause of the price drop on April 20, 2020, Vitol's CEO received a briefing about his company's trading of the May WTI Contract on that historic day. If that is the case, depending on the level of detail in the briefing, the

production of that briefing might satisfy most of the requests in the subpoena without imposing virtually any burden on Vitol.

Alternatively, many companies receive daily commodity statements from their respective futures commission merchants, detailing when commodities contracts (like the May WTI Contract) were purchased or sold. It is unclear why Vitol would not receive these statements for the two relevant days and why it would require Vitol to spend 170 hours looking for these two statements. It is difficult to imagine that, if Vitol's CEO requested this information, he would be told that it would take 170 hours to compile.

Vitol contends compliance with the subpoena would take approximately 800 hours of its employees' time. ECF No. 1 at 10, 13. That estimate appears to be driven by Vitol's self-imposed burdens. For example, Requests 1-3 can be satisfied by producing a spreadsheet with the daily commodity statement of Vitol's trades in the May WTI Contract on April 20 and 21. That does not require reviewing "corresponding information" for the relevant trades, "confirm[ing] that the information was pulled correctly," and then "validat[ing] the pulled information by review of the relevant commercial documents." ECF No. 1 at 10. Nor do Requests 4 through 8 require collection and review of "each and every document created by the relevant trader during this period." *Id.* at 12.

However, Vega and Spires are not asking Vitol to spend 800 hours responding to the subpoena. In a videoconference with Vitol's counsel on January 22, 2024, Vega and Spires offered to provide relevant search terms and negotiate the number of custodians with Vitol in an effort to ease any burden.[7] *See In re enTrilogy, LLC*, 2022 WL 3155412, at *6 (N.D. Cal. Aug.

---

[7] Counsel for Vega and Spires had asked for this videoconference on January 22, 2024 out of a concern that Vitol had misconstrued what they were seeking.

8, 2022) ("These [electronically stored] materials may be collected and filtered using search terms and other techniques according to well-known e-discovery practices" and "[t]he Court is not persuaded that a search for responsive documents will require the expenditure of more than a thousand hours or more than $200,000, and Non-Parties have provided insufficient support for such an estimate.").  Vega and Spires have further identified other ways that Vitol could search for responsive documents in an efficient and not unduly burdensome way.  For instance, Vitol could run a search for a mass email sent from the CME to certain market participants at 12:05 pm (CT) on April 20 (in which CME reminded those market participants that oil futures contracts could trade in the negative).  Ex. 7.  That search should lead to follow-up discussions in emails and text messages among Vitol traders and other employees as to how and when to trade the May WTI Contract (which should further illustrate the lack of demand on April 20).  Vega and Spires remain willing to work with Vitol to ease any burden in producing the documents responsive to the subpoena.  In response to Vega and Spires' offer on the January 22, 2024 meet-and-confer call, Vitol's counsel represented that they would be willing to consider these suggestions only after the Court rules on its trade secret and relevance objections.

## IV.     Any Trade Secrets or Confidential Information Can Be Protected By The Illinois Court's Existing Protective Order

The Illinois court's protective order can protect any trade secrets or confidential information in Vitol's production.  "[T]here is no absolute privilege for trade secrets and similar confidential information." *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979).  As such, "[t]he Federal Rules provide that the court 'may'—but is not required to—quash or modify a subpoena that requires disclosure of 'a trade secret or other confidential research, development, or commercial information.'" *Rios v. Ramage*, 2020 WL 6701206, at *6 (D. Kan. Nov. 13, 2020) (quoting Fed. R. Civ. P. 45(d)(3)(B)(i)). Vitol must first "demonstrate

16

that the subpoena seeks trade secrets or confidential information, and that the disclosure would be harmful to its interests." *In re Subpoenas to Plains All American Pipeline, L.P.*, 2014 WL 204447, at *4. "[C]onclusory allegations are not sufficient to meet the burden under Rule 45." *FieldTurf USA, Inc. v. Tencate Thiolon Middle E., LLC*, No. 4:11-CV-050-TWT, 2012 WL 844671, at *3 (W.D. Tex. Mar. 12, 2012). If it makes that showing, "the burden then shifts to the non-movant to demonstrate that the requested information is relevant and necessary to the underlying litigation." *In re Subpoenas to Plains All American Pipeline, L.P.*, 2014 WL 204447, at *4. "The court then balances the benefits from producing the information against the potential injury that could accrue to the producing party by the disclosure itself." *Id.*

Vitol makes blanket claims that *all* requested documents are "trade secrets and/or confidential commercial information." ECF No. 1 at 5, 6, 9-11, 13. In particular, Vitol broadly asserts that its trading information, activities, and strategies are "trade secrets and/or confidential commercial information" because Vitol takes various steps to "closely guard" this material, and thus disclosure "would provide an economic value to its competitors, like Mish and/or Vega." ECF No. 1-2 at ¶¶ 7, 8. These conclusory assertions, which would effectively give blanket protection to all of Vitol's business information, do not establish that specific documents encompassed by the subpoena requests qualify as "trade secrets and/or confidential commercial information."

To the extent Vitol has shown that any documents constitute trade secrets or confidential commercial information, then the Court should find that Vitol's concerns about disclosing such information are addressed by the protective order that governs discovery in the Illinois case. Ex. 8. Under any balancing test, courts regularly compel production of such discovery where it is relevant and necessary to the underlying action and the nonparty's interests are sufficiently

protected by a confidentiality or protective order. *See, e.g.*, *In re Subpoenas to Plains All American Pipeline, L.P.*, 2014 WL 204447, at *6 (agreeing that subpoenaed nonparty "has not shown an identifiable risk that its information, albeit sensitive, will be used for improper business purposes in violation of the protective order" in the case); *Timberlake v. Synthes Spine Co., L.P.*, 2008 WL 11389429, at *4 (S.D. Tex. June 4, 2008) ("[T]he Court will require that the parties sign a mutually agreeable confidentiality order to ensure that no proprietary information is disclosed publicly or outside this litigation."); *Garcia v. El Paso Tchrs. Fed. Credit Union*, No. EP-20-CV-25-PRM, 2021 WL 2784561, at *4 (W.D. Tex. Jan. 21, 2021) (finding nonparty's "concerns regarding confidential information and trade secrets, and the risk that disclosure may place a party in a competitive disadvantage, have clearly been addressed by the Confidentiality and Protective Order"); *FieldTurf USA, Inc.*, 2012 WL 844671, at *3 ("[T]o the extent the subpoena requires the production of trade secrets, the Confidentiality Order adequately protects any confidentiality interest [the non-party] has in its information.").

The protective order in the Illinois case allows parties and nonparties to designate discovery material as "Confidential" or "Highly Confidential," and contains restrictions on disclosure for each designation. Ex. 8 at §§ 2.1, 2.2, 4.2, 4.3. The restrictions for "Highly Confidential" designations are akin to attorneys' eyes only and will not permit any of the parties (including Mish, Spires, or the ten traders) to view Vitol's highly confidential information. *Id.* at § 4.3. The protective order limits use of discovery material to the Illinois case and expressly forbids it from being used for any "business, commercial, or other purpose." *Id.* at §§ 1.1, 4.1. Its terms are binding on all lawyers, parties, and persons subject to its terms. *Id.* at § 13.3. And any consultants, experts, or witnesses who may receive or view designated material must sign the attached acknowledgement and agreement to be bound by its terms, subject "to sanctions and

18

punishment in the nature of contempt" for any violation. *Id.* at §§ 4.2(e), 4.2(g), 4.3(e), 4.4, and Attachment A. These provisions sufficiently protect against the misuse of any discovery that may qualify as Vitol's trade secrets or confidential commercial information.

## CONCLUSION

For the foregoing reasons, to the extent the Court declines to transfer Vitol Inc.'s Motion to Quash to the U.S. District Court for the Northern District of Illinois, Vega and Spires respectfully request that the Court (1) deny Vitol's Motion to Quash, (2) enter an order requiring Vitol Inc. to comply with the subpoena issued by Vega and Spires within ten business days, and (3) grant any other relief the Court deems proper. A proposed order is attached to this brief.

Dated: January 24, 2024

Respectfully submitted,

AKERMAN LLP

By: /s/ *Sean Cichowski*
Sean Cichowski
State Bar No. 24062188
Southern District No. 1076539
1300 Post Oak Blvd. #2300
Houston, TX 77056
(713) 960-7363 (telephone)
(713) 960-1527 (facsimile)
sean.cichowski@akerman.com

*Attorney-in-Charge for Vega Capital London Limited and Adrian Spires*

Of Counsel:

Michael P. Kelly*
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 393-6222 (telephone)
(202) 393-5959 (facsimile)
michael.kelly@akerman.com

Shawn M. Taylor*
Elpitha B. Lambros*
AKERMAN LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700 (telephone)
(312) 424-1900 (facsimile)
shawn.taylor@akerman.com
elpitha.lambros@akerman.com

\*    Motions for admission *pro hac vice* pending

## CERTIFICATE OF SERVICE

I hereby certify that, on January 24, 2024, a true and correct copy of the foregoing Opposition to Vitol Inc.'s Motion to Quash was served via the Court's ECF filing system to the following counsel of record:

> Christopher Verducci
> Locke Lord LLP
> 600 Travis Street
> Houston, TX 77002
> cverducci@lockelord.com
>
> Russell Perdew
> Locke Lord LLP
> 111 S. Wacker Drive
> Chicago, IL 60606
> rperdew@lockelord.com
>
> M. Isabel Campos
> Locke Lord LLP
> 600 Travis Street
> Houston, TX 77002
> isabel.campos@lockelord.com

/s/ Shawn M. Taylor
Shawn M. Taylor

# Exhibit 1

# Interim Staff Report

Trading in NYMEX WTI Crude Oil Futures Contract Leading up to, on, and around April 20, 2020

*Published November 23, 2020*



COMMODITY FUTURES TRADING COMMISSION

DISCLAIMER

This is an interim report by certain staff of the Commodity Futures Trading Commission ("CFTC" or "Commission"). Any views expressed in this interim report are solely the views of staff, and do not necessarily represent the position or views of the CFTC, its five-member Commission, or any Commissioner.

# Contents

I.  Introduction ........................................................................................................................ 1

II.  Executive Summary ............................................................................................................ 1

III.  Background ......................................................................................................................... 3

   A.  Oil Market and Relationship to WTI Futures ................................................................ 3

   B.  NYMEX WTI Crude Oil Futures .................................................................................. 6

     1.  Settlement Process ..................................................................................................... 7

     2.  Execution Types ......................................................................................................... 7

   C.  Overview of April 20 Events ......................................................................................... 8

IV.  Fundamental Factors ........................................................................................................ 10

   A.  Impact of Global Economic Slowdown, COVID-19, and Other Factors ........................ 10

   B.  Storage Concerns ........................................................................................................ 11

V.  Trading Activity ................................................................................................................ 15

   A.  Open Interest in the May Contract ............................................................................... 15

   B.  Starting Open Interest on April 20 .............................................................................. 20

   C.  Intraday Trading ......................................................................................................... 23

   D.  Liquidity & Order Book Analysis ............................................................................... 28

   E.  Market Integrity Controls ........................................................................................... 35

VI.  Conclusion ....................................................................................................................... 36

# I.     Introduction

Division of Market Oversight ("**DMO**") and Office of the Chief Economist ("**OCE**") staff of the U.S. Commodity Futures Trading Commission (the "**CFTC**" or "**Commission**") issue this interim report (the "**Report**")[1] to provide background, context, and observations regarding the trading activity leading up to, on, and around April 20, 2020 ("**April 20**"), for the West Texas Intermediate ("**WTI**") Light Sweet Crude Oil futures contract (the "**WTI Contract**"), traded on the New York Mercantile Exchange ("**NYMEX**").[2]

This Report focuses on the WTI Contract's May 2020 expiration (the "**May Contract**"), which settled on April 20 at a price of -$37.63 per barrel. The May Contract's April 20 negative settlement price was the first time the WTI Contract traded at a negative price since being listed for trading 37 years ago.[3]

This Report includes: (i) an executive summary; (ii) background on the WTI Contract; (iii) a discussion of fundamental factors that impacted supply and demand for domestic crude oil; and (iv) an interim analysis of trading activity in the WTI Contract on April 20.

# II.    Executive Summary

This Report outlines the events of the WTI Contract market between January 1, 2020, and April 21, 2020. This Report also sets forth data on the geopolitical and fundamental economic drivers, as well as certain technical factors, preceding and coinciding with the negative settlement price of the WTI Contract on April 20.[4]

---

[1] Consistent with Section 8(a) of the Commodity Exchange Act ("**CEA**"), this Report does not contain data or information that would separately disclose (i) the business transactions or market positions of any person, or (ii) trade secrets or names of customers. In addition, this Report concerns only the observations by DMO and OCE staff and does not represent a legal conclusion with respect to the applicability of any provision of the CEA or the Commission's regulations. Furthermore, this Report is based upon the information available to such staff at the time this Report was written, and any different, changed, or omitted facts or circumstances may require additional analysis and result in different observations. This report is interim as a result of the above and the proximity to the events. "Interim" does not suggest that any further reports will or will not be forthcoming. Commission Staff may identify additional information or conduct additional analysis over time, and the determination of next steps or reports, if any, will be made at that time in light of the facts and circumstances at that time. The Commission has not expressed any view regarding the observations contained herein.

[2] NYMEX is a Designated Contract Market ("**DCM**") regulated by the CFTC and is part of the Chicago Mercantile Exchange Group Inc. ("**CME**"). The trading day for WTI Contracts (and many other CME contracts) is nearly 24 hours, Sunday through Friday. The April 20 trading session actually began at 6:00 p.m. Eastern Time ("**ET**") on Sunday, April 19. Unless otherwise indicated, reference herein to trading on April 20 refers to the trading session beginning at 6:00 p.m. ET Sunday, April 19, ending at 2:30 p.m. ET Monday, April 20. Also, all times in this Report reference ET, unless otherwise indicated.

[3] This Report is limited to analysis of the NYMEX WTI Contract and does not include analysis of trading activity in the ICE Futures Europe WTI crude futures contract, a cash-settled contract.

[4] This Report does not analyze the propriety of trading by any particular trader or group of traders. Additionally, to the extent any trading activity may have been abusive, manipulative, disruptive, or otherwise unlawful, an evaluation of that activity is beyond the scope of this Report. As such, this Report does not consider whether forces outside of supply and demand impacted prices leading up to, on, or around April 20, nor does this Report identify the root cause(s) of any price movement of the WTI Contract leading up to, on, or around April 20. Furthermore, as is customary, nothing in this Report should be interpreted to either confirm or deny the existence of an enforcement investigation by the Commission related to the matters addressed herein.

The negative settlement price of the WTI Contract occurred on the penultimate day of trading for the May Contract, which expired on April 21. For the WTI Contract May expiry, market participants who were not intending to make or take delivery of the crude oil underlying the futures contract were expected to close out of their positions by April 21 (the May Contract's expiration date and last day of trading). As described in detail below, the process of reducing the amount of the total number of futures contracts that remain open without an offsetting position or fulfilled by delivery, or "open interest" ("**OI**"),[5] through trading or netting is known as "**compression**." The level of compression for the May Contract on April 20, and the level of trading to achieve compression, was historically high, resulting in OI in the May Contract reducing markedly throughout the day.

This Report reviews the fundamental factors of supply, demand, and storage as well as technical trading factors surrounding the May Contract as it traded on April 20. Fundamental factors that coincided in and around the May Contract's trading and settlement at negative prices on April 20 discussed in this Report include the following:

- An already oversupplied global crude oil market was hit with an unprecedented reduction in demand caused by the novel coronavirus pandemic ("**COVID-19**").[6] Uncertainty over both the magnitude and duration of that loss of demand increased volatility to historic levels.[7] This Report observes how certain actions in response to the decline in demand by the Organization of Petroleum Exporting Countries ("**OPEC**"), along with 10 non-OPEC oil-exporting nations, colloquially referred to as "**OPEC Plus**," impacted market volatility.

- Concerns were growing in the marketplace about whether OPEC Plus or other global producers could respond quickly to the reduction in demand. These concerns raised questions about the availability of storage for excess production, and were particularly pressing at the Cushing, Oklahoma, oil terminal, which serves as the delivery point for the physically-settled WTI Contract.

- By March 2020, the working storage available at the Cushing facility was near capacity. The scarcity in capacity raised procedural concerns related to the mechanics of pipeline transportation and storage at the Cushing terminal, both of which are required to support the physical delivery process for the WTI Contract. Procedural concerns about the physical delivery process included questions about whether the WTI Contract would trade at negative prices. In or about late March and early April, NYMEX and some industry participants began preparing for the prospect of negative WTI crude oil prices,

---

[5] OI refers to the total number of futures contracts long or short in a delivery month or market that has been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery. OI is also referred to as "**open contracts**" or "**open commitments**." *See* CFTC Futures Glossary, https://www.cftc.gov/LearnAndProtect/ AdvisoriesAndArticles/CFTCGlossary/index.htm#O (last visited November 20, 2020).

[6] *See* Scott Tong, '*Suppliers are Sexy,' But the Real Oil Collapse Story is Demand,* MARKETPLACE (April 3, 2020), https://www.marketplace.org/2020/04/03/why-are-oil-prices-low-covid19/. The World Health Organization declared the coronavirus disease 2019 outbreak a global pandemic on March 11, 2020. *See* https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[7] *See* Figure 1, *infra* at p. 11.

changing technology and pricing models to account for this contingency.[8] As discussed below in Section III.A., while prices in futures contracts of other commodities (such as natural gas and interest rates) traded at negative levels at various points during the last decade, the WTI Contract had not.

In addition to the fundamental factors summarized above, a number of technical factors related to market structure coincided with, and may have influenced, the April 20 negative settlement price. As discussed in more detail below, these factors included the following:

- Generally, in the weeks prior to the expiration of the May Contract, and specifically at the start of the April 20 trading session, OI in the May Contract was much higher than usual.

- The majority of traders holding positions in the May Contract had traded out of their positions prior to April 20. OI fell from 634,727 contracts at the start of the month of April to 108,593 contracts at the start of the April 20 trading session.

- OI was high entering the April 20 trading session, but the number of reportable traders holding positions at expiry on April 21 was consistent with prior contract months.

- Limit order book activity related to multiple products show a decrease in liquidity in the May Contract starting well before April 20.

- During the April 20 trading session, exchange-based control mechanisms (such as dynamic circuit breakers ("**DCBs**")[9] designed to impose pauses in the event of rapid or large price moves) were triggered. Nevertheless, the speed and magnitude of the price moves observed on April 20 in the May Contract (particularly between 1:00 p.m. ET and the end-of-day settlement at 2:30 p.m. ET) were exceptional.[10]

In summary, a variety of factors coincided leading up to, on, and around April 20, when WTI Contract prices fell from $17.73 per barrel at the beginning of the trading session to finally settle at -$37.63 per barrel. An oversupplied global oil market faced an unprecedented reduction in demand due to COVID-19 slowdowns and shutdowns, and the uncertainty over supply, demand, and storage capacity coincided with price volatility in the WTI Contract observed at historic levels that day.

## III. Background

### A. Oil Market and Relationship to WTI Futures

In 2018 and 2019, the United States was the top producer of crude oil in the world.[11] The U.S. assumed this role for the first time in decades primarily as a result of expanded use and development of hydraulic fracturing technology in the Permian region of western Texas and eastern New Mexico, the Federal Offshore Gulf of Mexico, and the Bakken region of North

---

[8] *See* Section III.C., *infra*.

[9] DCBs define an upper and lower limit of how far an instrument is allowed to move in a configured time interval.

[10] *See* Section V.E. Market Integrity Controls.

[11] *See* U.S. ENERGY INFORMATION ADMINISTRATION ("**EIA**"), OIL AND PETROLEUM PRODUCTS EXPLAINED: WHERE OUR OIL COMES FROM (2020).

Dakota and Montana.[12] The increase since 2011 in U.S. production of light sweet crude oil grades has been particularly notable.[13]

Increases in national crude oil production coincided with growing export activity. In December 2015, the U.S. ban on oil exports was lifted, propelling the U.S. to become a leading crude oil exporter.[14] These dynamics further strengthened the importance of the crude oil industry to the overall U.S. economy.

The United States' role as a top crude oil producer and exporter highlights the WTI Contract's function as a global benchmark and the utilization of the oil facilities in Cushing, Oklahoma by domestic oil producers. Alongside the Brent Crude futures contract,[15] the WTI Contract is one of the largest and most widely-traded crude oil futures contracts in the world. The WTI Contract is used by both commercial and non-commercial participants to hedge and manage risk.

As a global benchmark for crude oil, the WTI Contract serves as a key reference rate for pricing physical and financial oil transactions. For example, in the physical oil commercial market, the WTI Contract is used as a reference rate for pricing U.S. domestic and regional crude oil production, which is generally priced at a differential to the WTI Contract price.[16] The WTI Contract is also utilized as a pricing reference rate for imports and exports of crude oil, both to and from the U.S., as well as regional markets in Canada, Mexico, and some Central and South American crude oil markets.[17]

Logistics, operational costs, and other constraints also play a role in setting crude oil futures contract prices.[18] In addition, the ability to standardize pricing of different grades of crude oil against a benchmark across various production, refining, and distribution regions allows the physical cash markets to operate more transparently.[19]

The WTI Contract also serves as the basis for the calculation of a spot contract price, that is, the price at which crude oil or a commodity may be bought or sold for immediate delivery. Physical

---

[12] See EIA, THE UNITED STATES IS NOW THE LARGEST GLOBAL CRUDE OIL PRODUCER (2018).

[13] Id. There are several types of crude oil, each priced according to various characteristics, two of which - density and sulfur content - are key. Density ranges from light to heavy. The level of sulfur content determines whether crude oil is graded sweet or sour. Generally, products such as gasoline and diesel fuel are more readily refined from light and sweet crude oil than from heavy and sour crude oil. See EIA, Crude Oils Have Different Quality Characteristics, (2012).

[14] Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, 129 Stat. 2242. President Obama signed the $1.15 trillion Consolidated Appropriations Act into law, which, among other things, appropriated funds to renewable energy producers while repealing the crude oil export ban.

[15] The Brent Crude futures contract is traded on Intercontinental Exchange ("**ICE**") Futures Europe. Unlike WTI, Brent Crude oil refers to oil from the North Sea.

[16] Secondary benchmarks include WTI Houston, WTI Midland, LLS, Mars, Argus Sour Crude Index, and WCS Cushing/WCS Houston.

[17] See EIA, BENCHMARKS PLAY AN IMPORTANT ROLE IN PRICING CRUDE OIL (2014).

[18] Bottlenecks, access to water, refinery, and export demand can have a marked effect on prices at different locations notwithstanding consistent crude oil quality. See generally EIA, PIPELINE CONSTRAINTS, REFINERY MAINTENANCE PUSH WESTERN CANADIAN CRUDE OIL PRICES LOWER (2018).

[19] Generally, commodities are traded in two separate but related markets: the cash market and the futures market. The cash market refers to the buying and selling of physical commodities where the price and exchange of product occurs in the present. In contrast, the futures market deals with the buying or selling of future obligations to make or take delivery of the commodities at some future date. Commodities can also be traded through swaps. Swaps are outside the focus of this Report.

crude oil cash trades are generally structured either as a differential or a basis through an exchange of barrels ("**barrel back**"), whereby one grade of regional crude oil can be valued, assessed, or exchanged against another grade. Cushing, Oklahoma, is conveniently situated and used for these trades, allowing producers and refiners to leverage the physical cash market and the WTI Contract to price, hedge, transfer, and settle these trades. Outright (non-derivative) commercial transactions often use a calendar month average ("**CMA**") pricing mechanism. This mechanism employs a volume-weighted average price ("**VWAP**") of (i) a crude oil contract such as the WTI Contract, or (ii) a price differential to the WTI Contract across a range of days or a period (typically a calendar month). In the case of CMA contracts referencing WTI Contract prices, the futures contract expires prior to the actual calendar month end. As a result, the contract term for the commercial transaction determines the contract price by computing the VWAP of the remaining period with the following near month in the WTI Contract series.

The WTI Contract also impacts financial markets, as a variety of transactions use the WTI Contract as a key reference price, including international derivative markets, crude oil swap transactions, commodity index transactions, and exchange traded funds ("**ETFs**") in the U.S. and internationally.[20] Many commodity index funds also include the WTI Contract as a component of their index funds. Canadian and Mexican grades of crude oil sold in the U.S. are reliant on the WTI Contract as a benchmark. The Bloomberg Sour Crude Index ("**USCRSRIN**") and Argus Sour Crude Index ("**ASCI**") are among the reference prices used by various nations, such as Saudi Arabia, Kuwait, and Iraq, to set the price of their exports to the U.S. These prices also bear a strong relationship to WTI prices, so much so that the USCRSRIN and ASCI also experienced negative prices on April 20.[21]

As indicated above, the WTI Contract's benchmark status means that a negative price shock can have broad implications. While negative prices in energy markets are not common, they have occurred. For example, negative prices have transpired in a European electricity market, where market commentators concluded that a high renewable energy supply combined with low consumer demand on a Sunday in May 2019 caused electricity prices to go negative in the EPEX SPOT market.[22] Negative prices have also been observed in a U.S. regional natural gas market, where market commentators noted that spot prices for natural gas dropped below zero in March 2019 as increased supply outstripped pipeline capacity near the Waha hub in the Permian Basin of Western Texas.[23]

The robustness, reliability, price formation, and price discovery roles of the WTI Contract are relied upon not only to meet the risk-management and hedging needs of commercial and non-commercial participants in the crude oil markets, but also as part of a critical infrastructure that is

---

[20] An example of such an offering is the Bank of China's wealth-management product issued to the Chinese high net-worth sector and linked to the WTI crude oil prices. This product is named "**Yuányóu Bǎo**" or "**原油宝**").

[21] *See* Bloomberg L.P. for USCRSRIN index, www.bloomberg.com/energy, and Argus Media.com for ASCI, https://www.argusmedia.com/-/media/Files/methodology/argus-sour-crude-index.ashx.

[22] *See* AleaSoft Energy Forecasting, "Negative prices in some European power markets thanks to a high renewables production" (May 28, 2019), https://www.pv-magazine.com/press-releases/negative-prices-in-some-european-power-markets-thanks-to-a-high-renewables-production/.

[23] *See* Scott DiSavino, *Explainer: Why are U.S. Natural Gas Prices in Texas Below Zero?* REUTERS, April 9, 2019, *available at:* https://www.reuters.com/article/us-natgas-pipelines-flaring-explainer/explainer-why-are-u-s-natural-gas-prices-in-texas-below-zero-idUSKCN1RL2NL.

vital for the oil industry and the well-being of regional and state economies, as well as the economy of the U.S. and beyond.[24]

As the main delivery and price settlement point for the WTI Contract, Cushing is a vital transshipment point with many intersecting pipelines and storage facilities, providing easy access to refiners and suppliers. Crude oil flows inbound to Cushing from a number of sources and outbound through dozens of pipelines.[25] Cushing serves as a central hub and way-station allowing the exchange, transfer, or trade of various grades of crude oil and refined products. Cushing's central location between the Gulf Coast, Midcontinent,[26] and Midwest producing basins, and refineries, storage, and export hubs, serves to reduce regional price differences,[27] creating a more uniform pricing structure. As a result, the WTI Contract is the central benchmark for domestic crude oil.[28]

## B. NYMEX WTI Crude Oil Futures

NYMEX's WTI Contract is the most actively traded crude oil futures contract in the U.S. Each contract is for 1,000 barrels of physically-deliverable crude oil that meets specific standards set by NYMEX. The WTI Contract is priced in U.S. dollars and Cushing, Oklahoma, is the delivery point. The WTI Contract series lists for trading monthly futures contracts for the current year, the subsequent 10 calendar years, and two additional months.[29] The contract trades nearly 24 hours a day, Sunday through Friday ET. Daily traded volume averages approximately 1.2 million contracts per day.[30]

---

[24] *See* U.S. DEPT. OF HOMELAND SECURITY & U.S. DEPT. OF ENERGY, CRITICAL INFRASTRUCTURE AND KEY RESOURCES SECTOR-SPECIFIC PLAN AS INPUT TO THE NATIONAL INFRASTRUCTURE PROTECTION PLAN (REDACTED) (2007).

[25] Pipelines deliver the vast majority of domestic crude oil to U.S. refineries. The pipelines connect domestic production regions to Cushing, Oklahoma, reducing logistical constraints and expanding the utility of a large secondary physical market with local storage capability.

[26] The Midcontinent region is a physiographic province that extends from northern Texas and covers portions of Nebraska, Kansas, and Oklahoma.

[27] The crude oil price differential among domestic producing regions has narrowed as a result of infrastructure spending. For example, the price difference between WTI Midland crude oil and WTI Cushing and Magellan East Houston crude oil has narrowed since 2018, as investments have removed most of the pipeline capacity constraints from the Permian region to Cushing. Conversely, WTI Midland prices still trade slightly lower than Houston crude oil prices, suggesting that the region still faces some takeaway constraints in shipping Permian crude oil to the U.S. Gulf Coast.

[28] While WTI is the most widely-known U.S. crude oil stream, other crude oil streams do exist, including (i) Light Louisiana Sweet (LLS) crude, which has become the local benchmark for sweet crude oil in the U.S. Gulf Coast; (ii) US-Gulf Coast Sour and Medium crudes, such as Mars and Poseidon (produced offshore Louisiana); and (iii) Southern Green Canyon produced offshore Texas.

[29] These forward periods are referred to as the "**term structure**" of the WTI Contract markets. The term structure of the WTI markets extends beyond 10 years, allowing participants to buy or sell futures contracts to hedge, risk manage, and invest. *See* https://www.cmegroup.com/trading/energy/crude-oil/light-sweet-crude_contractSpecs_futures.html for additional contract specifications.

[30] The WTI Contract market for April 20 opened on Sunday, April 19 at 6:00 p.m. ET, as Asian markets opened for trading on April 20. NYMEX cycles through a number of pre-defined market states at the open. These include: (1) Pre-Opening: a predetermined time before the trading session opens when participants are able to enter, modify, and cancel orders for the trading day that is going to start shortly. However, no trades are executed at this time; (2) Pre-Opening/No-Cancel: During the Pre-Opening period, the last 30 seconds prior to transitioning to Open. This Pre-Opening/No-Cancel period allows participants to place orders, but it does not allow orders to be canceled or

### 1. Settlement Process

Under NYMEX rules, the nearest of the contract months listed for trading is designated as the active month. However, the active month becomes a non-active month effective two business days prior to the spot month expiration.[31] April 20 was the penultimate day of the May Contract, meaning the May Contract, as the near-month contract, was no longer the active month on April 20. Instead, the June WTI Contract became the active contract on Friday, April 17, two business days prior to the May Contract's expiration day of April 21. As a result, under the NYMEX rule the May Contract (and all months other than the designated active month of June) would settle on April 20, based upon the VWAP of accumulated calendar spread transactions occurring between 2:28 p.m. and 2:30 p.m. ET, the calendar spread settlement period (calendar spreads are explained below).

### 2. Execution Types

There are many trade execution types available in the WTI Contract (*see* Table 1 for a full list of trade and execution types transacted on April 20).[32] Three of the most commonly-used types are relevant to the intraday trading dynamics observed on April 20: outright trades, calendar spread trades, and Trade at Settlement ("**TAS**") trades. Each is described in more detail in the following sections and formally defined on the CME's website.[33]

#### a) *Outright Trades*

Outright trades are the most direct futures trading instrument available. They represent the single purchase or sale of a futures contract for delivery at a single future date. For example, if a trader thinks oil prices will rise, he or she will want to establish a long position in WTI Contracts and might place an outright trade to buy WTI Contracts to do so. This provides an immediate position in the market on a single expiration. The position's profit or loss is calculated based on the movements of that single futures expiration (*e.g.*, the May Contract).

#### b) *Calendar Spreads*

Calendar spread trades are common in WTI Contracts and many other futures contracts. A calendar spread trade involves the simultaneous purchase and/or sale of two different expirations

---

modified. Trades are also not executed during this period; and (3) Markets Open: the period of time when orders are sent and matched in real time, based on the product's trading times.

[31] CME Group Daily Settlement Procedures, Light Sweet Crude Oil (CL) Futures Daily Settlement Procedure, *available at*: https://www.cmegroup.com/confluence/display/EPICSANDBOX/NYMEX+Crude+Oil#NYMEXCrudeOil-ActiveMonth. CME Group Daily Settlement Procedures, Light Sweet Crude Oil (CL) Futures Daily Settlement Procedure, *available at*: https://www.cmegroup.com/confluence/display/EPICSANDBOX/NYMEX+Crude+Oil#NYMEXCrudeOil-ActiveMonth.

[32] Table 1 is found on page 18, *infra*.

[33] For the instrument types available on CME's Globex trading platform ("**Globex**"), *see* https://www.cmegroup.com/confluence/display/EPICSANDBOX/Instrument+Types+Available+on+CME+Globex. Globex is an electronic trading system providing global connectivity to derivatives, including the WTI Contract. CME technology facilitates electronic trading, providing global users with virtually 24-hour access to its markets. *See* https://www.cmegroup.com/globex.html.

in the same contract. Individual positions in the spread are referred to as "**legs**." Calendar spread trades generally involve buying one expiration and selling another in the same contract.

Calendar spreads are priced off the differential between the two contracts. This means a trader holding a calendar spread is less interested in the price of each individual contract expiration than the *difference* between the two.

### c) Trading at Settlement (TAS)

TAS trades are an order type that allows a participant to execute a trade at a spread, or defined number of tick increments, above or below that day's settlement price, at any time during the trading session. TAS has been a trade type for crude oil contracts since 2001.[34] TAS allows market participants to establish new, or adjust existing, positions using the trading day's settlement prices, without actually trading in the market during the closing period.

TAS prices are derived from the settlement price of the underlying futures contract after the settlement is complete. TAS contracts are bought and sold at a price differential from the daily settlement price, so the final price of the TAS contract is the settlement plus or minus a premium or discount. The allowable price increments and differential are defined by NYMEX. TAS trades provide a mechanism to access the markets for traders who want to capture the day's settlement price.

Spread TAS trades are also available in the WTI Contract, operating in a similar manner to outright TAS. Spread TAS trades are priced at a differential from the day's settlement for the given spread. The spread TAS position is then converted into a calendar spread after the daily settlement.

## C. Overview of April 20 Events

On Monday, April 20, between approximately 2:08 p.m. ET and the end of the daily settlement period at 2:30 p.m. ET, the May Contract traded at prices below $0 per barrel for the first time since the inception of the WTI Contract in 1983. On April 20, the May Contract recorded an all-time intraday trading low price of -$40.32 per barrel before a final settlement of -$37.63 per barrel.[35] All other expirations in the WTI Contract settled at positive prices on April 20.[36]

As indicated above, April 20 was the May Contract's penultimate day, one day before the contract's expiration date.[37] The April 20 trading session commenced the preceding Sunday evening at 6:00 p.m. ET, when WTI Contract markets opened in Asia. The May Contract opened

---

[34] *See:* NYMEX Notice to Members No. 41, 1/31/2001. Amendments to NYMEX Rule 6.40B (Trading at Settlement (Pilot Program)): Extension of Pilot Program.

[35] Daily market information is widely available. *See* https://www.wsj.com/market-data/quotes/futures/ CRUDE%20OIL%20-%20ELECTRONIC?mg=prod/com-wsj.

[36] Markets with an upward sloping futures curve are referred to as being in "**contango**." *See* https://www.cmegroup.com/education/courses/introduction-to-ferrous-metals/what-is-contango-and-backwardation.html.

[37] Per the contract specifications, trading terminates three business days prior to the 25th calendar day of the month prior to the contract month, unless the 25th calendar day is not a business day, in which case trading terminates four business days prior. *See* https://www.cmegroup.com/trading/energy/crude-oil/light-sweet-crude_contractSpecs _futures.html.

the session on Sunday at a price of $17.73 per barrel. During the trading session from Sunday's open to Monday's intraday low, the May Contract price ultimately fell by $58.05 per barrel. The price drop was particularly pronounced during a 20-minute period between 2:08 p.m. and 2:28 p.m. ET, when May Contract prices moved from $0 to -$39.55 per barrel, before reaching the all-time low of -$40.32 at 2:29 p.m. ET.

Thus, the settlement price of the May Contract reflected the difference in price, or the "**spread**," between the May Contract and the active[38] June 2020 contract ("**June Contract**") (the "**May-June Spread**").[39] During the April 20 trading session, the May-June Spread widened from the previous trading day's closing spread of -$6.76 to -$58.06 per barrel.

The next trading session, which as is customary began the evening before, was the April 21 trading session. The April 21 trading session began on the evening of April 20. During the April 21 trading session, at approximately 8:04 p.m. ET on April 20, approximately six hours after prices dropped to negative prices during the April 20 trading session earlier that day, the May Contract traded above $0 per barrel.[40] During the overnight session of April 20 to 21, May Contract prices dipped below zero again when the European markets opened, and remained at or near negative prices until U.S. markets opened the morning of April 21. The price settled at expiration on April 21 at a price of $10.01 per barrel. At the end of the April 21 trading session, the May-June spread settled at -$1.56 per barrel, consistent with levels seen in mid-March.

As set forth in detail in the next section, coming into the penultimate trading day for the May Contract, the marketplace appeared to focus increasingly on the imbalance between supply and demand in the crude oil markets and the shortage of crude oil storage, particularly in light of the WTI Contract's terms requiring physical delivery in Cushing.[41] In the weeks prior to April 20, NYMEX announced it was preparing for negative prices in the WTI Contract, issuing a number of advisories and actions in preparation for such an event.[42] On or about April 1, the CME

---

[38] The active month is the nearest of the contract months listed. Two business days prior to the spot month expiration, the active month becomes a non-active month. For example, if the spot month expires on a Friday, the next-listed contract will be considered the active month contract on the Wednesday prior to the spot month expiration. Here, the May Contract transitioned from active to non-active status at 6:00 p.m. ET on April 16, 2020 (the start of the April 17, 2020 trade date).

[39] *See* https://www.cmegroup.com/confluence/display/EPICSANDBOX/NYMEX+Crude+Oil.

[40] Oil markets and trading that day were referenced in a White House press conference that began at approximately 5:39 p.m. ET, before the April 21 session opened at 6:00 p.m. ET on April 20. https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-29/.

[41] *See* International Energy Agency ("**IEA**"), IEA Oil Market Report (OMR), April 2020, *available at*: https://www.iea.org/reports/oil-market-report-april-2020.

[42] On April 3, CME issued a notice entitled "Changes to Price and Strike Price Eligibility Flags for Certain Energy Products," indicating that CME was flagging certain products, including WTI Contracts, for potential negative price trading. *See* https://www.cmegroup.com/notices/electronic-trading/2020/04/20200403.html. On April 8, CME issued a notice entitled "CME Clearing Plan to Address the Potential of a Negative Underlying in Certain Energy Options Contracts," stating that the CME Clearinghouse would provide one day's notice before allowing negative options pricing and strikes, in order to allow the clearing participants to switch to the Bachelier model. *See* https://www.cmegroup.com/notices/clearing/2020/04/Chadv20-152.html. The Black-Merton-Scholes options pricing model, among others, relies on logarithms in the calculations. As a result, models of this type cannot calculate a price for the option if the underlying asset has a negative price. As the Bachelier model does not rely on logarithms for its calculations, it is particularly useful in situations where the underlying asset on which the option is written may have a negative price. On April 13, CME issued a Globex notice announcing that firms wishing to test negative and zero trade, settlement, and strike prices for Crude Oil futures and options on Crude Oil futures could utilize the

advised CFTC staff that CME was taking operational steps toward supporting negative pricing, as needed, for futures and strikes for options for certain energy products traded on CME's Globex, including the WTI Contract. On April 3, 8, 13, and 15, CME issued public notices and communications to its members in this regard.[43]

## IV. Fundamental Factors

This section describes fundamental factors that may have influenced the May WTI Contract price on April 20 based on reporting staff's interim perspective.

### A. Impact of Global Economic Slowdown, COVID-19, and Other Factors

The COVID-19 pandemic significantly reduced demand for crude oil, driving prices lower and increasing the 90-day historical price volatility[44] to extreme levels (*see* Figure 1 below). Between January 2 and February 6, 2020, WTI Contract price levels dropped steadily from $61.18 per barrel to $50.95 per barrel. By March 2, they had fallen to $41.28 per barrel. The price drop from January through February may be attributed, at least in part, to the reduction in crude oil demand in China[45] and other Asian countries, in addition to the expanding concerns of a more widespread impact of the pandemic.



Figure 1: May Contract Performance during March and April 2020. Source: CFTC

---

CME Group New Release testing environment. The April 13 notice also noted that "as an operational step toward potentially supporting negative pricing and strikes," these energy outright futures and options were flagged as eligible to trade at negative prices on the CME market data platform. *See* https://www.cmegroup.com/notices/electronic-trading/2020/04/20200413.html. On April 15, CME issued a further notice to its clearing members entitled "Testing Opportunities in CME's 'New Release' Environment for Negative Prices and Strikes for Certain NYMEX Energy Contracts" about the possibility of negative prices. *See* https://www.cmegroup.com/notices/clearing/2020/04/Chadv20-160.html. On April 20, before WTI Contracts went negative, the CME Global Command Center notified its NYMEX exchange members that certain energy futures contracts, including the WTI Contract, would have no low limits and could trade negative.

[43] *See supra* n. 42.

[44] This volatility measurement was calculated using the standard historical volatility calculation by measuring price dispersion in the May Contract on a 90-days rolling basis.

[45] The International Energy Agency March Oil Market Report stated "Covid-19 (coronavirus) has spread beyond China and our 2020 base case global oil demand forecast is cut by 1.1 mb/d (million bpd). For the first time since 2009, demand is expected to fall year-on-year, by 90 kb/d. In 1Q20, China's demand falls by 1.8 mb/d y-o-y (year-on-year) with global demand down 2.5 mb/d…." *See* https://www.iea.org/reports/oil-market-report-march-2020.

In response to this decline in demand, OPEC Plus members sought to modify their existing agreement to reduce production in early March. However, they failed to do so and dissolved the agreement, further increasing downward pressure on WTI Contract prices.[46]

As the pandemic spread globally, global demand for crude oil fell further, and WTI Contract prices dropped to $28.70 per barrel by March 16.

Subsequently, as WTI Contract prices and Brent futures prices fell to $22.76 per barrel and $31.48 per barrel, respectively,[47] OPEC Plus members reached a historic agreement to cut the world's crude oil output by 9.7 million barrels per day ("**bpd**"), the largest single production cut in history.[48] On April 13, 2020, OPEC Plus announced this agreement prior to crude oil markets opening. Under the agreement, the cuts were to begin on May 1 and extend through the end of June 2020. The cuts would then be tapered to 7.7 million bpd from July 2020 through the end of 2020, and 5.8 million bpd from January 2021 through April 2022. OPEC Plus members planned to meet again in June 2020 to assess whether further actions would be needed.[49]

 The initial price response to the April 13, 2020 OPEC announcement of production cuts was muted, with the WTI Contract prices continuing to decline, although the Brent futures prices increased briefly on Monday, April 13. However, by the end of Friday, April 17, both the WTI Contract and Brent futures prices had further declined, as the production cuts were not slated to begin until May 1. In the near term, crude oil markets were still subject to unconstrained production at a time when global demand had been blunted by the COVID-19 pandemic. At the close on Friday, April 17, the May Contract price fell below $20 per barrel to $18.27 per barrel and Brent futures prices fell to $28.08 per barrel.

### B. Storage Concerns

The COVID-19 pandemic significantly reduced demand in a global crude oil market that was already over-supplied.[50] Although OPEC Plus members had agreed to reduce supply, the production reductions were not expected to commence until May 2020. Accordingly, concerns continued to increase around oversupply of crude oil production and undersupply of crude oil storage availability in the near term. In the U.S., with production unabated, similar concerns arose in late March, becoming increasingly persistent and pertinent as the May Contract approached expiration.[51]

---

[46] *See* Sam Meredith, *OPEC+ Fails to Agree on Massive Supply Cut, Sending Crude Prices to 2017 Lows*, CNBC (March 6, 2020), https://www.cnbc.com/2020/03/06/opec-meeting-coronavirus-weighs-on-oil-demand-as-oil-prices-fall.html.

[47] Near month futures prices at close of business April 9, 2020.

[48] *See* Pippa Stevens, *OPEC and Allies Finalize Record Oil Production Cuts After Days of Discussion*, CNBC (April 12, 2020), https://www.cnbc.com/2020/04/12/opec-and-allies-finalize-record-oil-production-cut-after-days-of-discussion.html#:~:text=OPEC%20and%20its%20oil%20producing%20allies%20on%20Sunday%20finalized%20a,largest%20output%20cut%20in%20history.

[49] At the June meeting, OPEC Plus members decided to extend the first level of production cuts for one month. Further meetings are scheduled for November 30, 2020 and December 1, 2020.

[50] *See* Scott Tong, '*Suppliers are Sexy,' But the Real Oil Collapse Story is Demand*, MARKETPLACE (April 3, 2020), https://www.marketplace.org/2020/04/03/why-are-oil-prices-low-covid19/.

[51] *See* Stanley Reed, *The World is Running Out of Places to Store Its Oil*, THE NEW YORK TIMES March 26, 2020, https://www.nytimes.com/2020/03/26/business/energy-environment/oil-storage.html.

At the start of 2020, there were approximately 49.4 million barrels of oil in floating storage worldwide.[52] While the number fluctuated week-to-week based on economic conditions, global floating storage inflows exceeded 10 million barrels during the week ending March 8, following the collapse of the first OPEC Plus agreement.[53] During the first three weeks of April, when the OPEC Plus members were not subject to any production quotas, the amount of oil in floating storage rose by almost 69 million barrels to about 127 million barrels, a 117% percent increase from the March 29 level (*see* Figure 2). The bulk of that increase, about 40 million barrels, came during the week ending April 19. At this point in time, the May Contract had entered its last three days of trading, referred to as the "**spot period**."



Note: Total barrels of crude oil observed in floating storage globally.

**Figure 2: Global Floating Storage of Crude Oil.**
**Source: Bloomberg Finance L.P.**

Note: Net stocks as a percentage of working storage capacity.

**Figure 3: Weekly Crude Oil Storage at Cushing, OK.**
**Source: EIA**

While U.S. crude oil stockpiles remained little changed in the early stages of the COVID-19 pandemic, stockpiles began to escalate rapidly as the pandemic persisted through the first quarter of 2020. During the week of March 27, crude oil stocks swelled by 13.8 million barrels, compared to an average increase of just three million barrels per week in February and early March.[54] Over the next four weeks, U.S. crude oil stocks increased by 15.8 million barrels per week. By April 17, U.S. crude oil stockpiles were just 17 million barrels short of the all-time peak.[55]

The buildup of oil in storage facilities significantly impacted available storage capacity. As Figure 3 indicates, data from the EIA shows that storage facilities at Cushing had increased from about 50% of capacity in mid-March to approximately 76% of capacity by April 17. Anecdotal press reports[56] during the week leading up to the April 20 trade date suggested that crude oil

---

[52] Source: Bloomberg Finance L.P.

[53] *Id*.

[54] For weekly information on U.S. crude oil stocks, *see* https://www.eia.gov/dnav/pet/pet_stoc_wstk_dcu_nus_w.htm.

[55] *See* EIA, WTI CRUDE OIL FUTURES PRICES FELL BELOW ZERO BECAUSE OF LOW LIQUIDITY AND LIMITED AVAILABLE STORAGE (2020).

[56] *See* Laila Kearney and Devika Krishna Kumar, *No Vacancy: Main U.S. Oil Storage in Cushing is All Booked*, REUTERS, April 21, 2020, https://www.reuters.com/article/us-global-oil-usa-storage/no-vacancy-main-u-s-oil-storage-in-cushing-is-all-booked-idUSKCN22332W, and Myra P. Saefong, *The Oil Market is Running Out of Storage Space and Production Cuts Loom*, MARKETWATCH April 21, 2020, https://www.marketwatch.com/story/the-oil-market-is-running-out-of-storage-options-2020-04-21.

storage was in particularly short supply. Some reports indicated that most, if not all, of the empty storage space had already been committed.[57]

Storage levels at Cushing (*see* Figure 3) are important not only because Cushing serves as the delivery point for the WTI Contract, but also because Cushing is a critical hub in the U.S. network of crude oil pipelines and accounts for a significant percentage of U.S. storage capacity. According to EIA, the 75.8 million barrels of storage capacity in Cushing represents about 44% of all crude oil working storage capacity in the Midwest (as defined by Petroleum Administration for Defense District 2), and about 11% of all commercial crude oil storage in the U.S. as a whole.



Note: Weekly Cushing, OK Ending Stocks
excluding SPR of Crude Oil

**Figure 4: Weekly Cushing, OK Ending Stocks.
Source: EIA**



Note: The spread between the May-June Contract
excluding April 20th

**Figure 5: WTI May-June Spread January to April 2020.
Source: CFTC**

As the May Contract approached expiration on April 21, spreads between the May and June Contracts widened, consistent with an increase in storage capacity concerns (*see* Figure 5).[58] On January 6, 2020, the May-June Spread closed at $0.55 per barrel, indicating the May Contract was trading at a slight premium to the June Contract. The spread later widened, consistent with increasing concerns about the impact on demand of the COVID-19 pandemic. The May-June Spread declined below zero on January 31, hovering between $-0.04 per barrel and -$0.24 per barrel until early March, at which point the spread began to widen rapidly, indicating the May Contract was trading at significantly lower levels than its June counterpart. By the close of trading on Friday April 17, the trading day prior to the April 20 trading session, the spread settled at -$6.76 per barrel, perhaps reflecting market concerns about the lack of available storage for barrels scheduled to be delivered in May, among other factors.

The crude oil industry's demand response to COVID-19 was faster than its supply response, leading to an increase in the oversupply problem in the crude oil markets. Consumption of refined production and crude oil fell at a rapid pace as the global economy slowed while attempts to curtail production lagged behind the dramatic demand loss. This created a buildup of oil that would be available for immediate use, pushing nearby prices lower. At the same time, the expectation that demand would recover in the future kept forward prices elevated. As more oil flowed into storage, particularly at Cushing, near-term prices continued falling, in part to

---

[57] *See* EIA, Low Liquidity and Limited Available Storage Pushed WTI Crude Oil Futures Prices Below Zero (2020).
[58] The widening of spreads meant the price of the May Contract traded at a lower price point to the June Contract.

discourage the continued flow of oil into facilities that were reaching their maximum operational capacity, further widening the spread between the May and June Contracts.

In summary, a wide-ranging set of fundamental factors coincided as crude oil fell over 70% in the days leading up to the April 20 trade date. An oversupplied global crude oil market was hit with an unprecedented reduction in demand, and the uncertainty over both the magnitude and duration of that loss helped push volatility to historic levels. The dissolution of the OPEC Plus agreement in March, coupled with the delay in resuming the production cuts until May, further exacerbated crude oil oversupply concerns, ultimately raising fears about the market's ability to store excess production. These concerns were particularly pressing at the Cushing storage facilities that serve as the delivery point for the physically-settled WTI Contract.

## V.  Trading Activity

This section reviews trading activity in the WTI Contract market leading up to, on, and around April 20. This section covers four main areas: (1) OI in the May Contract and related position changes; (2) aggregated intraday trading activity; (3) liquidity and related order book analysis; and (4) market integrity controls.

Multiple sources of information, collected and maintained by the CFTC, are incorporated into this analysis covering end-of-day positions, aggregated intraday transactions, and market depth information from the electronic central limit order book. DMO and OCE staff sought to review all relevant, reported derivative transactions involving the May Contract during the spot period, April 17 to 21. Staff of those divisions analyzed approximately 500,000 futures transactions (*see* Table 1). Staff also reviewed the use of commodity swaps hedged with WTI Contracts.[59]

**Table 1: April 20 All Traded Sides of May 2020 NYMEX WTI Contract. Source: CFTC**

| Trade Category | Description | Buy Volume | Sell Volume | % of Total |
|---|---|---|---|---|
| Outright Regular | Both the Buyer and Seller are transacting an outright transaction (OR). | 45,292 | 45,292 | 18.3% |
| Outright Implied | Outright trade for one participant is part of a spread trade by the other (OI). | 13,401 | 46,093 | 12.0% |
| Regular Spread Trade | Both buyer and seller are executing a spread trade (SR). | 49,056 | 49,056 | 19.8% |
| Spread Implied Trade | These trades face another leg that is either an outright or another spread (SI). | 46,303 | 13,611 | 12.1% |
| Outright TAS | A type of outright trade that is assigned a price after the settlement price is determined (OT). | 51,867 | 51,867 | 20.9% |
| Spread TAS | Spread trade that is assigned a value after the settlement window (ST). | 25,209 | 25,209 | 10.2% |
| Exchange for Physical | Futures positions exchanged for a physical position (EP). | 11,300 | 11,300 | 4.6% |
| Block Trades | Privately-negotiated trades ex-pit (PB). | 4,143 | 4,143 | 1.7% |
| Undetermined | Undetermined, usually a block trade (UM). | 1,376 | 1,376 | 0.6% |
| Overall Total Sides | | 247,947 | 247,947 | 100% |

### A.  Open Interest in the May Contract

During the weeks prior to the May Contract's expiration through its penultimate trading day of April 20, OI was higher than in previous periods. As Figure 6 shows, the previous 12-month average OI in expiring WTI Contracts peaked around 430,000 contracts. In contrast, OI for the May Contract peaked at 634,727 contracts on April 2.

---

[59] DMO and OCE staff reviewed: reportable futures positions by significant market participants; large trader reporting obtained through Form 40 filings required under CFTC Regulation 18.04; Part 20 information for large traders for physical commodity swaps; Parts 45 and 46 swap data recordkeeping and reporting submissions made by various market participants in swaps and options; and trade information provided by DCMs under Part 16.

Figure 6 also shows that OI continued to increase until about 10 days prior to expiry of the May Contract. OI generally begins to decline around four weeks prior to expiry, when participants traditionally shift their focus away from the front month (here, May) to the next listed futures expiration month (here, June). Participants do so as the expiring contract market shifts to physical settlement and non-commercial participants shift to the more actively traded contract.[60] The need to roll contracts periodically is a common feature of all futures trading due to the expiration cycle.

Figure 7 shows the transition from May to June, with OI reduction observed in the expiring contract. Market participants, including those trading for commodity index funds or ETFs rolled their positions from the May to June Contract during the month of April. By the open of April 20, almost all of the OI in the May Contract was closed out or rolled to future expirations.



Note: OI is the number of WTI Contracts outstanding (1 contract = 1,000 barrels of crude)

**Figure 6: May Contract OI vs. 12-Month Average.
Source: CFTC**

Note: OI transition from the near month May Contract to the June Contract.

**Figure 7: May vs. June Contract OI Transition.
Source: CFTC**

---

[60] By contrast to futures contracts that settle in cash, this physical settlement feature is unique and important to the futures markets, as it provides the basis for commercial participants to hedge their exposures directly to a physically-delivered commodity.

16



**Figure 8: Market Participation of May Contract, March to April 2020 by DCOT Trader Classification. Source: CFTC**

Figure 8 shows the reportable positions held by traders in the May Contract from March to until expiration on April 21.[61] Each panel displays the positions of an aggregated trader type, as reported in the Disaggregated Commitments of Traders report ("**DCOT**"). Traders from all four categories increased positions in aggregate in the contract through the beginning of April before reducing their positions in the second week of April consistent with Figure 8 above. While overall non-commercial participants' share of OI as a percentage of the overall OI decreased throughout April, 'Other Reportable' increased their share of reportable OI from 23.3% to 27.9%. As the May Contract expiration neared, most traders had closed their positions or rolled positions into contracts expiring at a later date, exiting their May Contract positions. OI at the end of the month was a small fraction of peak OI in the beginning of April.

**Table 2: Reportable Trader Positions in May Contract. Source: CFTC**

| | | | Reportable Positions | | | |
| | | | Commercial | | Non-Commercial | |
| Date | Commercial | Non-Commercial | Long | Short | Long | Short |
| | Trader Count | | | | | |

---

[61] *See* https://www.cftc.gov/MarketReports/CommitmentsofTraders/index.htm.

| | | | | | |
|---|---|---|---|---|---|
| April 1 (Open) | 122 | 217 | 211,217 | 298,944 | 356,553 | 304,975 |
| April 20 (Open) | 95 | 78 | 49,430 | 68,482 | 42,601 | 36,782 |
| April 20 (Close) | 59 | 16 | 9,715 | 12,845 | 2,473 | 90 |

Table 2 depicts the number of reportable[62] commercial and non-commercial traders in the May Contract at various points in April, along with their long and short positions. From April 1 to the opening of the April 20 trading session, commercial traders reduced their short positions in the May Contract by 77.1%, while the long positions of non-commercial traders fell by 88.1%. Similarly, 64.1% of non-commercial traders had left the May Contract by the session opening of April 20, the penultimate day of trading.

**Table 3: Beginning OI, Trading Volume and Reportable Initial Trader Counts on April 20, 2020. Source: CFTC**

| Contract | Beginning OI | | Initial Trader Counts | | Trading Volume | |
|---|---|---|---|---|---|---|
| | Contracts | Percent | Distinct Trader IDs | Percent of Total | Contracts | Percent |
| May | 108,593 | 4.5% | 173 | 38.6% | 247,947 | 10.4% |
| June | 538,038 | 22.5% | 352 | 78.6% | 1,319,926 | 55.2% |
| Other | 1,744,304 | 73.0% | 367 | 81.9% | 823,247 | 34.4% |
| Total | 2,390,935 | 100.0% | 448 | 100.0% | 2,391,120 | 100.0% |

Table 3 shows the breakdown of OI at the opening of the April 20 trading session, across different expirations for the WTI Contract. At the start of session trading, most traders had already rolled their positions into the following contracts, and only 4.5% of WTI Contract OI was still held in the May Contract versus all other expirations. Similarly, most of the trading volume on this date occurred in the June Contract. On April 20, out of the 448 distinct traders with reportable positions, 173 held positions in the May Contract. This is roughly half the number of traders who held reportable positions in WTI Contracts for June or later months.

In summary, over the first three weeks of April, and before the May Contract's penultimate trading day, 76.9% of commercial positions, and 88.0% of reportable non-commercial positions were closed out. Consistent with orderly rolls in previous periods, at the start of the April 20 trading session, the vast majority of reportable positions were in later contract months. Similarly, 89.6% of volume on April 20, was in June or later contracts.

---

[62] Reportable and non-reportable positions refer to data collected under the CFTC's Large Trader Reporting Program. At the time of this Report, any trader with a position of 350 contracts or larger in any single futures or option expiration month must report all their positions to the CFTC. Such traders are referred to as "reportable" traders, and traders below the 350-contract threshold are "non-reportable." *See* https://www.cftc.gov/IndustryOversight/MarketSurveillance/LargeTraderReportingProgram/ltrp.html.

**Table 4: Reportable and Non-Reportable Trader Positions on April 20, 2020. Source: CFTC**

| Contract | Beginning OI Contracts | Reportable Long | Reportable Short | Non-Reportable Long | Non-Reportable Short | CFTC Coverage Long | CFTC Coverage Short |
|---|---|---|---|---|---|---|---|
| May | 108,593 | 92,031 | 105,264 | 16,562 | 3,329 | 84.7% | 96.9% |
| June | 538,038 | 506,125 | 504,095 | 31,913 | 33,943 | 94.1% | 93.7% |
| Other | 1,744,304 | 1,683,633 | 1,701,498 | 60,671 | 42,806 | 96.5% | 97.5% |
| Total | 2,390,935 | 2,281,789 | 2,310,857 | 109,146 | 80,078 | 95.4% | 96.7% |

In addition to the reportable positions described above, the May Contract also had non-reportable traders holding positions. Table 4 shows the breakdown of OI at the start of the April 20 trading session, between reportable and non-reportable positions. Across all of the WTI Contract month expirations, 95.4% of long interest and 96.7% of short positions were held by traders whose positions were reported to the CFTC. At the beginning of the April 20 trading session, for the May Contract, 84.7% of the longs and 96.9% of the short positions were held by traders registered with the CFTC. CFTC coverage is the percent of total positions reported to the CFTC by large traders. Between the May 2019 and April 2020 contracts, average CFTC coverage was 89.7% for the long positions, and 91.4% for the short positions on the penultimate day of the maturing WTI Contract.

In addition to the reportable positions described above, non-reportable traders held positions the May Contract approaching April 20. Figure 9 and Figure 10 depict the non-reportable positions in the May Contract over the course of March to April 20. While the magnitude of open non-reportable positions decreased in the second and third weeks of April, the proportion of total May Contract OI in non-reportable positions increased from 4.8% at the beginning of March to a peak of 21.2% of OI in the third week of April.



**Figure 9: Long and Short Non-Reportable Positions as a Percentage of Positions in the May Contract. Source: CFTC**



**Figure 10: Long and Short Non-Reportable Positions in the May Contract. Source: CFTC**

## B. Starting Open Interest on April 20

This section of the Report reviews the significant reduction, or compression, of OI during the April 20 trading session. Relative to recent prior contract months, the amount of OI was significantly higher at the start of the April 20 trading session.



**Figure 11: Penultimate Day Starting OI by Contract. Source: CFTC**

**Figure 12: Penultimate Day OI Reduction by Contract. Source: CFTC**

As Figure 11 shows, the May Contract's OI at the start of the April 20 trading session was 108,593 contracts, approximately 69.4% higher than the trailing 12-month average penultimate day OI of 64,101 contracts. Figure 12 shows the OI reduction on April 20, of approximately 95 thousand contracts, was more than double the average penultimate day reduction of 41,096 contracts observed during the prior 12-month period. NYMEX rules require any contract that remains open after the last day of trading be either settled by delivery or liquidated by an

20

Exchange for Physical Related Product, or "**EFRP**."[63] As such, Figure 13 shows almost all long non-commercial participants, or 54.2% of OI, needed to either exit or roll their contracts prior to the expiry. Of these positions, 15.3% were held by non-reportable traders and 23.6% belonged to the "**Other Reportable**" category.



Figure 13: Starting OI on April 20, 2020 for May Contract, by DCOT Trader Type. Source: CFTC

---

[63] *See* NYMEX Rulebook 200102.F. Termination of Trading, available at https://www.cmegroup.com/content/ dam/cmegroup/rulebook/NYMEX/2/200.pdf at "200102.F." *See also* https://www.cmegroup.com/education/ courses/market-regulation/efrp/what-is-an-efrp.html. An EFRP is a transaction that involves a privately negotiated, off-exchange execution of an exchange futures or options contract and, on the opposite side of the market, the simultaneous execution of an equivalent quantity of the cash product, by-product, related product, or OTC derivative instrument corresponding to the asset underlying the exchange contract. Futures and options on futures must be executed openly and competitively on the exchange. EFRPs are one of the permitted exceptions to this general requirement, as they are privately negotiated away from the exchange and subsequently submitted to CME Clearing for clearing purposes.



**Figure 14: Penultimate Day Reportable Starting OI by Contract Month and DCOT Trader Type from May 2019 to May 2020. Source: CFTC**

At the opening of the April 20 trading session, 27.9% of long reportable OI was held by traders in the "Other Reportable" DCOT category. Figure 14 shows the comparison of opening OI on the penultimate day trading session for contracts for reportable positions expiring May 2019 to May 2020. Compared to previous months, April 2020 observed an above-average portion of OI held by this category whose trailing 12-month average was 14.3%.

Traders in the "Producer/Merchant" DCOT category held below average long positions in the May Contract. This group held 14.7% of reportable OI compared to the 52.5% trailing 12-month average. With respect to short positions, commercial trader positions are in line with their 12-month averages while "Other Reportables" have below average positions.



**Figure 15: Long and Short Non-Reportable Positions on the Penultimate Trading Day by Contract Month, May 2019 to May 2020 Contracts. Source: CFTC**

On the penultimate day of trading, 15.3% of long WTI Contract OI belonged to the non-reportable group. Figure 15 plots the percentage of non-reportable positions at the beginning of the penultimate day of trading, for contracts maturing from May 2019 to May 2020. The trailing 12-month average non-reportable percent is 10.3% for long positions and 8.6% for short positions. The percentage of non-reportable positions is above average, but similar in magnitude to the March 2020 contract.

22



Figure 16: Reportable OI by DCOT Trader Type at Expiration. Source: CFTC

At expiration, positions left open are typically held by commercial producers and merchants, swap dealers, and a few other reportable traders. On April 21, the proportion of reportable OI held by different DCOT trader groups remained largely in line with the contracts that expired in the past 12 months.[64] While the number of open contracts was 69.4% higher than the prior 12-month average on the penultimate day, most of these open positions were closed during the April 20 trading session, reflecting an above average level of compression. At the expiry of the May Contract on April 21, the number of contracts that remained open was 2,427, below the prior 12-month average of 2,815, or less than 1% of the peak OI during that period.

## C. Intraday Trading

This section analyzes aggregated intraday trading activity using a comprehensive transaction dataset collected by the CFTC.[65] The examination starts with a study of intraday prices, followed by volume, and finally, specific facts conditioning on customer account details. Unlike the end-of-day position data, the transaction data can be linked to specific product descriptions within a single expiration. This allows for the option to break down activity within the May Contract into the outright, spread, and TAS components – all of which are considered as distinct instruments on the exchange.

The study begins by looking into realized transaction prices within the day to help guide the analysis of volume and account participation. Figure 17 shows prices corresponding to all outright trades on April 17 and 20 and shows markets declined the day prior to April 20. Furthermore, the downward pressure in the market following the increased volatility and volume in late February and March pushed down the front month contracts, which resulted in a contango market with significant differences between individual expirations. The activity on April 20

---

[64] According to CFTC data, as displayed in Figure 16, market participants classified as commercial producers accounted for 100% of the long OI at the end of April 21 and approximately 57% of the short OI. The remaining 43% of short OI was held by commercial participants classified as swap dealers intermediating commercial interests.
[65] The CFTC collects daily files from trading exchanges for each transaction. While the information covers all trades, the majority are trades executed on an electronic venue.

shows how only the May Contract exhibited negative prices while the remaining expirations held relatively stable.



**Figure 17: Intraday Prices for all Contracts on April 17, 2020 (Left) and April 20, 2020 (Right). Source: CFTC**

The May Contract opened the April 20 trading session at $17.73 per barrel, fell $58.05 to reach an intraday low of -$40.32, before rebounding slightly to settle at -$37.63 per barrel. Prices in the May Contract fell below zero at 2:08 p.m. ET, close to the end of the trading day. Prices trended down for most of the April 20 trading session but the speed of price declines began to accelerate around noon ET. This also impacted the May-June spread, which widened from the previous trading day's closing spread of -$6.76 to settle at -$58.06 per barrel.

Figure 18 and Figure 19 focus on the afternoon of April 20 on the specific products with extreme price movements. This shows that TAS products (the May TAS, June TAS, and the May-June TAS Spread) all displayed extreme prices all hitting their exchange defined limit of 10 ticks and 20 ticks from the settlement price, for outright and spread, respectively.



**Figure 18: Intraday Prices for May Contract (Blue), May-June Spread (Red), May-June TAS Spread (Green); April 20, 2020 12:30 p.m. to 2:45 p.m. ET. Source: CFTC**

Figure 19: Intraday Prices for May TAS Contract (Blue), June TAS Contract (Red); April 20, 2020 12:30 p.m. to 2:45 p.m. ET. Source: CFTC

TAS contracts trade at a differential to the settlement price and are quoted as a premium/discount from the settlement price (*e.g.*, settlement price +0.02). Each contract has established limits for TAS pricing and in the case of the WTI Contract, the TAS limits are +/- 0.10 for outright TAS and +/- 0.20 for spread TAS. Figure 18 and Figure 19 show outright and spread TAS began trading at their minimum limits before prices in the May Contract went negative at 2:08 p.m. ET (2:30 p.m. ET is marked on the charts by the vertical red line).

TAS contracts do not trade at their price limits very often, and the number of TAS contracts traded at the maximum price differentials during the April 20 session in all contract months were well above average. During the April 20 trading session, the number of outright TAS contracts traded at the maximum price limit was more than 70 times higher than all of 2019. Spread TAS did not trade at its price limits at all in 2019 or any other day from January through May 2020, aside from April 20 (*see* Table 5).

Table 5: Summary of NYMEX WTI TAS Trades Executed at Maximum Price Differentials, January 2019 to May 2020. Source: CFTC

| Time Period | TAS Type | Trade Count | Volume |
|---|---|---|---|
| All 2019 | Limit Outright TAS | 49 | 164 |
| All 2019 | Other TAS | 234,432 | 8,106,679 |
| 2020, Jan 31- Apr 17 | Limit Outright TAS | 264 | 941 |
| 2020, Jan 31- Apr 17 | Other TAS | 104,552 | 4,255,584 |
| April 20th | Limit Outright TAS | 1,101 | 11,568 |
| April 20th | Limit Spread TAS | 41 | 241 |
| April 20th | Other TAS | 9,978 | 255,491 |
| 2020, Apr 21 - May 31 | Limit Outright TAS | 412 | 851 |
| 2020, Apr 21 - May 31 | Other TAS | 58,519 | 2,252,190 |

Moving to observed volume, Panel A of Table 6 presents a summary of volume and trades for the six futures products of interest based on the study of observed transaction prices. Comparing volume on April 20, the May TAS Contract has half the volume of the June TAS Contract. The

25

table shows TAS trades tend to have larger trade sizes – a fact that will be explored later in this section.

Table 6: Overview of Transaction Data by Product on April 20, 2020[66]. Source: CFTC

**Panel A: Market Activity Information:**

| Product | Type | Month | Full Day Volume | Trade Count | Avg Trade Size | Volume Before 2:00 p.m. ET | Volume After 2:00 p.m. ET | Volume After 2:00 p.m. % of Total |
|---------|------|-------|-----------------|-------------|----------------|----------------------------|---------------------------|-----------------------------------|
| CLK0 | Outright | May | 58,693 | 40,098 | 1.5 | 50,672 | 8,021 | 13.7% |
| CLTK0 | Outright TAS | May | 51,867 | 1,949 | 26.6 | 48,871 | 2,996 | 5.8% |
| CLM0 | Outright | June | 914,148 | 724,999 | 1.3 | 692,440 | 221,708 | 24.3% |
| CLTM0 | Outright TAS | June | 104,270 | 2,645 | 39.4 | 83,911 | 20,359 | 19.5% |
| CLK0-CLM0 | Spread | May-June | 142,667 | 71,310 | 2.0 | 125,247 | 17,420 | 12.2% |
| CLTK0-CLTM0 | Spread TAS | May-June | 41,836 | 3,616 | 11.6 | 36,188 | 5,648 | 13.5% |

**Panel B: Trader/Account Information:**

| Product | Type | Month | # of Active Accts | Avg Qty per Acct | Avg Trade Size per Acct | Active Only Before 2:00 p.m. ET | Active Only after 2:00 p.m. ET | Active During Full Day |
|---------|------|-------|-------------------|------------------|-------------------------|--------------------------------|--------------------------------|------------------------|
| CLK0 | Outright | May | 1,911 | 78.5 | 1.5 | 1,021 | 400 | 490 |
| CLTK0 | Outright TAS | May | 269 | 385.6 | 34.2 | 172 | 36 | 61 |
| CLM0 | Outright | June | 5,888 | 305.5 | 1.2 | 1,934 | 1,493 | 2,461 |
| CLTM0 | Outright TAS | June | 241 | 865.3 | 46.0 | 105 | 69 | 67 |
| CLK0-CLM0 | Spread | May-June | 490 | 582.3 | 2.2 | 245 | 66 | 179 |
| CLTK0-CLTM0 | Spread TAS | May-June | 99 | 845.2 | 34.0 | 42 | 9 | 48 |

The majority of the volume traded in the May and June Contracts, including outrights, spreads, and TAS was traded prior to 2:00 p.m. ET, meaning most of the volume was traded when prices were positive. The composition of trading accounts and volume in the May Contract on April 20 differed from the June Contract and May-June spread (*see* Table 6). The May Contract saw similar outright and outright TAS volume totals for the full day session, which is not the case for the June Contract or the May-June spread and spread TAS – those products show much higher volumes in non-TAS trading. In terms of magnitude, the June Contract traded over 15 times more volume than the May Contract.

The composition of active accounts in each contract on April 20 reflects the roll period having already largely occurred – over 5,000 accounts actively traded in the June Contract while about

---

[66] CME product codes are used to differentiate products in this table (*e.g.*, "CLK0"). The product types and contract months associated with each code are defined in this table not repeated in subsequent tables. Spread numbers include the volume for each leg and also include each leg as a trade. For example, a 200-lot CLTK0-CLTM0 trade would appear in the table as 400 contracts for volume (200 for each leg) and 2 trades (one trade for each leg).

1,900 traded in the May Contract (*see* Table 6). The May Contract had a higher proportion of accounts active only before 2:00 p.m. ET compared with the June Contract, which had more accounts active during both the pre- and post-2:00 p.m. ET periods. The number of accounts actively trading TAS was also much smaller than the number of accounts trading outrights.

Figure 20 and Figure 21 show intraday volume aggregated at one-minute intervals for the six futures contracts of interest. These figures demonstrate several things. For example, the figures demonstrate the importance of the settlement period for the active June Contract, relative differences between the TAS contracts, volume in the June TAS Contract being concentrated closer to the settlement window, and very little activity over the day in the May Contract.



**Figure 20: Volume of Futures Linked to the May Contract on April 20, 2020. Source: CFTC**



Figure 21: Volume of Futures Linked to the June Contract on April 20, 2020. Source: CFTC

Panel B of Table 6 provides a summary of account level activity by product. Most accounts are in the June Contract relative to the May Contract. Accounts in TAS tended to have larger quantity and larger average trade sizes.

### D. Liquidity & Order Book Analysis

This section considers market depth information from the central limit order book.[67] DMO and OCE staff utilized the information made available by the CME to market participants to test trading models and feed into near real-time trading algorithms. This data is useful in exploring market liquidity because the electronic limit order book represents all available liquidity (visible resting limit orders) and provides multiple price levels on both sides of the market.

For this analysis, daily market depth files, for dates April 13-20, 2020, are collected from Vertex Analytics for the May Contract, the June Contract, the July Contract, the May-June Spread, the June-July Spread, the May TAS Contract, the June TAS Contract, the May-June TAS Spread, and the June-July TAS Spread.[68] The raw data from Vertex is a collection of updates to the limit

---

[67] A limit order book is a collection of open limit orders sequenced by market side (buy vs. sell), entry time, and price level. For example, focusing on the best quotes, each will have a depth reflecting the number of contracts available at the price to buy or sell. The "**market**" is commonly defined by the best bid and ask price level and often the difference between these, in the most actively traded markets, is equal to the minimum tick size. Market participants use this information to assist with trading decisions as well as back-test trading strategies and trading algorithms. *See* https://www.cmegroup.com/market-data/datamine-historical-data/. This information is commonly used to study market liquidity. A limit order book with lots of depth at both best quotes is considered liquid as a market participant can buy or sell with no price impact. During times of elevated volatility, depth often decreases and the bid-ask spread is expected to widen, reflecting reduced liquidity.

[68] Vertex is a technology company focused on providing easy access and interactive visualizations of every message from the CME. The subscription allows for direct download of daily files across all the products traded on the CME. Once downloaded, raw message data is processed to rebuild the top ten levels of the limit order book. *See* https://vertex-analytics.com/.

order book and are then used to construct the full 10-deep book of resting depth at all 20 price levels.[69] Once the book is constructed, it is possible to select any point during the day and observe the current price levels and how many contracts are available for trade.

Table 7 provides total counts on the number of updates to the limit order book conditional on trade date and product. Each time a new limit order arrives, or an existing limit order is canceled or modified, an update message is created and made available for market participants to pick up and process. Therefore, the number of updates can serve as a proxy for activity in the limit order book. To provide additional details, counts are provided for the full day (Panel A), an hourly average (Panel B), an interval prior to the settlement window (Panel C), and during the 2-minute settlement period (Panel D).

Focusing on outrights, there was a general decreasing trend in activity in the May Contract, while there was an increasing trend in activity in the June Contract between April 13 and April 20. This is a common pattern in the market during roll periods as the nearby contract approaches expiration and traders migrate to the next contract with the most trading activity. The update counts, during our short sample of dates, show the TAS order book was updated less frequently than outright and spread markets, which is in line with observed transactions and the number of market participants (*see* Table 6).

**Table 7: Activity in the Limit Order Book by Date and Product. Source: CFTC**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | **Number of Book Updates** | | | |
| **Trade Date** | **CLK0** | **CLTK0** | **CLM0** | **CLTM0** | **CLK0-CLM0** | **CLTK0-CLTM0** |
| **Panel A: Full Day** | | | | | | |
| 4/13/2020 | 2,471,378 | 27,070 | 2,081,084 | 24,233 | 748,602 | 9,924 |
| 4/14/2020 | 2,356,864 | 24,649 | 1,823,570 | 25,566 | 862,084 | 9,165 |

---

[69] There are approximately 41 million observations in the sample.

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 4/15/2020 | 2,009,674 | 24,143 | 2,266,737 | 20,145 | 849,938 | 10,241 |
| 4/16/2020 | 1,491,536 | 19,608 | 2,208,738 | 17,983 | 858,685 | 7,506 |
| 4/17/2020 | 970,846 | 16,083 | 3,198,937 | 26,954 | 890,589 | 5,971 |
| 4/20/2020 | 409,676 | 4,281 | 4,746,611 | 11,123 | 536,066 | 3,166 |
| **Panel B: Average/Hour (9:00 a.m. to 2:00 p.m. ET)** | | | | | | |
| 4/13/2020 | 197,614.0 | 154.8 | 173,028.4 | 98.2 | 54,407.2 | 46.6 |
| 4/14/2020 | 212,473.2 | 119.8 | 182,269.4 | 79.0 | 84,011.8 | 67.2 |
| 4/15/2020 | 178,575.8 | 625.6 | 219,473.4 | 64.8 | 71,390.0 | 16.4 |
| 4/16/2020 | 141,525.0 | 53.8 | 203,114.0 | 137.0 | 64,216.2 | 19.4 |
| 4/17/2020 | 88,869.2 | 42.0 | 270,470.2 | 122.8 | 63,594.4 | 19.6 |
| 4/20/2020 | 39,207.0 | 495.0 | 397,187.0 | 547.0 | 40,648.4 | 377.8 |
| **Panel C: 2:00 p.m. - 2:28 p.m. ET** | | | | | | |
| 4/13/2020 | 113,657 | 448 | 103,783 | 297 | 59,462 | 153 |
| 4/14/2020 | 164,756 | 930 | 141,796 | 317 | 80,075 | 323 |
| 4/15/2020 | 107,712 | 396 | 149,885 | 302 | 66,078 | 178 |
| 4/16/2020 | 77,959 | 181 | 127,724 | 432 | 38,719 | 85 |
| 4/17/2020 | 33,996 | 146 | 202,658 | 449 | 54,627 | 127 |
| 4/20/2020 | 17,344 | 499 | 328,506 | 2,033 | 11,942 | 1,058 |
| **Panel D: 2:28 p.m. - 2:30 p.m. ET** | | | | | | |
| 4/13/2020 | 47,554 | 25,485 | 33,242 | 23,231 | 17,645 | 9,345 |
| 4/14/2020 | 55,394 | 22,633 | 38,835 | 24,490 | 18,612 | 8,209 |
| 4/15/2020 | 26,599 | 17,379 | 27,131 | 19,293 | 18,432 | 9,933 |
| 4/16/2020 | 28,410 | 18,928 | 29,741 | 16,553 | 10,157 | 7,251 |
| 4/17/2020 | 22,077 | 15,454 | 48,525 | 25,558 | 10,193 | 5,688 |
| 4/20/2020 | 1,157 | 17 | 81,186 | 5,632 | 294 | 6 |

Table 8 shows resting depth at the best bid and ask quotes across our sample of dates and contracts. Comparing the May and June Contracts, this shows the natural change in depth during the roll period as the market transitions to the new actively traded contract. The May Contract shows a 50 percent decline between April 13 and April 20. There is a larger decrease observed in the May-June Spread. TAS markets display a significant quantity of contracts at the best quotes with often large imbalances – a pattern not observed in outright and spread markets in this sample period. The largest imbalance observed in the June Contact occurs on April 20. The differences between outrights and TAS may relate to the larger TAS trade sizes observed in Table 6.

**Table 8: Resting Depth in the Limit Order Book by Date and Product (1-minute Average). Source: CFTC**

| CLK0 | CLTK0 | CLM0 | CLTM0 | CLK0-CLM0 | CLTK0-CLTM0 |
|---|---|---|---|---|---|

| Date | Best Bid | Best Ask | Best Bid | Best Ask | Best Bid | Best Ask | Best Bid | Best Ask | Best Bid | Best Ask | Best Bid | Best Ask |
|------|----------|----------|----------|----------|----------|----------|----------|----------|----------|----------|----------|----------|
| 4/13/20 | 8 | 8 | 10,950 | 8,623 | 5 | 5 | 6,363 | 5,986 | 16 | 15 | 2,062 | 3,824 |
| 4/14/20 | 12 | 11 | 11,691 | 22,724 | 8 | 6 | 7,680 | 7,796 | 17 | 18 | 6,750 | 6,619 |
| 4/15/20 | 10 | 11 | 5,255 | 5,127 | 8 | 7 | 3,598 | 4,243 | 16 | 26 | 924 | 4,483 |
| 4/16/20 | 7 | 8 | 5,659 | 3,316 | 9 | 9 | 8,950 | 11,904 | 12 | 15 | 1,766 | 4,578 |
| 4/17/20 | 4 | 6 | 5,867 | 3,692 | 11 | 10 | 10,280 | 8,138 | 14 | 10 | 1,341 | 4,607 |
| 4/20/20 | 4 | 5 | 1,169 | 10,402 | 12 | 11 | 5,063 | 21,305 | 4 | 3 | 949 | 2,976 |

Figure 22 and Figure 23 shows intraday depth at the best quotes for outrights and TAS, respectively. For comparison, information from April 17 is displayed (left side). For most of that day, the May Contract depth at the best quotes was close to five contracts, but there were intervals within the day with large imbalances, specifically on the sell side.

Figure 23 shows the imbalance between the bid and ask depth in the TAS contracts on April 20, which was due to the depth at the best ask being relatively larger than the depth at the best bid. As TAS markets pushed toward the -10-tick limit, this imbalance decreased.



**Figure 22: Limit Order Book Depth at Best Quotes (Bid=Blue; Ask=Red) on April 17 and 20 – Outrights. Source: CFTC**



**Figure 23: Limit Order Book Depth at Best Quotes (Bid=Blue; Ask=Red) on April 17 and 20 – TAS. Source: CFTC**

Besides resting depth, the reconstructed limit order books may allow for study of the bid-ask spread, a common measure of market liquidity.[70] Figure 24 shows intraday bid-ask spreads for the May and June Contracts by trade date. From the upper panel, we see the changes occurring during the week prior to April 20. As observed above, as activity moved from the May Contract to the June Contract, the bid-ask spreads increased in the May Contract and decreased in the June Contract. On April 17, the bid-ask spread in the May Contact was significantly higher than the bid-ask spreads observed in previous days.

The lower panel of Figure 24 shows the intraday bid-ask spread in the May Contract on April 20 and shows an increase in the bid-ask spread (the June Contract's bid-ask spread was similar to its pattern observed on April 17). The increase in the bid-ask spread started at noon and remained elevated for the rest of the afternoon.

---

[70] The bid-ask spread is computed by taking the difference between the best ask and the best bid quoted prices and then dividing by the minimum tick size, which results in a bid-ask spread measured in number of ticks. A reconstructed limit order book allows one to compute the bid-ask spread at all instances of a change in either best quote. Using the bid-ask spread at each book update and the duration between updates, a time-weighted measure is computed to more accurately capture the bid-ask spread in a market.



**Figure 24: Intraday Bid-Ask Spreads by Date and Product. Source: CFTC**

Next, we turn to examining resting depth away from the best quotes. The quantity of resting liquidity at levels deeper in the book provides additional information related to the amount of buying and selling interest away from the best bid and ask prices. Furthermore, knowledge of depth at deeper levels typically provides traders with information on price slippage if their demand exceeds depth at the best quotes. Figure 25 contrasts depth across the top five book levels on April 13 and April 20 in the May and June Contract. We can see the shift in depth over the week – the May Contract depth has significantly decreased across all book levels and became inverted as the largest depth was at the best quotes.

33



**Figure 25: Average Depth by Book Side and Level on April 13, 2020 (Blue) and April 20, 2020 (Red) – Outrights[71].**
**Source: CFTC**

---

[71] Figure reflects the average quantities resting on the top five book levels, which should be distinguished from the average quantities resting on the top five price levels.

Figure 26 extends the prior discussion and focuses attention on depth of the book in the two TAS markets for the May and June Contracts. Unlike the outright contracts, TAS order books appear to have most available liquidity at the first two levels of the limit order book.



**Figure 26: Average Depth by Book Side and Level on April 13, 2020 (Blue) and April 20, 2020 (Red) – TAS. Source: CFTC**

### E. Market Integrity Controls

The CME's electronic trading platform provides several types of market integrity controls designed to ensure fair and efficient trading for all participants. The market integrity control mechanisms are designed to strike a balance between maintaining orderly markets and ensuring price formation and price discovery are not hindered by limits or controls that stop markets from functioning. These exchange-based trading controls are applied to all markets that trade on the Globex.[72] These controls are an important safeguard for modern electronic trading.

An example of a control is the DCB, which sets a range in which prices can move and are reset continuously on a rolling 60-minute lookback window. If markets move +/- 15% in that time, a two-minute halt is initiated. Another is velocity logic ("**VL**"), a control designed to limit significant price movements in an extremely small time increment.[73]

---

[72] *See* CME Market Integrity Controls, *available at*: https://www.cmegroup.com/confluence/display/EPICSAND BOX/Market+Integrity+Controls.

[73] VL monitors potential significant price movements in extremely small time increments on Globex. VL works in conjunction with price banding to preserve the integrity of markets. Whereas price banding monitors futures price movements that would go too far, VL monitors futures price movements that would go too far, too fast. VL is calculated using the highest and lowest prices within a predetermined lookback window.

Several of the market integrity controls triggered in and around the May Contract trading on April 20. As Figure 27 indicates, market integrity controls began to trigger shortly before 1:00 p.m. ET as the price of the May Contract approached zero and continued to trigger while prices traded below zero.

In total, on April 20, over 30 DCBs were triggered in the May Contract and more than 10 DCBs were triggered in the May-June Spread contract. Over 15 other DCBs were triggered in various spread contracts and multiple VL events also affected various other related crude oil contracts.

In the WTI Contract, DCBs will halt the overall WTI Contracts market if there is a trigger event in the active contract. On April 20, the active contract was the June Contract. To the extent a non-active period or underlying spreads are triggered, the market only halts for that particular contract. VL also has a similar method in the WTI Contract where the specific contract is placed in a reserve status when a non-active VL is triggered.[74]



**Figure 27: Sample of May Contract Market Control Events on April 20, 2020. Source: CFTC**

# VI.   Conclusion

This Report describes interim observations concerning certain fundamental factors as well as certain trading activity related to the WTI Contract leading up to, on, and around April 20, 2020.

---

[74] VL introduces a momentary suspension in matching by transitioning the futures instrument(s). When a lead month futures instrument triggers an event, unless the lead month futures instrument belongs to an equities, metals, or FX instrument group when the entire group transitions into the Pre-Open state, the WTI Contract VL will transition that underlying contract into the Reserved/Pause state.

An oversupply of global crude oil, along with unprecedented reduction in demand due to the COVID-19 pandemic, increased concerns about the availability of storage for excess production. These fundamental factors coincided with a number of technical factors related to trading and liquidity which saw the May Contract trade and settle at negative prices on April 20.

Over the first three weeks of April, 2020 – and before the penultimate trading day – over 77% of commercial positions, and 88% of non-commercial positions, were closed out. At the start of the April 20 trading session, the vast majority of both positions were in later contract months. Roughly 90% of volume on April 20 was in June or later contracts.

The majority of the volume traded in the May and June Contracts, including outrights, spreads, and TAS, was traded prior to 2:00 p.m. ET, meaning most of the volume was traded when prices were positive. Limit order book activity related to multiple contracts show a decrease in liquidity in the May Contract, and this decrease started well before April 20.

Several of the market integrity controls triggered in and around the May Contract trading of April 20. In total, over 30 DCBs were triggered in the May Contract and more than 10 DCBs were triggered in the May-June Spread contract. The speed and magnitude of the price moves observed on April 20 in the May Contract, particularly between 1:00 p.m. ET and the end-of-day settlement at 2:30 p.m. ET, were exceptional. The market integrity controls triggered in the May Contract did not halt trading in the active June Contract or the WTI market as a whole.

The observations concerning certain fundamental factors discussed and various CFTC and market data preliminarily analyzed in this Report provide the public with an understanding of the WTI Contract market and aggregated trading activity leading up to, on, and around April 20.

**Exhibit 2**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

MISH INTERNATIONAL
MONETARY INC., on behalf of itself
and all others similarly situated,

*Plaintiff,*

v.

VEGA CAPITAL LONDON, LTD.,
Individual A, Trader 1, Trader 2
Trader 3, Trader 4
Trader 5, Trader 6
Trader 7, Trader 8
Trader 9, Trader 10
Trader 11, Trader 12
and JOHN DOES 1-100,

*Defendants.*

Case No. 1:20-cv-04577

## SECOND AMENDED CLASS ACTION COMPLAINT

### Corrected Copy

## FILED UNDER SEAL

## ERRATA

| Paragraph | Change |
|---|---|
| i-iii | Insert table of contents. |
| *passim* | Fixed internal citations. |
| 35 | Replaced "that Starmark is the principal of Vega" with "and has stated for years that the website is 'currently in development'" |
| 36 | Changed ███████ to ███████ |
| 219-220 | Deleted "that day" |
| 235 | Changed "Anthony Gibson signed" to "It was also ▪Trader 1▪ partner, Anthony Gibson who signed" |
| 239 | Added ███████ |
| 239(g) | Replaced ███████ with ███████ replaced ███████ with ███████ deleted ███████ |
| 239(f) | Changed ███████ to ███████ |
| 240 | Changed ███████ to ███████ changed ███████ to ███████ |
| 240-242 | Changed ███████ to ███████ |
| 242 | Changed ███████ ▪Individual A▪ ███████ ▪Individual A▪ |
| 246 | Added "typically" before "placed" and deleted "own" before "sub-account" |
| 247 | Changed "Vega enter trades on behalf of Vega, or" to "Vega to enter trades, or" |
| 258 | Changed "also" to "at times" |
| 259(h) | Added an open quote before ███████ |
| Heading 3 | Deleted "either" |
| 295 | Added "to" after "knowledge simultaneously" |
| 305 | Added an apostrophe after VTDs |
| 311 | Added ▪Trader 10▪ ███████ positions in the May Contract had an extremely high minute to minute correlation with other VTDs, *e.g.*, .965 ▪Trader 9▪ .965 ▪Trader 3▪ .960 ▪Trader 5▪ and .946 ▪Trader 4▪ ▪Trader 4▪ after "21-25" |
| 319-322 | Changed "May 20th" to "April 20th" |
| 329, 332 | Changed "trading" to "positions" |
| 359 | Changed ".981" to "9.81" |

# TABLE OF CONTENTS

SUMMARY OF ALLEGATIONS..…………………………………………………………1

JURISDICTION AND VENUE..…………………………….…………………………..9

PARTIES.………………………………………………………………………………11

    A.    Plaintiff.……………………………………………………………………11

    B.    Defendants.…………………………………………………………………12

BACKGROUND.………………………………………………………...……………31

    A.    Commodity Futures: How Futures Contract Trading Profits Or Losses Are Determined Using The May Contract As An Example…………..………31

    B.    The WTI Contract.……………………………………...………………35

    C.    Buying Pressure, Selling Pressure, Cumulative Net Sales And Cumulative Selling Pressure.……………………………………….……..……………38

UNDERLYING ALLEGATIONS.………………………………………..……………42

    A.    The Abuse Of TAS Transactions To Manipulate Prices…………..….……..42

    B.    Defendant Trader 1 Background and Formation of a Group That Could Execute a TAS Manipulation.…………………………………..………………..45

    C.    The Vega Defendants Manipulative Depression of May Contract Prices…....…48

    D.    The Vega Trading Defendants Combined, Conspired and Worked In Concert For The Purpose of Depressing The Price Of The May 2020 WTI Crude Oil Futures Contract On April 20, 2020……………………………51

    E.    Net Cumulative Aggressive Sales Pressure…………………………….……..64

    F.    High Degree Of Communications Among Most Vega Defendants And The Common Plan For Everyone To Be Short And Use Manipulative "Ammo" At The End Of Trading……………………………………………..71

    G.    The ICE WTI Crude Oil Futures Contract Price Is Explicitly Determined By The Price Of The NYMEX WTI Crude Oil Futures Contract And Numerous Vega Trading Defendants Profited On The ICE Due To Artificially Depressing The May Contract Price On The NYMEX…………..…84

i

H.    Vega Also Made Its Sales In An Aggressive Manner............................87

NEW ALLEGATIONS MADE PURSUANT TO THE ORDER....................................88

I.    The Extensive Interconnections, And Formal Contract Among Vega, ▆ And
The Vega Trading Defendants……………………………………...……………88

    A.    The Extensive Interconnections……………………………...………………88

        1.    The Profit Interests Of Defendants Vega And **Individual A** In ▆..............88

        2.    The Formation of Vega…………………………………………...93

            a.    During 2015 And 2016, The United Kingdom Announces
And Implements Enhanced Prohibitions of Manipulation..........93

            b.    The Enhanced Protections Against Manipulation Created
Greater Financial And Legal Risks For Firms Which Carried
Accounts For Manipulators…………………………………96

            c.    Vega's Apparent Founder, Anthony Gibson, Is A Business
Partner With Defendant **Trader 1** Including In
▆.……………………………………96

            d.    Vega's High Turnover Of Four Owners In Three Years
Before **Individual A** Become Sole Shareholder…………….…..…………98

    B.    The Written Agreement Between And Among Vega, ▆ And The
Vega Trading Defendants……………………………………………………..98

    C.    In Its "Market Facing" Agreement With GH Financials, Vega Expressly
Agreed That It Was The Principal For Each Trade By A Vega Trading
Defendant And That The Vega Trading Defendants Were Acting As Vega's
"Agent" Or Otherwise Acting For Or On Behalf Of Vega……………………..101

        1.    Long Before April 20, 2020, Defendants Vega And **Individual A** Well
Knew That The VTDs Traded In Unison To Manipulate Prices………104

        2.    The Vega Trading Defendants Engaged In Coordinated Trading
In WTI Crude Oil Futures Contracts A Month Prior To Engaging
In Substantially Similar But More Extreme Conduct On
April 20, 2020……………………………………………………………109

3.      Based On The Vega Trading Defendants' Activities On March 19, 2020 And Other Reasons, Defendants Vega Capital And ▮Individual A▮ Knew That The Vega Trading Defendants Were Engaged In Manipulative Trading And Affirmatively Took Steps To Facilitate The Manipulation…………………………..………116

4.      The VTDs Stalked Futures Contracts To Determine Those Most Vulnerable To Manipulation, And Then Blitz The Market By Making Trades In Unison To Move Prices……………………………..120

5.      Defendants Vega And ▮Individual A▮ Actively Facilitated The April 20th Manipulation, Profited Therefrom, And Specifically Intended That The Trades Which Vega Was Making In The May Contract Would Manipulatively Depress May Contract Prices……………...…………..121

6.      Defendant ▮Trader 7▮……………………….…………..………127

7.      Defendant ▮Trader 11▮……………………………….…………129

CLASS ALLEGATIONS…………………………………………………………132

INJURY TO PLAINTIFF AND CLASS MEMEBERS……………………….……………135

AS AND FOR A FIRST CLAIM AGAINST ALL DEFENDANTS………………………..135

AS AND FOR A SECOND CLAIM AGAINST ALL DEFENDANTS………………………137

AS ANF FOR A THIRD CLAIM AGAINST ALL DEFENDANTS…………………………140

AS AND FOR A FOURTH CLAIM AGAINST ALL DEFENDANTS………………………141

AS AND FOR A FIFTH CLAIM AGAINST ALL DEFENDANTS………………...………..142

AS AND FOR A SIXTH CLAIM AGAINST ALL DEFENDANTS…………………..………144

AS AND FOR A SEVENTH CLAIM AGAINST ALL DEFENDANTS………………..………145

AS AND FOR AN EIGHTH CLAIM AGAINST ALL DEFENDANTS……………..………147

PRAYER FOR RELIEF………………………………………………………..………148

DEMAND FOR JURY TRIAL……………………………………………….…………..150

Highly Confidential

Pursuant to this Court's Order (dated March 31, 2022, Dkt. No. 117) ("Order"), Plaintiff complains[1] of Defendants (including in the new allegations made at paragraphs 37, 55, 57, 209-333 pursuant to the Order) as follows:

## SUMMARY OF ALLEGATIONS

1.      From at least as early as April 2020, the Vega Defendants[2] combined, conspired, and agreed to depress on April 20, 2020 prices of the May 2020 West Texas Intermediate ("WTI") Light Sweet Crude Oil futures contract ("May Contract") which is traded on the Chicago Mercantile Exchange ("CME") Globex platform. See ¶¶ 30-59 (specifying the Vega Defendants).

2.      Though not a necessary condition to the manipulation of a futures contract price, each of the following steps is a sufficient condition to manipulate a futures contract price.

a.      A combination of market participants exerts significant cumulative net selling pressure on a futures contract over a specific time period. Cumulative net selling pressure means a market participant's sales of a futures contract minus their

---

[1] Plaintiff complains based on personal knowledge as to ¶29 and information and belief as to all other paragraphs. Plaintiffs' information includes CME records, Vega records produced to the CME, news articles, the materials referenced and alleged in this Complaint, and the investigation of counsel.

[2] As used in this complaint, the "Vega Defendants" means VEGA CAPITAL LONDON, LTD., Individual A Trader 1 Trader 2 Trader 3 Trader 4 Trader 5 Trader 6 Trader 6 Trader 8 Trader 9 Trader 10 Trader 11 Trader 12 and Vega Defendant John Does 1-4.

purchases of such futures contract during a specified time period. See ¶ 129 below.

Here, Defendants agreed to and did abuse the Trade at Settlement ("TAS") feature

of the May Contract to build up their cumulative net selling pressure on the May

Contract.[3] See ¶129.

      b.    A market participant uses their sales in a futures contract as

manipulative "ammo". See ¶ 103. "Ammo" has been recognized by the United

States CFTC and the United Kingdom Financial Control Authority ("FCA") as a

term used by manipulators. See ¶¶104-105; and fn. 5-6. The term "ammo" signifies

possession of the ability to make a quantity of transactions in a manner in which

the transactions will depress or inflate futures contract prices. See ¶¶ 103-105.



---

[3] As recently stated by Commodity Futures Trading Commission ("CFTC") Commissioner Dan Berkovitz on November 24, 2020: "The potential for TAS trading to artificially affect the settlement price of a contract is well known; indeed, the CFTC has brought two enforcement cases based on the use of TAS to manipulate the price of futures contracts." See https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement112320a. Commissioner Berkovitz also expressed his view that the CFTC should look into the TAS trading activity in its investigation of the precipitous drop and rebound of WTI oil trading prices on April 20-21.

Highly Confidential



[Emphasis added].  Based upon the Vega Trading Defendants' actual conduct, Plaintiff has good grounds to believe and does allege that Defendants agreed to and did use their sales as manipulative "ammo" to depress May Contract prices from approximately 12 pm on April 20 through the TAS settlement of the May Contract by 1:30 pm on that day. See ¶145(c)-(e) below.

c.      A market participant is responsible for an increasing share of the net sales made by the entire market, including at times when the market participant already has exerted substantial cumulative net selling pressure on such futures contract. Here, after Defendants had built up substantial net selling pressure on the May Contract, Defendants engaged in a frenzy of selling which greatly increased their sales per minute and caused their percentage of the entire market's sales to exceed 30% in this worldwide market. See ¶ 145.

d.      A market participant builds up a significant cumulative net "aggressive" sales pressure on a futures contract over a specified time. See ¶ 146-

Highly Confidential

164 (alleging the CME's definition of "aggressive" transactions and Defendants'
buildup of their significant cumulative net aggressive sales pressure).

3.      Although any one of the above steps would have sufficed to
manipulatively depress prices, Defendants agreed to and did engage in **all** of the
foregoing types of manipulative steps and thereby greatly depressed May Contract
prices on April 20.

4.      Regarding Defendants' combination and agreement to depress prices,
the manipulation of an entire market is something that persons can better
accomplish working in a combination and pursuant to an agreement rather than
individually. Yet even the broadest agreements and best manipulations entail risks.
Here, the Vega Trading Defendants each committed their capital to Vega to
guarantee one another's losses.  Such Defendants effectively acted as co-
guarantors to Vega of one another's financial outcomes. This is exactly the type of
agreement which would facilitate joint efforts to manipulate prices as well as
Vega's involvement with such efforts.

5.      Also indicating Defendants' agreement, Defendant Trader 1 , in
his own words, ███████████ all but two of the other Vega Trading Defendants.
Further indicative of an agreement, the five Vega Trading Defendants who build
up the largest May Contract short positions, did so in a manner that is extremely
highly correlated on a minute-by-minute basis with one another as well as with

Defendant ███Trader 1███ buildup of his May Contract short position. See ¶¶142-43. This is extremely unlikely to happen by independent decision making or freak occurrence. It is highly consistent with a very carefully executed agreement to build cumulative net selling pressure on the market in a manner which will succeed in depressing prices.

6.      Confirming that these multiple high correlations among many Defendants' May Contract short positions did not result from chance, there was a high degree of communications among Vega Trading Defendants on April 20. This includes communications in which they coordinate trades (which helps to explain the high degree of correlation in the growth of their positions). They also communicated to track what one another was doing and make sure they were going short May Contracts and long TAS contracts to build up net selling pressure on the May Contract. See below.

7.      Likewise, when Defendants exulted in the successful outcome of their manipulation after the close of trading in the May Contract on April 20, Defendant ███████████████████████████████████████

Trader 9

███████████████████ See ¶ 179 below. In fact, the Vega Trading Defendants had used the foregoing four means of manipulation (alleged at ¶2 a-d) to overwhelm and "blitz" through the limited buying pressure in the May Contract. As the Vega Defendants' cumulative net selling pressure and manipulative ammo

Highly Confidential

sales reached their highest levels, Vega caused the May Contract to experience all-time record price declines. See ¶¶136-137.

8.  Defendant **Trader 2**                          Defendant **Trader 1**
and apparently resides at and definitely trades out of Defendant **Trader 1**
residence.                                      Defendant **Trader 2**

                                                                      See
¶180 below. This further indicates coordination and joint conduct.

9.  GH Financial is a company located in this District and was the futures brokerage firm for Defendant Vega. On April 21, GH Financial informed Vega as follows: The trading by Vega in the May Contract on April 20 had set off multiple market alert alarms at GH Financial. Accordingly, the futures brokerage firm wanted to know whether the Vega persons doing the trading were acting together. Similarly, GH Financial wanted to know whether such persons appreciated exchange rules about market manipulation. And GH Financial asked numerous other questions about specific trades or traders, including relating to attempted manipulation. See ¶120 below. Soon after receiving Vega's responses, GH Financial gave notice to Vega that it was dropping Vega as a customer. This notice was due to the events which occurred on April 20 and GH Financial' s concerns

Highly Confidential

about the "risks" of continuing to do business with Defendant Vega and the Vega Trading Defendants. Id.

10.     As a result of Defendants extensive combination to overwhelm and depress the May Contract prices on April 20, Defendants proximately caused extremely artificial prices in the May Contract.

11.     Futures market "spreads" are the difference between the price of a futures contract expiring in one month and the price of a futures contract expiring in a different month

12.     Using futures contract spreads is a standard way to analyze whether the prices of a futures contract have deviated from supply and demand or are artificial in an economic sense of the term. The supply and demand for crude oil was substantially similar and the same on Friday April 17, Monday April 20, and Tuesday April 21. Based on a statistical analysis of the spread between the prices of the May Contract and the June WTI contract, and using a control period of January 2 until April 17, 2020, Plaintiff has good grounds to believe and does allege as follows.

13.     During trading on April 20, the spread between the May Contract price and the June Contract price declined by an extreme amount. In fact, the amount of the decline was 138 standard deviations.  A computer calculation of the

Highly Confidential

probability of this occurring in a competitive market untainted by manipulation returns a result of exactly zero.

14.     However, after 1:30 p.m. on April 20, Vega no longer had market power over May Contract trading. The May June spread then snapped back and increased to (and above) the levels on which such spread had closed on April 17, 2020. The statistical chance of this occurring in a competitive market is extraordinarily small. And the statistical chance that the May June spread, in a competitive market, would decline by so much on April 20 and then snapback so much on April 21 is even smaller.

15.     Because there were virtually no changes in supply and demand for crude oil between April 17 and April 21, much less dramatic decreases in the supply demand balance on April 20 followed by overwhelming increases in the supply demand balance on April 21, the fundamentals cannot explain what happened to prices here. However, Vega's four types of manipulative conduct were present in the May Contract on April 20 until 1:30 pm and then were removed from the May Contract after 1:30 pm on April 20.

16.     Accordingly, the Vega Defendants' blatantly manipulative "ammo" selling and other manipulative steps alleged in ¶2 (a)-(d) are the proximate cause of the artificially depressed May Contract prices on April 20.

17.     Plaintiff and members of the Class (as defined in ¶210) were directly injured by the Vega Defendants' agreement and conduct.  Among other things, Plaintiff and Class members were injured in that they sold May crude oil futures contracts to liquidate their long positions at artificially low prices. See ¶¶ 218-220 below.

## JURISDICTION AND VENUE

18.     The CME Group's global headquarters are located in this District at 20 South Wacker Drive, Chicago, Illinois 60606.  The May Contracts traded on the CME Group's electronic trading platforms Globex and ClearPort.  The CME Group's electronic Globex trading platform is housed approximately thirty-five miles from the CME Group's headquarters in Aurora, Illinois.  All May Contract transactions, including Plaintiff's and Defendants' May Contract transactions, were entered and executed in this District.

19.     WTI crude oil is a "commodity" and is the "commodity underlying" the WTI crude oil futures contracts traded on the CME Globex, as those terms are defined and used in Sections 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

20.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate

commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this complaint.

21. The Court has subject matter jurisdiction over this action pursuant to 7 U.S.C. §25, Section 4 of the Clayton Act, 15 U.S.C. §15 and 28 U.S.C. §§1331 and 1337.

22. The Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22. Defendants have minimum contacts with the United States, transacting business in this District, including by electronically placing trades in NYMEX WTI crude oil futures contracts on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms.

23. General venue is proper in the Northern District of Illinois pursuant to 7 U.S.C. §25(c), 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d).

24. The Court also has personal jurisdiction over Defendants and venue is proper pursuant to Section 22 of Commodity Exchange Act, 7 U.S.C. § 22. Defendants transact business in this judicial district and the CEA violations occurred in this District.

25. Plaintiff's and Defendants' brokers are located in this District. See ¶¶27, 67. The price manipulation occurred and the claims arose in this District.

Also, a substantial part of the events or omissions giving rise to the claims arose in this District.

26. 

27.

28.    The ICE has a colocation data center in this District as well as in Mahwah, New Jersey and Basildon, United Kingdom.

https://www.theice.com/connectivity-and-feeds/icecolocation

## PARTIES

### A. Plaintiff

29.    Plaintiff Mish International Monetary, Inc. is a California corporation with its principal place of business in Menlo Park, California. On the afternoon of April 20, 2020, Plaintiff Mish sold, through his brokers located in this District, ten (10) May Contracts at negative prices in order to liquidate a long position in such contract. Plaintiff Mish incurred a net loss of approximately $92,490 in connection with the foregoing transactions executed in this District. Plaintiff sold at the artificially low May Contract prices registered which occurred in this District due

Highly Confidential

to Defendants' manipulative impact on the trading executed and the order book maintained for May Contracts in this District. As alleged hereafter, Plaintiff is entitled to recover damages from Defendants, including actual damages, treble damages and other relief.

### B. Defendants

30.     Defendant Vega Capital London, Ltd. ("Vega") is a corporation organized and existing under the laws of the United Kingdom, incorporated on May 13, 2016, with a registered office in Essex, England and a principal place of business in London, England. Defendant Vega maintained a trading account with United States Futures Commissions Merchant ("FCM") G.H. Financial LLC. See ¶¶ 248, 263 below. ███████████████████████████████████████

███████████████████████████████████████████

31.     In its trading account with GH Financial, Vega maintained multiple accounts and scores of sub-accounts. Part of these sub-accounts, those in █████████ contained the accounts of the Vega Trading Defendants, whose names are alleged in ¶39 below, except for Defendant **Trader 7** whose account was in ██████ █ But the Vega Trading Defendants did **not** have accounts with GH Financial and GH Financials' only customer was Vega.  Defendant Vega's accounts included a master account ██████████

Highly Confidential

32.     All of the Vega Trading Defendants entered their orders and made their trades (of which Plaintiff is so far aware in the May Contract) with GH Financial in the name of and through Defendant Vega.

33.     On October 26, 2017, Defendant Vega registered with the FCA as an Appointed Representative of Starmark Investment Management Limited ("Starmark"). Defendant Vega terminated its registration with the FCA on August 13, 2019.

34.     Currently, Vega is wholly owned by Defendant ███Individual A███ (see ¶34 below). As of Vega's incorporation on May 13, 2016, Anthony Gibson was its sole shareholder. On July 1, 2017, Dean George Scott acquired all outstanding shares from Mr. Gibson. On September 26, 2017, ██Individual A██ and Tommy Gaunt each acquired half of Mr. Scott's shares, so that they co-owned the company equally. On October 23, 2019, after Defendant Vega had de-registered with the FCA, ██Individual A██ acquired all of Mr. Gaunt's shares.

35.     According to its filings with the UK's Companies House, Defendant Vega had zero employees in 2017, 3 employees in 2018 and 7 in 2019.  Vega states on its website and has stated for years that the website is "currently in development".

36.     ████████████████████████████████████████

████████████████████████████████████████



37.     Defendant Vega describes the individual trading defendants, whose names are alleged below, as ███████████████████ However, the relationship between and among Vega, ███ and the Vega Trading Defendants is alleged in detail at ¶¶209-261 below.

38.     Defendant ███████ is a natural person residing in the UK. Defendant ███████ is Defendant Vega's sole shareholder, sole owner and sole director. Prior to Vega's de-registration with the FCA on August 13, 2019, Defendant Individual A was registered with the FCA to provide financial services to the public as an appointed representative of both Starmark and Vega. Defendant Individual A is still registered with the FCA as a representative of Starmark. The Vega Trading Defendants are Defendants Trader 1  Trader 2  Trader 5  Trader 9  Trader 4  Trader 3  Trader 10  Trader 11  Trader 12  Trader 6  Trader 7  Trader 8

39.    Defendant ██Trader 1██ is a natural person residing ████████

████████ ██Trader 1██ is registered with the FCA to provide financial

services to the public as an appointed representative of Starmark. Defendant ██

██Trader 1██ maintained an account with Defendant Vega. Defendant ██Trader 1██

████████████████████████████████████████████████

████████

40.    ████████ ██Trader 1██ ████████████████████████

████████████████████████████████████████

██Trader 1██ ████████████████████████████

41.    Defendant ██Trader 1██ coordinated and worked with the other

Vega Trading Defendants to depress the prices of the May Contract on April 20.

(a) Defendant ██Trader 1██ minute to minute pattern in his May Contract

short position on April 20 is almost identical to and holds an extremely high

correlation with the patterns in which Defendants ██Trader 6██ ██Trader 4██ ██Trader 5██

██Trader 3██ added to their May Contract short positions on April 20.  See ¶¶45, 47,

49, 51 (identifying Defendants ██Trader 6██ ██Trader 4██ ██Trader 5██ ██Trader 3██) and

¶143 (alleging the correlations). Such high correlations with one trader, much less

many traders, have an extremely low likelihood of occurring by chance or from

randomly independent trading decisions.

(b) Defendant ▮Trader 1▮ exploited the TAS device to place selling pressure in the May Contract to net sell a total of ▮▮ May Contracts and avoid placing offsetting purchase pressure in the May Contract by purchasing ▮▮ TAS contracts on April 20.

(c) Defendant ▮Trader 1▮ sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

42.     Defendant ▮Trader 2▮ ▮▮▮▮▮ ▮Trader 1▮ and also maintained an account with Defendant Vega. Defendant ▮Trader 2▮ resides at, and traded on April 20, 2020 ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ Defendant ▮Trader 2▮ also maintained an account with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of ▮▮▮▮▮

43.     Defendant ▮Trader 2▮ worked with other Vega Defendants to depress the prices of the May Contract on April 20.  Among other things, Defendant ▮Trader 2▮ communicated with other Vega Defendants about the May Contract put selling pressure into the May Contract on April 20 by net selling ▮▮ May Contracts, and avoided putting offsetting buying pressure into the May Contract by net purchasing ▮▮ TAS contracts. Defendant ▮Trader 2▮ sold a

large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading. See ¶¶ 111, 164 below.

44.     Defendant Trader 6 is the son of a friend of Defendant Trader 1 Defendant Trader 6 is a natural person residing

Defendant Trader 6 also maintained an account with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Trader 1 trading team.

45.     (a) Defendant Trader 6 minute to the minute pattern of adding to his May Contract short position on April 20 is almost identical to and holds an extremely high correlation with the patterns in which Defendants Trader 1 Trader 4 Trader 5 Trader 3 added to their May Contract short positions on April 20. See ¶143 (identifying Defendants Trader 1 Trader 4 Trader 5 Trader 3 and ¶143 (alleging the .919 correlation to Defendant Trader 1 trades). Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or from randomly independent trading decisions.

(b) Defendant Trader 6 exploited the TAS device to place selling pressure in the May Contract to net sell a total of        May Contracts and avoid placing

17

offsetting purchase pressure in the May Contract by net purchasing ▬▬▬ TAS

contracts on April 20.

(c) Defendant Trader 6 sold a large portion of his May Contracts in an

aggressive manner and used his May Contracts as "ammo" during April 20,

including during the last hour of trading.

46.    Defendant Trader 5 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Trader 3 ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬ Defendant

Trader 5 has been a director of an entity called ▬▬▬▬▬▬ along

with Defendant Trader 1 and Defendant Trader 4 Additionally, Defendant

Trader 5 co-owned a firm called ▬▬▬▬▬▬ with Defendant ▬▬

Trader 1 Defendant Trader 5 is a natural person residing ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬ Defendant Trader 5 also maintained an account with Vega, is also

registered with the FCA as an authorized representative of Starmark, and also is a

member of Defendant Trader 1 trading team.

47.    (a) Defendant Trader 5 minute to the minute pattern of adding to

his May Contract short position on April 20 is almost identical to and holds an

extremely high correlation with the patterns in which Defendants Trader 1

Trader 4 Trader 6 Trader 3 added to their May Contract short positions on

18

April 20. See ¶142 (identifying Defendants ██Trader 1██ ██Trader 4██ ██Trader 6██ ██Trader 3██ and ¶143 (alleging the .974 correlation to Defendant ██Trader 1██ trades). Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or from randomly independent trading decisions.

(b) Defendant ██Trader 5██ exploited the TAS device to place selling pressure in the May Contract to sell a total of ███ May Contracts and avoid placing offsetting purchase pressure in the May Contract by purchasing ████ TAS contracts on April 20.

(c) Defendant ██Trader 5██ sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

48.    Defendant ██Trader 4██████████ has been a director of an entity called ████████████ along with Defendant ██Trader 1██ and Defendant ██Trader 5██ Defendant ██Trader 4██ is a natural person residing ████ ████████████████████████████████████ ████████████████████████████ Defendant ██Trader 4██ also maintained an account with Vega, is also registered with the FCA as an authorized

representative of Starmark, and also is a member of Defendant **Trader 1**

trading team.

49.     (a) Defendant **Trader 4** minute to the minute pattern of adding to

his May Contract short position on April 20 is almost identical to and holds an

extremely high correlation with the patterns in which Defendants **Trader 1**

**Trader 5** **Trader 6** **Trader 3** added to their May Contract short positions on

April 20. See ¶142 (identifying Defendants **Trader 1**     **Trader 5** **Trader 6**

**Trader 3** and ¶143 (alleging the .940 correlation to Defendant **Trader 1** trades).

Such high correlations with one trader, much less many traders, have an extremely

low likelihood of occurring by chance or from randomly independent trading

decisions.

(b) Defendant **Trader 4** exploited the TAS device to place selling pressure

in the May Contract to net sell a total of ▬▬ May Contracts and avoid placing

offsetting purchase pressure in the May Contract by net purchasing ▬▬ TAS

contracts on April 20.

(c) Defendant **Trader 4** sold a large portion of his May Contracts in an

aggressive manner and used his May Contracts as "ammo" during April 20,

including during the last hour of trading.

Highly Confidential



50.    Defendant ███████ ████████████████████████

████████████████ ████████ ████ Defendant ██████ is a

natural person residing at ████████████████████████████

████████████████████ Defendant ████ also maintained an account

with Vega, is also registered with the FCA as an authorized representative of

Starmark, and also is a member of Defendant ████████ trading team.

51.    (a) Defendant ████████ minute to the minute pattern of adding to his

May Contract short position on April 20 is almost identical to and holds an

extremely high correlation with the patterns in which Defendants ██████████

████████ ████████ ██ ██████████ added to their May Contract short positions on

April 20. See ¶142 (identifying Defendants ████████ ████████ ████████

████████ and ¶143 (alleging the .976 correlation to Defendant ████████

trades).  Such high correlations with one trader, much less many traders, have an

extremely low likelihood of occurring by chance or randomly independent trading

decisions.

(b) Defendant ████ exploited the TAS device to place selling pressure in

the May Contract to sell a total of █████ May Contracts and avoid placing

offsetting purchase pressure in the May Contract by purchasing █████ TAS

contracts on April 20.

(c) Defendant Trader 3 sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

52.    Defendant Trader 9 is a natural person residing ████████ ███████████████████████████████████████████████████████ ████████ Defendant Trader 9 also maintained an account with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Trader 1 trading team.

(a) Defendant Trader 9 minute to the minute pattern of adding to his May Contract short position on April 20 is almost identical to and holds an extremely high correlation with the patterns in which Defendants Trader 1 Trader 4 Trader 6 Trader 3 Trader 5 added to their May Contract short positions on April 20. See ¶142 (identifying Defendants Trader 1   Trader 4 Trader 6 Trader 3 Trader 5 and ¶143 (alleging the .946 correlation to Defendant Trader 1 trades).  Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or randomly independent trading decisions.

(b) Defendant Trader 9 exploited the TAS device to place selling pressure in the May Contract by net selling ██████ May Contracts and avoid placing offsetting

purchase pressure in the May Contract by net purchasing ███ TAS contracts on April 20.

(c) Defendant ███Trader 9 sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

53.    The five largest Vega traders accounted for 69% of the total Vega volume, and their minute by minute positions have extremely strong correlations (between 96.2% and 99.7%) with each other.

   a.  ██Trader 6 sales of May Contracts on April 20 were the largest sales of any Vega defendant on April 20. ██Trader 6 minute by minute positions in the May Contract had an extremely strong tendency (between .962 and .996) to increase as to the other largest Vega Traders on April 20 (██Trader 3 ██Trader 9 ██Trader 5 ██Trader 4 ).

   b.  ██Trader 4 sales of May Contracts on April 20 were the second largest sales of any Vega defendant on April 20. ██Trader 4 minute by minute positions in the May Contract had an extremely strong tendency (between .973 and .996) to increase as to the other largest Vega Traders on April 20 (██Trader 3 ██Trader 9 ██Trader 6 ██Trader 5 .

   c.  ██Trader 5 sales of May Contracts on April 20 were the third largest sales of any Vega defendant on April 20. ██Trader 5 minute by

minute positions in the May Contract had an extremely strong

tendency (between .977 and .997) to increase as to the other largest

Vega Traders on April 20 (█Trader 3█ █Trader 9█ █Trader 6█ █Trader 4█).

**d.** █Trader 3█ sales of May Contracts on April 20 were the fifth largest sales

of any Vega defendant on April 20. ████ minute by minute

positions in the May Contract had an extremely strong tendency

(between .962 and .997) to increase as to the other largest Vega

Traders on April 20 (█Trader 5█ █Trader 9█Trader 6█Trader 4█.

**e.** █Trader 9█ sales of May Contracts on April 20 were the fourth largest

sales of any Vega defendant on April 20. █Trader 9█ minute by minute

positions in the May Contract had an extremely strong tendency

(between .981 and .993) to increase as to the other largest Vega

Traders on April 20 (█Trader 3█ █Trader 5█ █Trader 6█ █Trader 4█).

54.   Defendant █Trader 12█ is a natural person residing █

████████████████████████████

███ Defendant █Trader 12█ also maintained an account with Vega, is also

registered with the FCA as an authorized representative of Starmark, and also is a

member of Defendant █Trader 1█ trading team.

(a) Defendant █Trader 12█ minute to the minute pattern of adding to his

May Contract short position on April 20 is almost identical to and holds an

extremely high correlation (.979) with the patterns in which Defendants ▇▇ Trader 1 Trader 4 Trader 6 Trader 3 Trader 9 Trader 5 added to their May Contract short positions on April 20. See ¶¶ 142-143. Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or randomly independent trading decisions.

(b) Defendant Trader 12 exploited the TAS device to place selling pressure in the May Contract by selling ▇▇▇ May Contracts and avoid placing offsetting purchase pressure in the May Contract by purchasing ▇▇▇ TAS contracts on April 20.

(c) Defendant Trader 12 sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

55. Defendant Trader 10 ▇▇▇▇▇▇▇▇▇▇▇ is a natural person residing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Defendant Trader 10 also maintained an account with Vega, completed compliance oversight training with Starmark to qualify as and later registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Trader 1 trading team. Defendant Trader 10 worked with other Vega Defendants to depress the prices of the

May Contract on April 20. Among other things, Defendant ███Trader 10███ communicated with other Vega Defendants about the May Contract, put selling pressure into the May Contract on April 20 by net selling ███ May Contracts, and avoided putting offsetting buying pressure into the May Contract by purchasing ███ TAS contracts. Defendant ███Trader 10███ sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading. See ¶¶139, 145 below.

56.     Defendant ███Trader 11███ is a natural person residing ███ ████████████████████████████████████████ ███████ Defendant ███Trader 11███ also maintained an account with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant ███Trader 1███ trading team. Defendant ███Trader 11███ worked with other Vega Defendants to depress the prices of the May Contract on April 20. Among other things, Defendant ███Trader 11███ communicated with other Vega Defendants about the May Contract, put selling pressure into the May Contract on April 20 by net selling ███ May Contracts, and avoided putting offsetting buying pressure into the May Contract by purchasing ███ TAS contracts. Defendant ███Trader 11███ sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading. See ¶¶139, 145 below.

26

Highly Confidential

57.     Defendant  **Trader 7** is a natural person residing ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ Defendant **Trader 7** also maintained an account with Vega, completed

compliance oversight training with Starmark to qualify as an authorized

representative of Starmark, and also is a member of Defendant **Trader 1**

trading team. Defendant **Trader 7** worked with other Vega Defendants to depress the

prices of the May Contract on April 20.  Among other things, Defendant **Trader 7**

communicated with other Vega Defendants about the May Contract, put selling

pressure into the May Contract on April 20 by net selling ▮▮ May Contracts, and

avoided putting offsetting buying pressure into the May Contract by purchasing

▮▮ TAS contracts. Defendant **Trader 7** sold a large portion of his May Contracts in

an aggressive manner and used his May Contracts as "ammo" during April 20,

including during the last hour of trading. See ¶¶139, 145 below.

58.     Defendant **Trader 8** is a natural person residing ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ Defendant **Trader 8** also maintained an account with Vega, is also

registered with the FCA as an authorized representative of Starmark, and also is a

member of Defendant **Trader 1** trading team. Defendant **Trader 8** worked

with other Vega Defendants to depress the prices of the May Contract on April 20.

Among other things, Defendant **Trader 8** communicated with other Vega

Defendants about the May Contract, put selling pressure into the May Contract on April 20 by net selling ▌ May Contract, and avoided putting offsetting buying pressure into the May Contract by purchasing ▌ TAS contract. Defendant Trader 8 sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading. See ¶¶139, 145 below. Defendant Trader 8 made ▌ price moving trades for Defendant Trader 11 between 13:31:21 and 13:31:24. These trades were transferred to Defendant Trader 11 after Defendant Trader 8 made them.

59.     Starmark Investment Management Limited is a private limited company organized and existing under the laws of the United Kingdom, formed on June 3, 1998, and having a registered office and principal place of business in London, England. Starmark has a supervisory role over Defendant Vega Capital that initiated with the latter's FCA registration as an Appointed Representative of Starmark, its Principal, from October 26, 2017 through August 13, 2019, the day Vega Capital's FCA registration terminated. Vega has a supervisory role of Defendant Individual A who is a representative of Starmark.

60.     Eldon John Kerr, Starmark's co-founder, "currently focuses on monitoring Appointed Representative and CF30 trading activity," according to Starmark's website. As such, Mr. Kerr would have supervised Vega Capital in its role as Starmark's Appointed Representative until August 13, 2019. Despite the

termination of Vega Capital's FCA registration as an Appointed Representative of Starmark on such date, Mr. Kerr's inclusion by GH Financials on April 21, 2020 correspondence with Vega Capital regarding the previous day's trading irregularities suggests that Starmark's supervisory role over Defendant **Individual A** or Defendant Vega's trading activities persists.

61.     In addition to its supervisory role over Defendant Vega, Starmark also directly supervises Defendants **Trader 8**    **Trader 1**    **Trader 5**    **Trader 9**   **Trader 4**    **Trader 3**    **Individual A** **Trader 11**    **Trader 12**    **Trader 6**    all of whom are registered with the FCA as Starmark representatives.

62.     (a) Vega John Doe #1. Unknown Vega Defendant is one of the Vega accounts. This Defendant financially benefited from the manipulation of the May Contract by Defendant Vega and the Vega Trading Defendants.

(b) Vega John Doe #2. Unknown Vega Defendant is one of the Vega accounts. This Defendant financially benefited from the manipulation of the May Contract by Defendant Vega and the Vega Trading Defendants.

(c) Vega John Doe #3. Unknown Vega Defendant is one of the Vega accounts. This Defendant financially benefited from the manipulation of the May Contract by Defendant Vega and the Vega Trading Defendants.

(d) Vega John Doe #4. Unknown Vega Defendant is one of the Vega accounts. This Defendant financially benefited from the manipulation of the May Contract by Defendant Vega and the Vega Trading Defendants.

63.    John Doe Defendants 20-100 are persons or entities who worked with Defendants or on whose behalf Defendant Vega Capital worked to manipulate and fix prices of NYMEX crude oil futures contracts.

64.    G.H. Financials, LLC ("GHF LLC" or "GHF") has been a Delaware corporation since May 31, 2011. GHF became operational as a clearing Futures Commission Merchant the same year. An FCM is a futures broker. As such, it solicits or accepts orders to buy or sell futures contracts, and accepts money or other assets from customers to support such orders. GHF was Defendant Vega's broker until shortly after April 20, 2020 and made, as Vega's agent the sales on the May Contract.

65.    GHF LLC is regulated by the Chicago Mercantile Exchange ("CME") which is a Delegated Self-Regulatory Organization ("DSRO") on behalf of the CFTC.

66.    GHF LLC is located at 311 South Wacker Drive, Suite 1550, Chicago, Illinois 60606, and is a member of the National Futures Association ("NFA").  GHF LLC also holds memberships on the CME, NYMEX and ICE Futures US.

Highly Confidential

67.     GHF acted as the FCM. 

On April 20, Vega was the customer of GHF which made all the manipulative trades alleged herein. GHF was the FCM and exchange member which made all those trades. The accounts held by the Vega Trading Defendants were sub accounts of the Vega accounts under the ███████ designation with different sub accounts.

68.     G.H. Financials Limited is a Private limited Company incorporated on January 4, 1993 and registered at Companies House as No. 02775278, with the nature of its business defined as security and commodity contract dealing activities (SIC 66120) and its registered office located at 29 Ludgate Hill, 4th Floor, London ECAM 7JR ("GHF Ltd"). See: https://find-and-update.company-information.service.gov.uk/company/02775278

## BACKGROUND

### A.     Commodity Futures; How Futures Contract Trading Profits Or Losses Are Determined Using The May Contract As An Example.

69.     A person may act as a futures contract exchange or board of trade only if that person is approved and designated to do so by the Commodity Futures

Trading Commission.  The CFTC approves such a designation only if the proposed

exchange sufficiently demonstrates (a) that it has rules, such as position limit rules,

to prevent price manipulation, and (b) that it has procedures to enforce such anti-

manipulation rules.

70.    The NYMEX is designated by the CFTC as a board of trade.

NYMEX is the world's largest physical commodity futures exchange. The

NYMEX applies to the CFTC for permission to trade each commodity in which the

NYMEX offers a contract.  The NYMEX must establish, among other things, that

the proposed contract is not prone to price manipulation in order to win approval to

trade such contract.  NYMEX members and clearing members have to follow the

rules of the NYMEX.  This includes the most important rules, the rules prohibiting

manipulation.

71.    Also, commodity futures professionals licensed as associated persons,

futures commissions merchants, commodity trading advisors, and commodity pool

operators are required to be familiar with CFTC and exchange requirements.  This

includes the most important requirements, those prohibiting price manipulation.

72.    A commodity futures contract is an agreement to buy or sell a

commodity, such as WTI, at a date in the future.  Futures contracts are bilateral

contracts with two sides.  The "long" side is the buyer of the contract. The buyer is

obligated to take delivery and pay for the commodity if the buyer holds the

Highly Confidential

contract until the specified delivery dates.  Buyers are referred to as "longs."  The "short" side of the futures contract is the seller of the contract. The seller is obligated to make delivery of the commodity on the delivery dates.  Sellers are referred to as "shorts."

73.    Almost every aspect of a futures contract is standardized, except the price and quantity.  Futures markets are specifically designed to facilitate and ease trading in one central marketplace for traders who are located throughout the United States and the world.

74.    In practice, very few deliveries occur and most futures contracts are satisfied or "liquidated" in the trading market. For example, significantly less than 1% of all WTI futures contracts traded result in deliveries. Well over 99% of the WTI futures contracts which are traded are satisfied through liquidation trading.

75.    In order to satisfy a futures contract through trading in the futures market, a trader who holds a long position of one contract **sells** one contract. That creates one long position and one short position in such futures contract for the trader. These offsetting positions cancel out or liquidate the trader's obligations to purchase a commodity and make delivery of a commodity under the contracts. Likewise, a trader who holds a short position of one contract **buys** one contract in order to trade out of the position. This, again, creates one long position and one short position for such trader. And this, again, cancels and liquidates the trader's

Highly Confidential

original obligation to deliver the commodity by creating a separate obligation to purchase the commodity.

76.     The difference between the price at which a trader buys the contract and the price at which the trader sells the contract establishes the profit or loss on the contract.

77.     For example, suppose a trader sold one May Contract to establish a short position. Suppose the trader purchased back such May Contract later on the same day. Suppose that the sales price was $2.50 per barrel. Suppose that the purchase price was minus $37.50 per barrel. In this example, the profit (exclusive of trading commissions) would be $40.00 per barrel. Each May Contract consists of 1,000 barrels of WTI crude oil.  The profit on that one contract (exclusive of commissions) would be $40,000.00.

78.     Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. Each open transaction has a buyer (a long) and a seller (a short).  The open interest in commodity futures contracts tends to fluctuate from day to day. The open interest and trading volumes in a futures contract begin to decrease very substantially during the last month of trading in a futures contract. As such contract approaches its final expiration date and all trading must cease, the last few days of trading the volume and open interest continue to their lowest levels.

Highly Confidential

## B.    The WTI Contract

79.    One of the futures contracts traded on the CME is the light sweet crude oil (WTI) futures contract. The size of a WTI crude oil futures contract is 1,000 barrels. The WTI crude oil futures contracts call for settlement by physical delivery at a variety of pipelines or storage facilities in or around Cushing, Oklahoma.

80.    Pursuant to NYMEX and CME rules, trading is conducted in WTI futures contracts expiring in each calendar month from the current month and continuing for the next ten calendar years plus two additional contract months. Trading in WTI crude oil futures contracts terminates on the third business day prior to the twenty-fifth calendar day of the month preceding the delivery month. If the twenty-fifth calendar day is not a business day, trading terminates four business days prior to the twenty-fifth calendar day of the month prior to the contract month.

81.    Daily settlement prices of WTI crude oil futures are settled at the volume-weighted average price ("VWAP") of trades occurring on CME Globex between 1:28 and 1:30 p.m. Midwest time.  The settlement price for the active month contract is determined by trades in the active month and trades in other contract expirations are determined by calendar spread transactions.

Highly Confidential

82.     Trading in WTI crude oil futures contracts is subject to the rules and regulations of the NYMEX and CME, and prices are quoted in U.S. dollars and cents per barrel.

83.     The crude oil marketing hub in Cushing, Oklahoma is the most significant marketing and trading hub for crude oil in North America.  Cushing serves as the delivery point for light sweet crude oil futures contracts traded on the CME.

84.     WTI crude oil is one of the most actively traded domestic crude oils, operates as the United States benchmark grade and is the primary deliverable grade under the WTI crude oil futures contracts.

85.     Like other commodity futures contracts which call for physical delivery, the open interest (see ¶79) and the daily trading volume in a WTI futures contract tend to decline dramatically as the last days of trading and the beginning of deliveries approach.

86.     In Trading at Settlement (or "TAS") for WTI contracts, a market participant agrees to purchase or sell a WTI futures contract at a price that is to be determined by the end of day settlement price of a particular WTI futures contract.

87.     Trade at Settlement is a capability that allows a commodities trader to execute an order to buy or sell an eligible futures contract at the settlement price or at a spread to the settlement price. The spread may be at a price up to a specified

Highly Confidential

number of ticks (minimum price fluctuations) above or below the settlement price

for that particular type of commodity contract. See e.g.,

www.theice.com/publicdocs/futures_us/TAS_FAQ.pdf

88.     Similarly, traders who buy TAS contacts as they sell May Contracts

have a motive to depress prices in order to make the prices approaching and at the

end of the day as low as possible.  Again, the cost band for TAS contracts is from

minus ten cents to plus ten cents on the outright contracts, and minus twenty cents

to plus twenty cents on the spreads. The NYMEX Rulebook provides: "Unless

otherwise specified by the Exchange, a TAS transaction may be executed at the

current day's settlement price or at any valid price increment ten ticks higher or

lower than the settlement price." Chapter 5, Section 524.A.3 (TAS Transactions),

available at:

https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/5.pdf

89.     There are separate bids and offers for TAS contracts than for WTI

contracts. TAS contracts are bought and sold at a price differential from the daily

settlement price, so the final price of the TAS contract is the settlement plus or

minus a premium or discount. The allowable price increments and differential are

defined by NYMEX. See *Interim Staff Report; Trading in NYMEX WTI Crude Oil*

*Futures Contract Leading up to, on, and around April 20, 2020* (CFTC Nov. 23,

Highly Confidential

2020). In the TAS contract market, the price may range ten ticks higher or lower than the settlement price. NYMEX Rule 524.

90.     TAS contracts may serve valuable functions in physical delivery markets, including by allowing institutions and others to pay a small sum in order to lock in a trade at the settlement price determined between 1:28 and 1:30 pm Chicago time for a given WTI contract. However, even in well-designed and well-regulated futures contracts such as the WTI futures contract, the use of TAS contracts is subject to abuse when certain constraints exist in the market.   See ¶¶107-112 below.

91.     As recently stated by CFTC Commissioner Dan Berkovitz on November 24, 2020: "The potential for TAS trading to artificially affect the settlement price of a contract is well known; indeed, the CFTC has brought two enforcement cases based on the use of TAS to manipulate the price of futures contracts." See https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement112320a. Commissioner Berkovitz also expressed his view that the CFTC should look into the TAS trading activity in its investigation of the precipitous drop and rebound of WTI oil trading prices on April 20-21.

### C.    Buying Pressure, Selling Pressure, Cumulative Net Sales And Cumulative Selling Pressure

Highly Confidential

92.     All else equal, sales of futures contracts exert downward pressure on prices, and the larger the number of sales, the greater the downward pressure on prices. All else equal, purchases of futures contracts exert upward pressure on prices, and the greater the number of purchases, the greater the upward pressure on prices.

93.     All else equal, the more that a market participant (or a group of market participants) sells a commodity futures contract and the less that they say a commodity futures contract during a trade day, the more cumulative net sales they will make and downward pressure on prices that they exert.

94.     All other things equal, buying pressure in a commodity futures contract will tend to make prices higher than they otherwise would have been. Selling pressure in a commodity futures contract will tend to make prices lower than they otherwise would have been.

95.     Bids are orders to buy a futures contract. Offers are orders to sell a futures contract. When the highest bid equals or exceeds the lowest offer, an agreement to purchase and sell a futures contract is made. Because the prices in the futures market are determined by the lowest offer and the highest bid, the futures markets are sometimes referred to as a dual auction market.  After the match creating an execution, the bid and offer are removed from the order book to the extent of the match. The remaining bids and offers determine the prices.

Highly Confidential

96.     Orders to purchase or sell may be submitted in two general types. One is a "limit" order, which is an order to sell or buy at a price limit. A bid for $10 per barrel or better, is a bid to buy at a maximum of $10 and less than $10 if possible. An offer to sell at $10 per barrel is an offer to sell at $10 per barrel or higher, but not less than $10 per barrel.

97.     A market order is an order to buy at or above the available offer, or to sell at or below the available bid in the market. Limit orders which seek to buy at or above the lowest offer or sell at or below the highest bid are, in effect, market orders to that extent.[4]  A market order to sell 10 contracts is an offer to sell 10 contracts at whatever the bid is in the market. If there are three contracts bid at $10 per barrel, three contracts bid at $9.95 per barrel, three contracts bid at $9.90 per barrel, and one contract bid at $9.85 per barrel, the 10 contract market offer will, all other things equal, remove all of those from the order book and execute with the last price of $9.85 per barrel. The bid after that transaction will be whatever the highest bid is below $9.85 per barrel.

98.     All other things equal, market order sells exert downward pressure on prices and market order buys exert upward pressure on prices.

99.     Making offers to sell below the highest bid in a volume greater than the highest bid causes prices to decline and "sells through the market". This

---

[4] These are sometimes referred to as "marketable limit orders".

Highly Confidential

removes from the order book the bids at the higher level. This is a sufficient, but not necessary condition to cause prices to decline.

100.   This can also execute the next bids and, depending on the size of the marketable offers and the size of the bids, take them out of the order book. If a trader adds marginal (*i.e.,* extra) offers to a market which exceed the bids in the market at a given price, then the trader or traders will cause prices to move down.

101.   If a trader is able to add marginal offers at a given price that cause the total offers to exceed the total bids, then there will be downward pressure on prices and prices will move down. This is a significant but not a necessary condition to depress prices.

**The United States Commodity Futures Trading Commission And The United Kingdom Financial Control Authority Have Recognized That The Use By Traders Of Their Trades As "Ammo" Constitutes A Manipulative Device**

102.   Regulators recognize that "ammo" is a term used by manipulators. Although the exact meaning of "ammo" varies in the context of the specific manipulation, the use of the term "ammo" signifies possession of the ability to make a quantity of transactions in a manner in which the transactions will depress or inflate futures contract prices.

103.   The FCA has previously explained that the use of the word "ammo" was part of a manipulative strategy to influence prices.[5]

104.   The United States Commodity Futures Trading Commission also recognized the use of the term "ammo" as being part of a manipulative device in the consent order in ISDAFix. There, the CFTC stated that "…traders would use limited "ammo" and timing techniques to attempt to manipulate…".

https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfroyalorder020317.pdf

105.   The CFTC, in providing "Examples of Misconduct in Private Chat Rooms"[6], discusses the use of the word "ammo".  In an example under the heading, "Traders Share 'Ammo'", the CFTC quotes a conversation where traders at different banks discuss "more ammo for you…."

## UNDERLYING ALLEGATIONS

## A. The Abuse Of TAS Transactions To Manipulate Prices

---

[5] https://fca-legacy.videomarketingplatform.co/secret//62508029/a45a0407be96952c359daa5be8158bcc (video presentation showing multiple firms using the phrase "leaving you with the ammo" as part of the collusive conversation in an attempt to fix and move rates); see also FCA Final Notice against UBS, https://www.fca.org.uk/publication/final-notices/final-notice-ubs.pdf. https://www.ft.com/content/47c32ec4-6a34-11e4-8fca-00144feabdc0 ("Furthermore, traders in a chatroom with net orders in the opposite direction to the desired movement at the fix sought to transact before the fix with traders outside the chatroom. The FCA said this practice was commonly referred to as "leaving you with the ammo", building the volume of orders held by the traders in the chatroom in the desired direction and increasing their potential influence on the fix.")
[6]
https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/hsbcmisconduct111114.pdf

Highly Confidential

106.   The use of TAS contracts may cause a fragmentation of order flow. Part of the order flow to purchase and sell, in this case, May Contracts, goes into the bids and asks for May Contracts. A different part of the order flow to purchase and sell May Contracts may be put into the TAS market.

107.   Peer reviewed economic literature shows that this "fragmentation" of order flow into two different markets tends to (a) cause individual orders for the futures contract (here the May Contract) to have somewhat greater price impact; and that the purchase order in the TAS market does not exert buying pressure which offsets or equals the selling pressure in the futures contract, here the May Contract. Craig Pirrong, *The Economics Of Commodity Market Manipulation: A Survey,* Journal of Commodity Markets, Vol. 5, pp. 1-17, (March 2017).

108.   Thus, persons who purchased TAS contracts prior to or as they sell May Contracts during April 20, create for themselves an increasingly large financial interest in lower settlement prices for the May Contract. After their May Contract sales and TAS purchases go beyond an insignificant amount, certain types of traders have an increasingly large motive to make large net sales of the May Contract in order to exert downward pressure on the settlement price and create a profit for themselves.

109.   Similarly, this type of manipulative trader, also has a large financial motive to recruit an increasingly large group of traders to follow the same modus

Highly Confidential

operandi of selling the futures contract and buying the TAS contract. Combined, this group can exert cumulative net selling pressure on the (in this instance) May Contract as the day progresses.

110. Then, as the end of trading approaches (in the last hour or half hour of trading), this type of trader has a motivation to ramp up their own sales to a large percentage of the market and exert further causation of depression through blatantly using their sales as "ammo" to depress prices.

111. By doing the foregoing and also combining with other traders, this type of trader can bring its maximum pressure to bear on prices at the end of trading. Specifically, as the trading group's net cumulative sales of the futures contract are reaching their highest levels and reaching the most cumulative downward effect on prices (by removing the largest cumulative amounts of bids from the order book), the trading group also increases its percentage of sales in the market and does so in an aggressive manner that converts that significant percentage of the share of the sales in the market into the manipulative device of "ammo".  Both the large percentage of sales and the greater impact per sale of making the sale as "ammo" (i.e., very aggressively to intentionally move down prices) exert separate and further downward impacts on prices.

112. The foregoing profile is exactly what the Vega Trading Defendants did in the May Contract.

**B. Defendant** Trader 1 **background and formation of a group that could execute a TAS manipulation.**

113.  ████████ Trader 1 ████████████████████████████

████████████████████████████████████████████████████████

████████████ Trader 1 ████████████████████████████

████████████████

114.    Traders on the IPE reportedly combined together to make transactions in opposition directions in the futures contract and related TAS contract. For example, they would purchase the TAS contract and sell the futures contracts. By engaging in increasing selling as the day wore on, the IPE traders could cause the TAS contract prices to be lower. By depressing the TAS price, they IPE futures traders could make a profit on the difference between their higher priced sales earlier in the day and their lower prices at which they purchased at the end of the day by virtue of the lower settlement they caused and which, through the TAS mechanism, became their purchase price.

115.    After the closing of the IPE, former floor traders banded together at "arcades" or "prop" (proprietary trading) shops with five of these groups, known as the "five families" based in London. One advantage of having these groups is that they could exploit the TAS mechanism exactly by trading in a group.

116.    Reportedly, Defendant Trader 1 and other traders worked for one of the "five families" – ████████████████████ – for a long time.

Highly Confidential

117.   However, Defendant  **Trader 1** then reportedly started his own group which consists at least of the other Vega Trading Defendants.

118.   Reportedly, the Vega Defendants frequently make trades in the same contracts at around the same time to move prices.

119.   ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

120.   ████████████████████████ **Individual A** ██

**Trader 1** ████████████████████████████████

███████████████

121.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████ That is, the Vega Trading Defendants commit their trading capital to fund one another's risks, which is similar to a joint venture in which the co-venturers commit their trading capital to help any member of the combine.

122. 

Trader 12     Trader 11

Trader 1

123.

Trader 1                                                      Trader 12

Trader 11

124.   Also, Vega has a financial motive to see that Trader 12 Trader 11 are in a position to try to make lots of profits; however, provided that the pool of capital is sufficient from the Vega Traders, Vega has no downside. I.e., the more risk that Trader 12 Trader 11 take, the more that Vega stands to gain.

125.         Trader 1

---

[7] VEGA_M1SH_000042676
[8] VEGA_M1SH_000042676
[9] *See* https://find-and-update.company-information.service.gov.uk/company/07158619

126.   Thus, Defendant Trader 1 speaks on behalf of all the other Defendants. In such position, Defendant Trader 1 not only knows the reasons behind what each trader was doing, but that the reasons were the exact same.

127.   When people act for exactly the same reasons, they are more likely to be in an agreement, especially if an agreement to combine together makes them more likely to achieve their goals and make their reasons work out. This is even more true when the reasons are a market power manipulation in which the traders are combining their cumulative net sales of the May Contract and separate purchases of TAS contracts to have the largest financial motive to manipulate and the largest ability to manipulatively depress May Contract prices at the close of trading on April 20. Finally, what they were doing on April 20 is exactly parallel to a TAS manipulation (described in ¶¶87-92, 107-113 above) and the type of TAS manipulations that occurred on the IPE (described in ¶¶114-116 above). It is also a type of manipulation which "families" of traders are well positioned to engage. See ¶¶116-117 above. Reportedly, Trader 1 and other traders at Vega vacation together, socialize together, and drink together.

## C. The Vega Defendants Manipulative Depression of May Contract Prices

128.   On April 20th, the Vega Defendants believed that the May Contract was in its next to last day of trading and was a "thin" market in which there was not great depth of trading and orders to purchase. The Vega Defendants believed

Highly Confidential

that the May Contract was vulnerable to price depression by a concerted group of traders pursuing the following method. The traders would exert an increasing cumulative net selling pressure on the May Contract. As that cumulative net selling pressure reached high levels, the Vega Defendants would use their sales as manipulative "ammo". See above. The use of the "ammo" would both depress prices directly, and also increase Vega's rate of sales and the percentage of the total volume of May Contract sales that the Vega Defendants' sales constituted. This combination of increasing cumulative net selling pressure (which had been removing purchase orders from the market), the use of manipulative "ammo" sales, and the large increases in Vega's percentage of the overall volume of sales in the market would manipulatively depress May Contract prices during April 20th including at the time of the determination of the TAS. Thereby, the Vega Defendants would reap substantial profits from the higher prices at which they made their May Contract sales and the lower prices at which they would purchase as determined by the artificially depressed settlement price.

129. As with all manipulations, there were risks to the manipulators of the success of their manipulation. But the Vega Defendants reportedly had prior experience with trading together at the same times to move prices. And they successfully executed their manipulative depression of May Contract prices.

Highly Confidential

130.   On April 20th, the May Contract price was approximately $11.69 per barrel at 9:00 a.m. in Chicago. From at or about 9:00 am on April 20th until at or about 11 am, the May Contract price declined from $11.69 to $10.33. During this time, the Vega Defendants placed increasing cumulative net selling pressure on the May Contract price. This caused the May Contract prices to be lower than they otherwise would have been.

131.   Similarly, during the next time periods of the day (alleged below) the Vega trading Defendants continued to increase their cumulative net selling pressure on the May Contract price. During each of these periods, the Vega Trading Defendants placed increasing cumulative net selling pressure on the May Contract and caused the May Contract prices to be lower than they otherwise would have been.

132.   A manipulator seeks to sell at a high price and buy at a low price. The Vega Defendants followed this pattern. They exerted less pressure on May Contract prices until their cumulative net selling pressure had built up a substantial short position in the May Contract and a substantial TAS position to liquidate (purchase back) that short position at whatever that May Contract price turned out to be at the end of trading.

133. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

134. During this time period, the Vega Defendants

    a. Substantially increased their number of May Contracts sold per minute.

    b. Substantially increased their percentage of the total sales of May Contracts made by the entire market.

    c. Exerted greater depressive impact on prices, per each new May Contract sold, by selling in a manipulative "ammo" fashion.

135. During the Vega Defendants' final frenzy of manipulative ammo selling, they caused and help cause the May Contract to move into negative prices for the first time in history, and to experience the vast majority of its all-time record price decline on April 20th during a brief 20 minute period between 1:08 and 1:28 pm.

136. Specifically, due to the combination of all Vega's foregoing steps, the May Contract declined from minus one penny per barrel to as low as minus 42 dollars per barrel.

**D. The Vega Trading Defendants Combined, Conspired and Worked In Concert For The Purpose of Depressing the Price of the May 2020 WTI Crude Oil Futures Contract on April 20, 2020**

Highly Confidential

137. On April 20, 2020, each Vega Trading Defendant engaged in the **exact same manipulative strategy**: purchasing May Contracts via TAS and selling May Contracts for the purpose of depressing its price, which also allowed them to increase their position limits because they had less risk of the TAS.[10] Having purchased large volumes of May Contracts via TAS, the Vega Trading Defendants had a large financial incentive for the price of the May Contract to go lower.

138. On the trading day for April 20, 2020, each of the below Vega Trading Defendants purchased May Contracts via TAS and sold May Contracts in approximately the amounts set forth below. In total, the Vega Trading Defendants sold approximately ███ May 2020 Contracts (████████████ ████████████ and purchased approximately ███ May Contracts via TAS.[11] The Vega Trading Defendants' profits in connection with their trading of the May Contract on April 20, 2020 totaled approximately ███████

████████████████████████████████
████████████████████████████████
████████████████████████████████

---

[10] Transactions in the May Contract, including sales, move prices. TAS transactions in the May Contract, including TAS purchases, have minimal or sometimes no impact on prices.

[11] On the trading day for April 20, 2020, the Vega Trading Defendants purchased approximately ███ May 2020 NYMEX WTI futures contracts via outright trades. Approximately 40% of these purchases ████████████ came after 1:30 p.m. On the trading day for April 20, 2020, the Vega Trading Defendants sold ██ May Contracts via TAS.

**Highly Confidential**



**Highly Confidential**



Highly Confidential



140. Despite representing to the CME that the Vega Trading Defendants acted "independently" on April 20, 2020 (*see* ¶¶ 37, 126), the five Vega Trading Defendants with the highest volume of May Contract sales (approximately 69% of Vega's total sales)—Defendants Trader 6 Trader 4 Trader 5 Trader 9 Trader 3 sold May Contracts in virtual lockstep as reflected in the below chart. Based upon information and belief, Plaintiff alleges that the Vega Trading Defendants entered trades manually, and not by computer program.

Highly Confidential



141.  A statistical correlation analysis of the minute-by-minute positions of

Defendants  reflects that these

five traders' positions in the May Contract on April 20 were very highly correlated.

Specifically, the minute-by-minute positions of these five traders in the May

Contract had an extremely strong tendency (**between 96.2% and 99.7%**) to move

in the same direction at the very same time throughout the day on April 20.



142.    Further, each of the above Defendants additions to its positions was highly correlated with those of Defendant Trader 1



143.    In order to depress the price of the May 2020 NYMEX WTI crude oil futures contract (and thereby reap large profits by purchasing via TAS May Contracts at an extremely low price), the Vega Trading Defendants combined and conspired to sell large volumes of May Contracts in the final hours before the settlement price of the May Contract was to be determined at approximately 1:30 p.m. CST on April 20.  *See* below.

144.    As detailed below, the Vega Trading Defendants' large sales of the May Contract constituted an increasingly larger share of the total trading volume

Highly Confidential

of the May Contract (growing to more than 30% of the total volume during the last approximately 22 minutes of trading) at the same times that the prices of the May Contract were increasing their rate of decline. Specifically:

    a.  During the time period 9:00 a.m. CST until 11:00 a.m. CST on April 20, 2020, the Vega Trading Defendants sold approximately ███ May Contracts, which constituted approximately **6.7%** of the total volume in the May Contract during the same time period. During this time period, the Vega Trading Defendants sold, on average, ███ May Contracts per minute. The price of the May Contract decreased by approximately $1.36 per barrel from 9:00 a.m. CST (approximately $11.69 per barrel) to 11:00 a.m. CST ($10.33 per barrel).



Highly Confidential



b. During the time period 11:00 a.m. CST until noon CST on April 20, 2020, the Vega Trading Defendants sold approximately ▉ May Contracts, which constituted approximately **16.4%** of the total volume in the May Contract during the same time period. During this time period, the Vega Trading Defendants sold, on average, ▉ May Contracts per minute. The price of the May Contract decreased by approximately $5.41 per barrel from 11:00 a.m. CST (approximately $10.33 per barrel) to noon CST ($4.92 per barrel).

Highly Confidential



c. During the last 1.5 hours of trading (noon CST until 1:30 p.m. CST), the Vega Trading Defendants sold approximately ███ May Contracts, which constituted approximately **23.6%** of the total volume in the May Contract during the same time period. During this time period, the Vega Trading Defendants sold, on average, ███ May Contracts per minute. The price of the May Contract decreased by approximately $42.55 per barrel from noon CST (approximately $4.92

60

Highly Confidential



d.  During the last half hour of trading (1:00 p.m. CST to 1:30 p.m. CST),
    the Vega Trading Defendants sold approximately ███ May
    Contracts, which constituted approximately **29.2%** of the total volume
    in the May Contract during the same time period.  During this time

Highly Confidential

period, the Vega Trading Defendants sold, on average,  May Contracts per minute. The price of the May Contract decreased by approximately $38.29 per barrel from 1:00 p.m. CST (approximately $0.66 per barrel) to 1:30 p.m. CST (negative $37.63 per barrel). The average price decline of the May Contract during this time period was approximately $1.28 a barrel per minute.

Highly Confidential



e. During the last approximately 22 minutes of trading (*i.e.*, from the time when the first May Contract traded at a negative price (approximately 1:08:23 p.m. CST) until the 1:30 p.m. CST,) the Vega Trading Defendants sold approximately ███ May Contracts, which constituted approximately **30.5%** of the total volume in the May Contract during the same time period. During this time period, the Vega Trading Defendants sold, on average, ███ May Contracts per minute. The price of the May Contract decreased by approximately $37.62 per barrel from approximately 1:08:23 CST (approximately negative $0.01 per barrel) to 1:30 p.m. CST (negative $37.63 per barrel). The average price decline of the May Contract during this time period was approximately $1.71 a barrel per minute.





**E. Net Cumulative Aggressive Sales Pressure.**

145.   Though not a necessary condition for manipulation, a sufficient condition for manipulation the creation of significant net aggressive selling pressure on a futures contract.

146.   The CME provides an aggressor indicator in its market depth data for individual trades.  The CME states

> "An aggressor is defined as any customer order that triggers a trade immediately upon entering the book.
>
> Tag 5797-AggressorSide indicates if the trade had an aggressor and, if so, which side of the book it was on. When an Aggressor Side is defined (1 = Buy, 2 = Sell), the first Order Detail level related to the Summary Level represents that aggressor order.

Highly Confidential

- The aggressor quantity (tag 32) in the first Order Detail entry is equal to the Summary Level fill quantity (tag 271)
- If the aggressor quantity (tag 32) in the first Order Detail entry is equal to the sum of the remaining Order Detail entries quantity associated with that Summary Level, only customer orders were filled in the trade
- If the aggressor quantity (tag 32) is **not** equal to the sum of the remaining Order Detail entries quantity associated with that Summary Level, customer and implied orders were filled in the trade. The unreported quantity are the participating implied orders.
- There may be only **one** Order Detail entry present, which means an aggressing customer order traded against implied orders only.
- The aggressor quantity (tag 32) in the first Order Detail entry is **not** equal to the Summary Level fill quantity (tag 271)
- In this case, the aggressor joined a pool of resting orders and thereby created sufficient quantity to trigger a trade.
- This scenario can occur in any ratio spread where a different minimum quantity is required for each leg in order for the spread to trade. Examples include IVR and butterfly spreads."

https://www.cmegroup.com/confluence/display/EPICSANDBOX/MDP+3.0+-+Trade+Summary+Order+Level+Detail Last reviewed on 1/22/2021.

147. The CME describes the impact of an aggressor or an aggressing order as follows:

An "Aggressor" or "Aggressing Order" by definition is an incoming order matching with one or more orders resting on the order book. The Aggressor pulls liquidity out of the order book by triggering a match event removing resting quantity and potentially price level from the order book.

Highly Confidential

> The Aggressor is identified in each order match during the continuous trading period and reported on all three customer interfaces, Order Entry, Market Data, and Post-Matching/Clearing. There is no Aggressor indicator for trades occurring at the end of the market opening auction or any other state other than continuous trading.

https://www.cmegroup.com/confluence/display/EPICSANDBOX/Order+Function alities [last reviewed on 1/22/2021].

148. The CME describes multiple situations in which a transaction is not assigned an aggressor tag even if it has the impact of matching with one or more orders resting on the order book (and thereby "removing resting quantity and potentially price level from the order book"). These situations include the use of the mixing of a spread order and outright order to create an implied order for the execution, and during the market open re-open resolution trades.

https://www.cmegroup.com/confluence/display/EPICSANDBOX/MDP+3.0+-+Trade+Summary+Order+Level+Detail [last reviewed on 1/22/2021].

149. Also, the CME does not report an aggressor tag for market open and re-open resolution trades. *Id.*

150. Likewise, for spread trading the CME states

> "For trades involving spread instruments, the Aggressor is reported at the spread level only. Meaning, that the aggressor flag is only present in the Fill Notice for the spread summary and the flag is not present in the Fill Notices submitted for the leg components of the spread."

66

https://www.cmegroup.com/confluence/display/EPICSANDBOX/Order+Function alities [last visited on 1/26/2021].

151.   Accordingly, even transactions that do not appear in the CME aggressor column, may functionally constitute "aggressor" transactions if they remove resting bids or offers from the order book.

152.   The CME record of aggressor sales minus the aggressor purchases for a given period (*e.g.,* April 20, 2020) is one indication of the cumulative net selling pressure placed on the market during that period.

153.   If a market participant's aggressive sales exceed that participant's aggressive buys over a given period, then that participant will exert downward pressure on prices during that period. The greater the difference between the participant's aggressive purchases and sales, the more selling pressure and the greater the decline in prices that participant will cause over that period, all else equal. The greater the percentage that a market participant's net aggressive sales represent of the entire market's net aggressive sales over a given period, the larger the proportion of the price decline during that period the market participant may cause.

154.   **Total CME Net Aggressor Sales Of May Contracts On April 20.** The CME Market Depth FIX records reflect aggressive sales of approximately 47,077 May Contracts and aggressive purchases of approximately 20,769 May

Highly Confidential

Contracts on April 20. Subtracting the May Contracts transacted in aggressive purchases from the May Contracts transacted in aggressive sales on April 20, produces a net aggressive sales of May Contracts on April 20 of 26,306 contracts for the Chicago trading day from 9am.

155.   Through their coordinated selling pressure on the May Contract and their coordinated diversion of buying pressure into the TAS contract, the Vega Trading Defendants also made on April 20 aggressive sales of May Contracts that were much greater than their aggressive purchases of May Contracts.

156.   **Estimating Vega's Aggressive Sales.** The CME has a column which designates trades as "aggressor" trades in its Order Entry, Market Data, and Post-Matching/Clearing. A comparison between the exact prices and the exact times (to the nanosecond) of the transactions reflected in the CME's Market Data as aggressive sales, with the exact prices and exact times (to the nanosecond) of Vega's sales of May Contracts reflected in Vega's records, produces an estimate of the approximate amount of aggressive sales made by the Vega Defendants during April 20. Based on this comparison, Plaintiff estimates that the Vega Defendants made aggressive sales of at least ███ May Contracts on April 20.

157.   **Estimating Vega's Aggressive Purchases.** A comparison between the exact prices and exact times to the nanosecond of the transactions reflected in the CME market data as aggressive purchases, with the exact prices and exact

Highly Confidential

times (to the nanosecond) of Vega's purchase of May Contracts reflected in Vega's records, produces an estimate of the approximate amount of May Contracts of which Vega made aggressive purchases of approximately ████ contracts on April 20.

158.  Based upon the comparison of the data sets, Plaintiff has good grounds to believe and does allege that Vega made aggressive sales of at least ████ May Contracts and aggressive purchases of approximately ████ May Contracts during April 20. Discovery is needed to determine the exact extent of Vega's aggressor purchases and sales.

159.  **Estimating Vega's Net Aggressive Sales.** Subtracting Vega's estimated aggressive purchases of ████ contracts from Vega's estimated aggressive sales of ████ May Contracts on April 20 produces a net aggressive sales by Vega on April 20, of at least ████ contracts.

160.  **Estimating The Percentage That Vega's Net Aggressive Sales Constituted Of The Entire Market's Net Aggressive Sales On April 20.** The net aggressive sales by Vega of ████ May Contracts on April 20 constitutes approximately 26.4% of the total net aggressive sales of ████ May Contracts by the entire market on April 20.

161.  Applying the same methodology as applied above to the time periods within May 20, Plaintiff has good grounds to believe and does allege as follows.

162.    In addition to having a large share of the total volume of the May

Contract, the Vega Trading Defendants had an even larger share of the cumulative

total net aggressor sales.  Specifically:

a. From 9:00 a.m. CST until 11:00 a.m. CST, the Vega Trading
   Defendants had a minimum of approximately ▮▮ net aggressor sales
   of May Contracts out of a total of approximately ▮▮ net aggressive
   sales of May Contracts in the market during this same time
   period.  Thus, the Vega Trading Defendants' sales of May Contracts
   during this time period constituted at least ▮▮ of the total net
   aggressive sales of the total market during this time period.

b. From 11:00 a.m. CST until noon CST, the Vega Trading Defendants
   had a minimum of approximately ▮▮ net aggressor sales of May
   Contracts out of a total of approximately ▮▮ net aggressive sales of
   May Contracts in the market during this same time period.  Thus, the
   Vega Trading Defendants' sales of May Contracts during this time
   period constituted at least ▮▮ of the total net aggressive sales of
   the total market during this time period.

c. From noon CST until 1:30 CST, the Vega Trading Defendants had a
   minimum of approximately ▮▮ net aggressor sales of May
   Contracts out of a total of approximately ▮▮ net aggressive sales
   of May Contracts in the market during this same time period.  Thus,
   the Vega Trading Defendants' sales of May Contracts during this time
   period constituted at least ▮▮ of the total net aggressive sales of
   the total market during this time period.

d. From 1:00 p.m. CST until 1:30 p.m. CST, the Vega Trading
   Defendants had a minimum of approximately ▮▮ net aggressor
   sales of May Contracts out of a total of approximately ▮▮ net
   aggressive sales of May Contracts in the market during this same time
   period.  Thus, the Vega Trading Defendants' sales of May Contracts
   during this time period constituted at least ▮▮ of the total net
   aggressive sales of the total market during this time period.

e. From 1:08:23 p.m. CST until 1:30 p.m. CST, the Vega Trading
   Defendants had a minimum of approximately ▮▮ net aggressor
   sales of May Contracts out of a total of approximately ▮▮ net
   aggressive sales of May Contracts in the market during this same time

period.  Thus, the Vega Trading Defendants' sales of May Contracts during this time period constituted at least ▮▮▮ of the total net aggressive sales of the total market during this time period.

163.   Plaintiff has good grounds to believe and does allege that discovery will show that the Vega Defendants exerted an increasing cumulative net aggressive selling pressure on the May Contract during April 20; that their net aggressive sales ramped up during the last hours, the last hour, and the last 30 minutes of trading; and that the combination of these steps exerted a substantial downward effect on prices during April 20.

### F.  High Degree Of Communications Among Most Vega Defendants And The Common Plan For Everyone To Be Short And Use Manipulative "Ammo" At The End Of Trading.

164.   In furtherance of their agreement to depress May Contract prices, the Vega Trading Defendants communicated, in real time, about their sales of the May Contract and related matters. To do so, such Defendants employed text messages, group text messages, phone calls, and private "bulletin board" texting available via mobile phone "apps" such as "WhatsApp".

165.   Through these means, the Vega Trading Defendants discussed their May Contract positions, their selling of WTI futures, their buying of TAS positions, and their plans for depressing WTI futures contract prices.

166.   Pursuant to Defendants agreement, Defendants Trader 12 ▮▮▮▮▮▮▮

Trader 9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Highly Confidential



18:00

167.   By 1:05 Chicago time, Defendants had substantially ramped up their

sales of May Contracts and their impact on prices.

Defendants' selling pressure on the May Contract had moved prices down and was

getting very close to causing the May Contract prices to become negative.

Trader 9

Trader 12

Also between 1pm and 1:30, the Vega Defendants increased their rate of

sales to ▮ contracts per minute, and increased the amount of depression they

Highly Confidential

caused per contract sold through the use of the manipulative device of "ammo" sales. See allegations "D" immediately preceding this section.

168.    Pursuant to Defendants' agreement, three Vega Trading Defendants

Trader 9 Trader 6 Trader 4 ███████████████████████████████

███████████████████████████████████████████████

███████████████████

169.    As is revealed by a comparison of all the records in this communication with Defendant Trader 9 statements alleged above in his communication with Defendant Trader 12 Defendant Trader 4 ███████████

████████████████████████████████████████ However, Plaintiff has good grounds to believe and does allege that Defendant Trader 4

████████ Trader 9 █ Trader 12 ██████████████

███████████████████████████████ Defendant

Trader 4 sold ████ May Contracts from 1 p.m. Chicago time to 1:30 pm.

170.    Some of these conversations include the following:



Highly Confidential

██████████████████████████
██████████████

171.   Also pursuant to their combination and agreement, Defendants ███ **Trader 1** and **Trader 5** engaged in various conversations to keep one another apprised of their positions and intentions via texts on WhatsApp. Among other things, they compared their trading positions and confirmed their mutual intentions to sell May Contracts outright.



172.   Plaintiff has good grounds to believe and does allege that Defendants **Trader 1** and Defendant **Trader 5** confirmed to one another that the other Vega Trading Defendants were engaged in the same pattern of placing cumulative net selling pressure into the May Contract and diverting buying pressure away from the May Contract and into the TAS market.

173.   ████████████████████████

██████████████████████████



174. The communications between Defendant  Trader 1 and Trader 5 also indicate Defendants' mutual knowledge of their concerted diversion of buying pressure away from the May Contract and into TAS contracts.



**Highly Confidential**



175.

176.

177.

Highly Confidential



Highly Confidential

181. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

182. ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

█  ███████████████████████████████████████

**Highly Confidential**



183.

Highly Confidential

184.

Highly Confidential

██████████████████████████████████████████████████

████████████████████████████████████████

185. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

186. ████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████

**Highly Confidential**



187.

188.

189.

190.

**Highly Confidential**



191.

192.

193.

Highly Confidential

194. ███████████████████████████████████████

███████████████████████████████████████████

███████████

## G. The ICE WTI Crude Oil Futures Contract Price Is Explicitly Determined By The Price of the NYMEX WTI Crude Oil Futures Contract and Numerous Vega Trading Defendants Profited on the ICE Due to Artificially Depressing the May Contract Price on the NYMEX

195. The Defendants had an additional motivation to intentionally cause (and they did cause) artificially depressed prices of the May Contract. This is because the closing price of the May 2020 NYMEX WTI crude oil futures contract on April 20, 2020 determined the settlement price of the May Contract that expired on April 20, 2020.

196. The Intercontinental Exchange ("ICE") offers trading in effectively the same WTI crude oil futures contracts as the NYMEX (*i.e.*, representing 1,000 barrels of WTI crude oil) with one important difference.

197. Unlike NYMEX WTI futures contracts, which may be settled by physical delivery with trading terminating three business days prior to the 25th calendar day of the month prior to the contract month, trading in ICE WTI futures contracts terminate on the fourth business day prior to the 25th calendar day of the month by "cash settlement," not physical delivery.

198. More specifically, ICE WTI futures contracts cash settle to the penultimate settlement price of the corresponding NYMEX WTI crude oil futures

contract. For example, on April 20, 2020, the May Contract cash settled to the settlement price of the May 2020 NYMEX WTI crude oil futures contract on April 20, 2020 (*i.e.*, negative $37.63).

199. On April 20, 2020, the total volume of May Contracts traded was approximately 20,789 contracts. At the end of trading on April 20, 2020, a total of approximately 23,241 May Contracts remained open and thereby were cash settled to the settlement price of the May Contract on April 20, 2020 (*i.e.*, negative $37.63).

200. On April 20, 2020, numerous Vega Trading Defendants engaged in a manipulative trading strategy on the ICE that was virtually identical to the manipulative trading strategy employed by the Vega Trading Defendants on the NYMEX (*see* ¶¶138-139 above): selling May Contracts and buying May Contracts via TAS. *See* ¶¶203 below.

201. Because the settlement price of the May Contract on April 20, 2020 would be, by its express terms, determined by the closing price of the May 2020 NYMEX WTI futures contract on April 20, 2020 (*see* ¶¶ 198-99 above), the Vega Trading Defendants' artificial suppression of the May 2020 NYMEX WTI futures price alleged herein **necessarily** resulted in an artificially depressed price of the May Contract.

Highly Confidential

202.   On April 20, 2020, each of the below Vega Trading Defendants purchased May Contracts via TAS and sold May Contracts in approximately the amounts set forth below.



Highly Confidential



**F.    Vega Also Made Its Sales In An Aggressive Manner.**

203.   Another means that may be used to depress prices is to make sales in an aggressive manner.

204.   Thus, when an "aggressor" sale is executed, it "pulls liquidity out of the order book" by "removing resting" bid or bids to purchase contracts. In the context of the imbalance of sell orders over buy orders on April 20, the more that the bids were pulled out of the order book by executions, the closer that the sell orders were to "blitzing" through the orders and causing a rapid decline in prices.

205.   Plaintiff has good grounds to believe and does allege that considerably more than one half of Vega's sales were "aggressor" sales. Plaintiff has good grounds to believe that discovery will reveal that up to 90% or more of Vega's sales were aggressor sales. Plaintiff's grounds for these allegations include the following.

206.   ███████████████████████████████████



208.   Fourth, making "aggressive" sales is consistent with the Vega

Defendants conduct otherwise alleged herein, including at ¶¶42, 44, 46, 48, 50, 52-

53, 55-59, 112, 146, 154-61, 163-64, 204, 209.

## NEW ALLEGATIONS MADE PURSUANT TO THE ORDER

### I. The Extensive Interconnections, And Formal Contract Among Vega, ▮ And The Vega Trading Defendants.

209.   Vega's contract governing its relations with the Vega Trading

Defendants was an agreement made among (a) Vega, (b) ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ and (c) the Vega Trading Defendants. See ¶¶239-243 below.

### A. The Extensive Interconnections.

### 1. The Profit Interests Of Defendants Vega And ▮Individual A▮ In ▮▮▮

Highly Confidential

210. Until April 1, 2021, ███████████████████████ ████████ was owned 25% by Defendant  **Trader 1** 25% by ████████ ████████, and 50% by ████████████ who was another trader and FCA approved representative of Starmark.[12] ¶123. Defendant █████████ was listed as an office manager and director of the company.

211. On April 1, 2021, ██████ filing with the Companies House disclosed for the first time that **Individual A** was also a person with a significant interest and, in fact, control of ████ The filing disclosed that **Individual A** "holds, directly or indirectly, 75% or more of the voting rights in the company", and that ██████████████ and ████████████ were removed as directors of █████ Based on this filing, Plaintiff alleges that, from some point prior to or as of April 1, 2021 forward, **Individual A** owned a (substantial) share of the equity and held a (substantial) share of the voting rights of ████

212. On March 1, 2022, ████ was dissolved pursuant to an application co-signed by Defendants **Individual A** and **Trader 1** and no further information was provided.

213. As alleged below (¶¶214-223), ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[12] *See* ████████████████████████████████████████

Highly Confidential





[Emphasis added] See ¶167 above.

216. ███████████████████████████████████

███████████████████ Trader 11 **Trader 11** ███████████████

█████████████████████ **Trader 2** ████████████████

█████████████████████████ See ¶¶328-333 below. As a result of their

consulting with one another in their trading of the May Contract, Defendant

Trader 11 trading had an extraordinarily high minute to minute correlation with

Defendant **Trader 2** positions of .99. See ¶319 below. And Defendant

Trader 11 trading also had high correlations of .988 to .951 with the trading of

Defendants Trader 6 Trader 4 Trader 9 *Id.*

217. As previously alleged, Defendant Trader 12 made approximately

█████████ and Defendant Trader 11 made approximately █████████ from their

manipulative trades on April 20th. ███████████████████████████

█████████ Trader 12 ██████████████████████ Trader 11

████████████████████████ ██████████████████████

███████████████ Trader 12 Trader 11 ███████████████

218. ███████████████████████████████████

███████████████████████████████████████

Highly Confidential



219. ████████████████████████ **Trader 12**

**Trader 11** ████████████████████████████

████████████████████████████████████████

████████████████ **Trader 12** **Trader 11** ████

████████████████████████████████

██ See ¶218.

220. ████████████████████████ **Trader 12****Trader 11**

████████████████ **Trader 12** **Trader 11** ████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████ See ¶218.

221. ████████████████████████████

████████ **Trader 12****Trader 11** ████████████

████████████████████████████████████

████████████████████████████████████

████████████ See ¶218.

222. 

223.

## 2. The Formation Of Vega.

### a. During 2015 And 2016, The United Kingdom Announces And Implements Enhanced Prohibitions Of Manipulation

224.    By as early as May 11, 2015, the U.K.'s Financial Conduct Authority

published its policy proposals and handbook of rules and guidance to support the

implementation of the new European Market Abuse Regulation regime, to apply

from July 3, 2016.  *FCA consults on Market Abuse Regulation policy proposals

and Handbook changes*, FCA Press Release (May 11, 2015), at

https://www.fca.org.uk/news/press-releases/fca-consults-market-abuse-regulation-

policy-proposals-and-handbook-changes; *see* FCA's website *Market Abuse

Regulation*, at https://www.fca.org.uk/markets/market-abuse/regulation, hyperlink

"*EU Market Abuse Regulation*" (Regulation (EU) No. 596/2014 of the European

Parliament and of the Council of April 16, 2014 on market abuse (market abuse

regulation) and repealing Directive 2003/6/EC of the European Parliament and of

Highly Confidential

the Council and Commission Directives 2003/124/EC, 2003/125/EC and

2004/72/EC) (last visited Apr. 27, 2022).

225.   By December 17, 2015, the European Union supplemented the EU

Market Abuse Regulation. *See* E.U. Commission Delegated Regulation (EU)

2016/522 (applicable from July 3, 2016), at

https://www.fca.org.uk/markets/market-abuse/regulation, hyperlink "*Delegated*

*Regulation 2016/522*" (last visited Apr. 27, 2022).

226.   Effective July 3, 2016, the EU Market Abuse Regulation was

automatically applicable in the UK under UK and EU law without the need for any

domestic implementing legislation as the UK was a member of the EU at the time

of implementation, and the UK amended its Financial Services and Market Act

2000 to give effect to and make it compatible with the EU Market Abuse

Regulation. Financial Services and Market Act 2000 (Market Abuse) Regulations

2016, Part 1.1 (Statutory Instruments, 2016 No. 680) ("UK MAR"). See Market

Abuse (Amendment) (EU Exit) Regulations 2019, UK Statutory Instruments (2019

No. 310) (substantially retaining EU Market Abuse Regulation following the end

of the Brexit transition period, pursuant to the European Union (Withdrawal Act

2018), available at https://www.legislation.gov.uk/uksi/2019/310/contents/made

(last visited April 28, 2022).

Highly Confidential

227. For purposes of Article 12(1)(a) of the UK MAR, which prohibits manipulation, the UK MAR explicitly sets forth non-exhaustive indicators of manipulative trading, effective July 3, 2016. UK MAR, Annex I (https://www.fca.org.uk/markets/market-abuse/regulation#revisions, at hyperlink "Market Abuse Regulation (MAR)") ("UK MAR, Annex I"). The indications include:

> (a) the extent to which orders to trade given or transactions undertaken represent a significant proportion of the daily volume of transactions in the relevant financial instrument …, in particular when those activities lead to a significant change in their prices;

> (b) the extent to which orders to trade given or transactions undertaken by persons with a significant buying or selling position in a financial instrument…, lead to significant changes in the price of that financial instrument, related spot commodity contract, or auctioned product based on emission allowances;

> ****

> (e) the extent to which orders to trade given or transactions undertaken are concentrated within a short time span in the trading session and lead to a price change which is subsequently reversed;

> ****

> (g) the extent to which orders to trade are given or transactions are undertaken at or around a specific time when reference prices, settlement prices and valuations are calculated and lead to price changes which have an effect on such prices and valuations.

UK MAR, Annex I.

**b. These Enhanced Protections Against Manipulation Created Greater Financial And Legal Risks For Firms Which Carried Accounts For Manipulators.**

228. After the announcements in 2015 about the increased regulations against manipulations and market abuses, it was clear that there would be greater legal and financial risks for registered persons to hold the accounts of manipulators, including persons who manipulated prices at or around the time of the determination of the TAS.

229. These legal and financial risks created incentives to form and opened opportunities for persons to form trading firms that could assume the substantial legal and financial risk of working with persons who engaged in TAS manipulations. Such firms could seek to create a series of norms, trading procedures, and compliance (or lack thereof) that facilitated and would help defend against charges of TAS manipulations.

230. In the foregoing context, Vega was incorporated on May 13, 2016, with Anthony Gibson as its sole shareholder. See ¶34.

**c. Vega's Apparent Founder, Anthony Gibson, Is A Business Partner With Defendant Trader 1 Including In ▌▌▌▌▌**

231. Anthony Gibson and Defendant Trader 1 are or have been business partners in various ventures.

232.   These include, without limitation, ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

233.   On November 9, 2018, Trader 1 Gibson and Trader 5 incorporated

▮▮▮▮▮▮▮▮▮▮▮ as a private limited company ▮▮▮▮▮▮

▮▮▮▮ According to Companies House records, Trader 5 resigned as

Director on October 7, 2019 and was replaced the same day by Trader 4

identified as "Derivatives Trader." Trader 4 resigned as Director on May 7, 2020.

All four owned significant shares in ▮▮ during their directorships, with Trader 1

and Gibson still continuing as Directors of ▮▮▮▮▮▮▮, which has an

active company status with the latest confirmation statement filed on November

18, 2021.

234.   Defendant Individual A worked at ▮▮▮▮▮▮ and knew Defendant

Trader 1 while at ▮▮▮▮▮▮ during 2007 and later. According to the

Businessweek article "The Essex Boys: How Nine Traders Hit a gusher With

Negative Oil," Trader 1 did know ▮▮▮ while Trader 1 was running "an off-site

offshoot of Tower Trading Group," and when Individual A and Gaunt left to "start their

own outfit," Trader 1 and his team of traders joined him.

235.   It was also Trader 1 partner, Anthony Gibson who signed on behalf

of Vega the agreement with GH Financials alleged below.

Highly Confidential

    **d. Vega's High Turnover Of Four Owners In Three Years Before  Becomes Sole Shareholder.**

236.    As previously alleged, Vega had four different owners within three years. See ¶34. By February 3, 2020, Defendant ███████ was the sole owner of Defendant Vega.

237.    Between October 26, 2017 and August 13, 2019, Vega was registered with the United Kingdom Financial Control Authority as an Appointed Representative of Starmark.

    **B. The Written Agreement Between And Among Vega, ███ And The Vega Trading Defendants.**

238.    In Autumn 2017 and thereafter, a ████████████ ████████ ("Agreement") was made between and among ██████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████

239.    Pursuant to this Agreement ████████████████ ████:

Highly Confidential



Highly Confidential



240. ████████████████████████████

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
███████████████████

241. ████████████████████████████

████████████████████████████
████████████████████████████
████████████████████████████

242. ████████████████████████████

████████████████████████████



**C. In Its "Market Facing" Agreement With GH Financials, Vega Expressly Agreed That It Was The Principal For Each Trade By A Vega Trading Defendant And That The Vega Trading Defendants Were Acting As Vega's "Agent" Or Otherwise Acting For Or On Behalf Of Vega.**

243.    GH Financials (see ¶65 above) was a clearing member of the

CME. Pursuant to a "GH FINANCIALS LIMITED TERMS OF BUSINESS

FOR EXCHANGE TRADED FUTURES AND OPTIONS BUSINESS"

("TOB") (Version 15.1) dated July 12, 2016, and signed by Anthony Ross

Gibson on behalf of Vega Capital London Ltd., Vega agreed in entering its

relationship with GH Financials that:

TOB ¶27 (f).

244.    <u>**Vega Expressly Agreed That Trades In Its Accounts Would Be**</u>

<u>**Made On Vega's Behalf By Authorized Persons.**</u>  Pursuant to Vega's agreement

with GH Financials, only                        of Vega were permitted to perform

acts on behalf of Vega.

Highly Confidential



TOB ¶9 [emphasis added].

245. Plaintiff alleges that an ███ under ¶9 of Vega's Agreement with GH Financials quoted above, included the placing of ███, and the holding of orders that were ███ as trades.

246. Each Vega Trading Defendant typically placed "orders" for its sub-account which were "executed" by GH Financials.

247. As such, pursuant to Vega's TOB with GH Financials, ¶9, each Vega Trading Defendant was acting either as Vega's ███ or had otherwise been granted ███ by Vega to ███ of Vega to enter trades, or had otherwise been granted authority by Vega in its trades.

248. Plaintiff further alleges that, pursuant to TOB ¶9, Vega was the ███ for all trades made by each Vega Trading Defendant.

249. Vega and GH Financials also entered a "Clearing Module" on July 12, 2016. They later entered, on or about November 16, 2017, an updated Terms of Business for Exchange Traded Futures and Options Business.

Highly Confidential

250.   Neither the Clearing Module nor the updated November 16, 2017 agreement purported to modify or amend the foregoing provisions of the TOB in any way.

251.   On the contrary, the 2017 TOB expressly provides and adds to the former clause 27(f) (quoted above):



2017 TOB ¶6(b).

252.   "Applicable Regulations" is defined in ¶5 of the 2017 TOB as meaning:



2017 TOB ¶5. For transactions on the CME, applicable laws include U.S. laws, including, but not limited to the laws prohibiting manipulation, and agreements to fix and manipulate prices.

253.   When GH Financials terminated its business with Vega after the May Contract manipulation on April 20th, GH Financials did not terminate the business

only with the Vega Trading Defendants. Instead, GH Financials terminated **all** business with Vega.

1. **Long Before April 20, 2020, Defendants Vega And** ▮▮▮ **Well Knew That The VTDs Traded In Unison To Manipulate Prices.**

254. The Vega Trading Defendants "regularly" acted in unison to make transactions which moved the TAS price at the time of settlement.

255. For example, in an award-winning article authored by Liam Vaughan, Kit Chellel & Benjamin Bain, *London Traders Hit $500 Million Jackpot When Oil Went Negative*, Bloomberg Businessweek (August 4, 2020) explicitly reported as follows:

> Vega's jackpot [on April 20, 2020 in the May contract] …involved about a dozen traders aggressively selling oil in unison before the May West Texas Intermediate contract settled at 2:30 p.m. in New York…**It's a tactic Vega's traders used regularly, according to another person familiar with the firm's strategy**…

*See* full copy of article, annexed as Exhibit 2 to this Amended Complaint.

256. In another award-winning article authored by Liam Vaughan, *The Essex Boys: How Nine Traders Hit a Gusher With Negative Oil*, Bloomberg, (December 10, 2020) explicitly reported that

> **…trading records and people who worked alongside them** [the VTDs] indicate they [the VTDs] frequently operated in a similar fashion [to their conduct on April 20th in the May Contract], buying or selling in the same direction at key moments.

*See* full copy of article, annexed as Exhibit 1 to this Amended Complaint.

257.    The articles won the British Journalism award for Crime and Legal Affairs Journalism in 2021. https://pressgazette.co.uk/british-journalism-awards-winners-2021/

258.    The award-winning journalism quoted above reports that "trading records", "people who worked alongside" the Vega Trading Defendants, and "a person familiar with the firm's strategy", all show or indicate that, prior to April 20, 2020, the Vega traders "regularly" or "frequently" traded in a similar fashion to their manipulative trading on April 20th. Regarding the reference to "trading records" in the award winning article quoted above, Vega and Individual A also had **complete knowledge** of the trading records of the Vega Trading Defendants. This included real time knowledge of what the VTDs were trading and doing. Prior to COVID, Vega and Individual A had at times worked in the same office and "alongside" at least some of the VTDs in the trading arcade.

259.    In fact, Defendants Vega and Individual A had access to much more than simply the trading records. Based on the allegations set forth below, Defendants Vega and Individual A had sophisticated detailed analytical tools in real time. This enabled Defendants Vega and Individual A easily to detect trading patterns in real time, as these patterns developed. This included *high degrees*

105

Highly Confidential

*of correlation of the trading between and among the accounts.* Among

other things:



**Highly Confidential**





260.    Corroborating the award winning journalism based upon the
multiple sources alleged above, VTD **Trader 9** stated that ███████████

███████████████████████████████████████████████

███ See ¶179 above. **Trader 9** ███████████████████

███████████████████████████████████████████████

██████

261.    As of April 20, 2020, Defendants Vega and **Individual A** also had
handled the VTDs' trading for ████. Vega and **Individual A** also well knew that
the Vega Trading Defendants had for years traded together to ██████
markets by making trades in unison to move prices.

## 2. The Vega Trading Defendants Engaged in Coordinated Trading In WTI Crude Oil Futures Contracts A Month Prior to Engaging in Substantially Similar But More Extreme Conduct on April 20, 2020

262.   By March 19, 2020, the penultimate trading day in the April 2020 NYMEX WTI crude oil futures contract, the trading volume in the April 2020 contract had been significantly reduced.  The low volume (*i.e.*, "thin" market) made the April 2020 contract susceptible to manipulation by "ammo" trading.

263.   The average trading volume in the April 2020 contract for the twenty (20) trading days preceding March 19, 2020 was approximately 881,814 contracts. The trading volume in the April 2020 contract on March 19, 2020 was approximately 136,722 contracts, an 84.5% decrease in the average volume for the preceding twenty (20) trading days.

264.   On March 19, 2020, the Vega Trading Defendants sold approximately ███ April 2020 contracts, purchased approximately ███ May 2020 contracts, purchased approximately ███ April 2020 contracts via TAS and sold approximately ███ May 2020 contracts via TAS. █████████████████████████
███████████████████████████████████████
███████████████████████[14]

     a. ██████████████████████████████████████

---

[14] Defendants Trader 10 Trader 8 Trader 11 Trader 7 did not trade NYMEX WTI futures on March 19, 2020.

**Highly Confidential**



---

[15] Defendant  Trader 5 also sold ■ May 2020 contracts and purchased ■ May 2020 contracts via TAS.

[16] Defendant Trader 4 also purchased ■ April 2020 contracts and sold ■ May 2020 contracts.

[17] Defendant Trader 6 also purchased ■ April 2020 contracts, sold ■ April 2020 contracts via TAS, sold ■ May 2020 contracts and purchased ■ May 2020 contracts via TAS.

[18] Defendant Trader 9 also sold ■ May 2020 contracts.

Highly Confidential

265.   The foregoing short April and long May "spread" positions, along with the corresponding TAS orders to buy the April contract and sell May contract at their respective settlement prices, gave each of the above Vega Trading Defendants an incentive to depress the price of the April contract relative to the price of the May contract.

266.   

267.

268.   Based upon Plaintiff's interpretations of and CME market depth data for March 19, 2020, Plaintiff alleges as follows with respect to the intra-day trading of the Vega Trading Defendants on March 19, 2020.

Highly Confidential

269.    During the final hour of trading on March 19, 2020 (*i.e.*, 12:30 to 1:30 pm central time) the Vega Trading Defendants sold a total of approximately ███ April 2020 contracts.[19]  That is, the Vega Trading Defendants waited until late in the trading day and compressed **more than** ███ of their total April 2020 contract sales during the final hour of trading.  During the final hour of trading, the price of the April-May spread decreased from approximately negative 53 cents at 12:30 pm to approximately negative 69 cents at 1:30 pm.  During the final hour of trading, the Vega Trading Defendants sold the April 2020 contract in the following volumes.



a. Trader 5

b. Trader 4

c. Trader 6

d. Trader 3

e. Trader 12

f. Trader 9

g. Trader 1

h. Trader 2

---

[19] The Vega Trading Defendants also purchased ███ April 2020 contracts during the final hour of trading.

[20] Defendant Trader 4 also purchased ███ April 2020 contracts during the final hour of trading.

[21] Defendant Trader 6 also purchased ███ April 2020 contracts during the final hour of trading.

270.  During the final thirty (30) minutes of trading on March 19, 2020 (*i.e.*, 1:00 to 1:30 pm central time) the Vega Trading Defendants sold a total of approximately ▮ April 2020 contracts.[22]  That is, the Vega Trading Defendants waited until late in the trading day and compressed **more than** ▮ of their total April 2020 contract sales during the final thirty (30) minutes of trading.  During the final thirty (30) minutes of trading, the price of the April-May spread decreased from approximately negative 49 cents at 1:00 pm to approximately negative 69 cents at 1:30 pm.  During the final thirty (30) minutes of trading, the Vega Trading Defendants sold the April 2020 contract in the following volumes.

 a. **Trader 4** (LVEGF042) sold approximately 1,051 April 2020 contracts.[23]

 b. **Trader 5** (LVEGF003) sold approximately 663 April 2020 contracts.

 c. **Trader 6** (LVEGF022) sold approximately 600 April 2020 contracts.[24]

 d. **Trader 9** (LVEGF013) sold approximately 300 April 2020 contracts.

 e. **Trader 12** (LVEGF029) sold approximately 210 April 2020 contracts.

 f. **Trader 1** (LVEGF001) sold approximately 150 April 2020 contracts.

 g. **Trader 2** (LVEGF006) sold approximately 10 April 2020 contracts.

---

[22] The Vega Trading Defendants also purchased ▮ April 2020 contracts during the final thirty minutes of trading.

[23] Defendant **Trader 4** also purchased ▮ April 2020 contract.

[24] Defendant **Trader 6** also purchased ▮ April 2020 contracts.

113

271.   During the final two (2) minutes of trading on March 19, 2020 (*i.e.*, 1:28 to 1:30 pm central time) the Vega Trading Defendants sold a total of approximately ▮▮▮ April 2020 contracts.  During the final two (2) minutes of trading, the price of the April-May spread decreased from approximately negative 65 cents at 1:28 pm to approximately negative 69 cents at 1:30 pm.  During the final two (2) minutes of trading, the Vega Trading Defendants sold the April 2020 contract in the following volumes.



a.  Trader 5

b.  Trader 1

c.  Trader 4

d.  Trader 12

e.  Trader 2

272.   Based on time and sales information in the CME market depth data ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Vega Trading Defendants' (a) sales of approximately ▮▮▮ April 2020 contracts during the final hour of trading constituted approximately ▮▮▮ of the volume of April 2020 contracts during that time period; (b) sales of approximately ▮▮▮ April 2020 contracts during the final thirty (30) minutes of trading constituted approximately ▮▮▮ of the volume of April 2020 contracts during that time period; and (c) sales of approximately ▮▮▮ April 2020 contracts during the last two (2) minutes of trading

constituted approximately ██████ of the volume of April 2020 contracts during that time period.

273.  At the close of trading on March 19, 2020, the April-May spread settled at negative 69 cents.  The closing spread price of negative 69 cents on March 19 was an all-time low for the spread price of the April-May 2020 contracts and was more than **four standard deviations** lower than the mean spread over the prior year of trading.

274.  At the close of the next trading day on March 20, 2020, the April-May spread settled at negative 20 cents.  Thus, on March 20, 2020, after Vega's trading on March 19 had ceased, the spread price rebounded substantially by 49 cents.

275.  In total, the Vega Trading Defendants generated net profits of approximately ██████████ in connection with their trading of April and May 2020 contracts on March 19, 2020:



Highly Confidential



3. **Based on the Vega Trading Defendants' Activities on March 19, 2020 and Other Reasons, Defendants Vega Capital and** Individual A **Knew That The Vega Trading Defendants Were Engaged in Manipulative Trading And Affirmatively Took Steps To Facilitate The Manipulation.**

276.    The potential for abuse of TAS trading in order to affect the price of a commodity futures contract is well known.  The Commodity Futures Trading Commission ("CFTC") has brought multiple cases involving TAS trading, including TAS trading in the WTI crude oil futures market.

277.    In 2016 new regulations were passed in the U.K. that included a non-exhaustive list of manipulative trading indicators.  Such indicators included: (a) significant buying or selling of a financial instrument that leads to significant changes in the price of that financial instrument; (b) transactions concentrated within a short time span in the trading session and lead to a price change which is subsequently reversed; and (c) transactions undertaken at or around the time when settlement prices are calculated which have an effect on such prices.  All three of

these indicators were present in respect of the Vega Trading Defendants' trading activity on March 19, 2020.  *See* ¶¶224-227 above.

278.   As part of Vega  agreement with GH Financials, Vega represented, warranted and agreed, among other things, that



279.

280.   As part of its agreement with GH Financials, Vega agreed to

As part of Vega's agreement with the Vega Trading Defendants, Vega agreed to                    GHF TOB Annex 3, Section 3

281. 

282. According to Bloomberg's award-winning reporting, a person familiar with Vega's strategy stated that Vega's traders "regularly" traded in unison.

283. Far beyond being merely "familiar" with the Vega Trading Defendants' strategy, Defendants Vega and ▮Individual A▮ had real time access to all trading in Vega's accounts and received daily statements of all trading in Vega's accounts, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.

284. A review of Vega's trading on March 19, 2020, just a month before April 20, would have revealed the following "red flags" to Defendants Vega and ▮Individual A▮ (a) each of the eight Vega Trading Defendants that traded NYMEX WTI crude oil futures traded in the exact same direction in both the April and May contracts; (b) each of the eight traders that traded NYMEX WTI crude oil futures also used TAS orders in the same direction for both the April and May contracts; (c) the traders traded a significant volume of contracts in the April contract (more than ▮▮▮ contracts or more than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ barrels of

oil), which was set to expire the following day; (d) a substantial volume of transactions by the Vega Trading Defendants were concentrated near the end of trading on March 19, 2020; and (e) the April-May spread price moved in the direction of Vega's trading on March 19, 2020 and then reversed on the next trading day on March 20, 2020. *See* above.

285. Despite the coordinated ammo trading in the April 2020 contract on March 19, which, like the May 2020 contract on April 20, was set to expire the following day, Defendants Vega and  did not take steps to prevent the Vega Trading Defendants from engaging in substantially similar manipulative conduct on a much larger scale on April 20, 2020.

286. Going well beyond the trading on March 19, on April 20, twelve Vega Trading Defendants, not eight, engaged in coordinated trading and the Vega Trading Defendants ██████ their volume of trades on April 20 (more than ██████ contracts on April 20 in the front month contract versus more than ██████ contracts on March 19 in the front month contract).

287. ████████████████████████████████

████████████████████████████████████████████

████████████████ that Defendants Vega and ████ revoked the Vega Trading Defendants' access to Vega's trading accounts.

### 4. The VTDs Stalked Futures Contracts To Determine Those Most Vulnerable To Manipulation, And Then Blitz The Market By Making Trades In Unison To Move Prices.

288.    Plaintiff has good grounds to believe and does allege that when Defendants ▇Trader 9▇ stated shortly after the close on April 20th that ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ his reference to ▇▇▇▇ referred to the Vega Trading Defendants; his use of the word ▇▇▇▇ referred to the VTDs' extensive ammo trades to drive down prices between 1pm and 1:30; and his reference to ▇▇ referred to the May Contract and, specifically, the last 30 minutes of trading therein.

289.    The VTDs' ▇▇▇▇▇▇ of futures contracts to manipulate the final settlement prices or prices at other key times, was most likely to be successful in markets which were thinly traded and had less new entrants into the market.  In such market conditions, the VTDs' chances to trade in unison to successfully blitz the market and manipulate prices were much higher.

290.    The VTDs often had greater volumes of trades in contracts which, like the April WTI contract and the May WTI contract, were near the end of trading and less likely to have new entrants. Such contracts were more likely to have lower trade volume than earlier during the life of the contract when there were more new entrants into the market.

Case 4:22-cv-05490... Document #732... Filed 05/29/2024... Page 187 of 273... PageID #: ...
Highly Confidential

291. In addition to the April 2020 and May 2020 WTI contracts, the VTDs traded significant volumes of contracts in other contracts which were near expiration and likely to have less new entrants.

292. For one example, seven of the VTDs (Defendants ███

| Trader 1 | Trader 5 | Trader 3 | Trader 9 | Trader 6 | Trader 10 | Trader 7 | traded |

███ April ICE gasoil futures contracts on March 25, 2020 when the volume in that contract was approximately 1/3 of its trailing 30 day average.

### 5. Defendants Vega And Individual A Actively Facilitated The April 20th Manipulation, Profited Therefrom, And Specifically Intended That The Trades Which Vega Was Making In The May Contract Would Manipulatively Depress May Contract Prices

293. Defendant Individual A worked in and was ██████████

████████████████████████

████████████████████████

See ¶¶ 114-117.

294. According to a former compliance person at the IPE, the IPE should have had restrictions relating to TAS which made TAS manipulation on the IPE more difficult. *See* Oil Bonanza at U.K. Firm Casts Light on Price-Blind Trades, Liam Vaughan and Benjamin Bain (August 7, 2020), https://www.bloomberg.com/news/articles/2020-08-07/oil-bonanza-at-u-k-firm-casts-spotlight-on-price-blind-trades. After leaving the IPE, such compliance

Highly Confidential

person learned that the wrongdoing on the IPE in TAS manipulation was "blatant".
*Id*.

295. In general, there are two types of compliance people. The first type consists of persons who seek to enforce compliance with the rules. The second type seek to facilitate the violation of the rules (here, manipulation) but use their compliance knowledge simultaneously to try to avoid adverse consequences from such violation.

296. On and well before April 20th, the work of Defendants ▮Individual A▮ and Vega in fulfilling their duties to achieve compliance with the rules and prevent manipulation, greatly facilitated manipulation and sought to avoid the adverse consequences from manipulation. And Defendant ▮Individual A▮ and Vega consistently did not seek to prevent manipulation.

297. With full knowledge of what had happened on the penultimate trading day of the prior expiring WTI contract (that is, the April Contract on March 19th, see above), Defendants Vega and ▮Individual A▮ facilitated the manipulation of May Contract on its penultimate day of trading.

298. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮

**Highly Confidential**



299. Second,

300. Third,

301. Fourth,

302. Fifth,

303. Sixth,

304. Seventh,

305. Eighth, 

See e.g., ¶¶224-227, 278-280 above.

306. But instead of sending emails or other written communications demanding explanations from the VTDs about what they were doing, Defendants Vega and ▮Individual A▮ did nothing to stop the manipulation.

307. On the contrary, consistent with the long train of facts beginning with the creation of Vega after more restrictive prohibitions of manipulation (including TAS manipulation) had been announced, the only affirmative actions in which Defendants Vega and ▮Individual A▮ had engaged were those which facilitated the manipulation, e.g., ▮▮▮▮▮ In addition to failing to ask any questions of anyone, Defendants Vega and ▮Individual A▮ did not, for example, restrain the amounts of trades that the VTDs could make. Nor did Vega and ▮Individual A▮ take any other steps to avoid manipulation.

308. Instead, Defendants Vega and  continued to allow the manipulation to succeed and ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ See ¶251, citing to 2017 TOB ¶6(b).

309. Plaintiff has good grounds to believe and does allege that the specific intention of Defendants Vega and [Individual A] on April 20th was to facilitate the manipulation by the VTDs of the May Contract. Defendants Vega and [Individual A] had a substantial financial motivation for doing so based on their profit shares of Defendants [Trader 12] [Trader 11]. Defendants [Individual A] and Vega could see in real time the large short positions that Defendants [Trader 12] [Trader 11] were developing in the May Contract. Plaintiff has good grounds to believe and does allege that Defendants Vega and [Individual A] had other financial reasons to facilitate the manipulation.

310. In the vacuum of compliance conduct by Defendants Vega and [Individual A] GH Financials began to send trading alerts and ask questions on the afternoon of April 20th. Defendants Vega and [Individual A] demonstrated no initiative or efforts additional to GH Financials' questions to uncover a manipulation by the VTDs.

Instead, Defendants Vega and  Individual A merely acted as a vessel to answer the questions put by GH Financials.

311.    But as the GH Financials questions were beginning, Defendants Individual A sought to avoid detection of the manipulation and minimize the adverse consequences therefrom by telling Defendant Trader 9 (the ebullient Defendant who said that, after years of training, the VTDs had ███████████ on April 20th) ███████████. Specifically, Defendant Trader 9 stated to Trader 10 and others on the morning of April 21st:

[emphasis added] Vega_Mish_00021-25. Trader 10 positions in the May Contract had an extremely high minute to minute correlation with other VTDs, e.g., .965 Trader 9 .965 Trader 3 .960 Trader 5 Trader 5 and .946 Trader 4.

312.    Both ███████████ are identified as being ██████ Trader 9 in the Vega letter to the CME. Vega_MISH_000042691. Plaintiff has good grounds to believe and does allege that the explanation for the difference in display names may be that Trader 9 switched electronic devices; in any event, both ███████████ signify that it is Trader 9 talking.

313.   Plaintiff has good grounds to believe and does allege as follows. First, ▮Individual A▮ as used by Defendant ▮▮ above, refers to ▮Individual A▮. Plaintiff alleges that it was ▮Individual A▮ who called Defendant ▮Trader 9▮ and told him not to tell ▮▮▮▮▮▮▮▮▮▮

    a.  One basis for Plaintiff's foregoing belief is that no ▮▮▮ other than ▮Individual A▮ appears in any of the scores of names included in the production to Plaintiff.

    b.  Another basis is the long train of conduct by Defendants ▮"OEJWJEVBJ"▮ and Vega alleged below, which further supports Plaintiff's allegations that Defendant ▮Individual A▮ and Vega knew about and participated in Defendants' manipulations.

314.   Based on the foregoing, Defendant ▮Individual A▮ statement to Defendant ▮Trader 9▮ ▮▮▮▮▮▮▮ on April 20th, constitutes a further manipulative act intended to minimize the likelihood of detection of the VTDs manipulation on April 20th, and avoid the adverse consequences of such detection.

## 6.  Defendant ▮Trader 7▮

315.   (a) **First**, Defendant ▮Trader 7▮ admits that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ VEGA_MISH_000042650.

Highly Confidential

(b) **Second,** Defendant Trader 7 expressly admits ███████████

███████████████████████████

VEGA_MISH_000042650. ████ includes Defendant Individual A and others at

Vega.

316.   Defendant Trader 7 foregoing admitted ███████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████

317.   That Defendant Trader 7 did, during this excellent **opportunity** to

conspire, actually reach an agreement with the VTDs, is strongly corroborated by

the following.

318.   Defendant Trader 7 May Contract trading has an extremely high minute

to minute correlation of .989 to Defendant Trader 2 minute to minute

positions.

319.   Defendant Trader 7 minute to minute correlation on April 20th with

Defendant Trader 11 minute to minute positions is an extraordinarily high .984.

320.   Defendant Trader 7 minute to minute correlation on April 20th with

Defendant Trader 6 minute to minute positions is an extraordinarily high .975.

321.  Defendant Trader 7 minute to minute correlation on April 20th with Defendant Trader 4 minute to minute positions is an extraordinarily high .971

322.  Defendant Trader 7 minute to minute correlation on April 20th with Defendant Trader 9 minute to minute positions is a very high .944.

323.  The foregoing extremely high correlations are very contrary to independent conduct. They are extremely consistent with an agreement between Trader 7 and the VTDs to depress May Contract prices.

324.  Also, Defendant Trader 7 also made increasing amounts of aggressor sales in the May Contract beginning at 11am.

325.  Additionally, Defendant Trader 7 made aggressor, uneconomic "ammo" sales between 1 and 1:30pm including while the CME was entering stop trading orders to attempt to maintain orderly May Contract trading.

326.  By joining other VTDs in making uneconomic aggressor "ammo" sales at increasingly lower prices between 1 and 1:30pm, Defendant Trader 7 and the other VTDs overcame the CME's orderly-market trading halts, and greatly depressed May Contract prices.

327.  Because Defendant Trader 7 trading pattern manipulatively sought to depress prices on a public market, and manipulation of a public market is more likely to succeed through an agreement with others than by one's own trading, it is

extremely plausible that Defendant [Trader 7] and other VTDs were trading on April

20th pursuant to an agreement to depress prices.

### 7. Defendant [Trader 11]

328.    In addition to the parallel conduct in which Defendant [Trader 11]

and the other VTDs engaged, [Trader 11] communications with other VTDs

include at least 48 text communications which [Trader 11] initiated with

Defendant [Trader 2] on April 20, 2020 as they coordinated their

trading in the May Contract.

329.    As a result of such coordination, Defendant [Trader 11] minute to

minute positions on April 20th in the May Contract has an extraordinarily

high correlation to Defendant [Trader 2] minute to minute positions

of 99.3%.

330.    Such Defendants' high degree of coordination of their May

Contract trading includes, for example, the following communications.

    a.  At 3:15 am Chicago time (9:15 am London time) [Trader 11] states

        to Defendant [Trader 2] "It's all about wti now".

    b.  At 9:24 to 9:25 Chicago time, [Trader 2] and ▮

        [Trader 11] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

130

**Highly Confidential**



331.   Defendant <span style="background:black">Trader 11</span> ███████████████████

████ <span style="background:black">Trader 2</span> ████████████████████████

███████. Approximately two minutes after the request, at 12:58pm Chicago

Time, Defendant <span style="background:black">Trader 11</span> sent Defendants <span style="background:black">Trader 2</span> ██████████████

<span style="background:black">Trader 11</span> ██████████████ <span style="background:black">Trader 2</span> ████████████████

████

332.    Also, Defendant <span style="background:black">Trader 11</span> minute by minute positions in the

May Contract was 94.9% correlated with the overall minute to minute

positions of Defendants <span style="background:black">Trader 1</span>   <span style="background:black">Trader 2</span>   <span style="background:black">Trader 3</span>

Highly Confidential

|  | Trader 4 | Trader 5 | Trader 6 | Trader 9 |

Trader 12

333.    The extremely high correlations of Defendant Trader 11 trading

with that of the other manipulators, combined with the numerous explicit

communications coordinating his trading with Defendant Trader 2 is

highly consistent with an agreement to manipulate May Contract prices and

directly contrary to independent individual decision making by Defendant

Trader 11

## CLASS ALLEGATIONS

334.    Plaintiff brings this action on behalf of itself, and all others similarly

situated, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil

Procedure on behalf of the following Class:

> All persons and entities that purchased and/or sold during the period
> from at least April 20, 2020 through at least April 21, 2020 a May 2020
> light sweet crude oil (WTI) futures contract traded on the NYMEX
> and/or the ICE. Excluded from the Class are Defendants and their
> officers, directors, management, employees, subsidiaries, or affiliates
> and all federal governmental entities.[25]

335.    The Class is so numerous that joinder of all members is impracticable.

Due to the nature of the commerce involved, the members of the Class are

---

[25] Plaintiff reserves the right to amend the definition of the Class in the class motion or
otherwise.

geographically dispersed throughout the United States. Plaintiff believes there are hundreds of members of the Class.

336. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. Whether Defendants combined, conspired, and agreed to manipulate and fix the prices of NYMEX and/or ICE WTI crude oil futures contracts in violation of the Sherman Act;

    b. whether Defendants manipulated NYMEX and/or ICE WTI crude oil futures contracts in violation of the CEA;

    c. whether such manipulation caused NYMEX and/or ICE WTI crude oil futures contracts to be artificial;

    d. whether such manipulation caused cognizable legal injury under the CEA;

    e. whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests;

    f. whether Defendants were unjustly enriched to the detriment of Plaintiff and the Class; and

g. the operative time period and extent of Defendants' foregoing violations.

337. Plaintiff's claims are typical of the claims of the other members of the Class he seeks to represent. Plaintiff and members of the Class all sustained damages arising out of Defendant's same course of unlawful conduct alleged herein.

338. Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel experienced in complex commodity futures manipulation and antitrust class actions. Plaintiff has no interests that are adverse to or in conflict with other members of the Class.

339. The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

340. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect

Highly Confidential

to persons similarly situated. It would do so without sacrificing procedural fairness or bringing about other undesirable results.

341. The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Plaintiff anticipates no difficulty in the management of this action as a class action.

## **INJURY TO PLAINTIFF AND CLASS MEMBERS**

342. During the Class Period, Plaintiff and Class members transacted in WTI crude oil futures contracts at artificial prices and were deprived of a lawfully operating market.

343. Further, by reason of the alleged violations of the CEA and Sherman Act, Plaintiff and Class members sold at prices that were not what they would have paid in the absence of the extensive unlawful conduct alleged herein. As a result, Plaintiff and Class members have suffered a legally cognizable injury due to Defendants' alleged violations of the CEA and Sherman Act.

344. Defendants' manipulation caused fluctuating amounts of artificiality in the prices of NYMEX WTI crude oil futures contracts beginning at least as early as April 20, 2020 and continuing until at least until April 21, 2020.

345. The specific amounts of actual damages under the CEA and damages under the Sherman Act have not yet been determined because such determination will require discovery of the conduct of Defendants, the NYMEX, and other non-parties.

**AS AND FOR A FIRST CLAIM**

**<u>AGAINST ALL DEFENDANTS</u>**

**(Violation of Section 1 of the Sherman Antitrust Act 15 U.S.C. §1 *et seq*.)**

346. Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

347. Defendants Vega Capital London, Ltd., ███Individual A███ the Vega Trading Defendants (*see* ¶¶39-59 above), and John Doe Defendants 1-100 entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act Antitrust Act, 15 U.S.C. §1 *et seq*. ("Sherman Act").

348. Defendants combined, conspired, and agreed to manipulate and fix NYMEX WTI crude oil futures prices and ICE WTI crude oil futures prices during at least the Class Period.

349. Defendants' conspiracy to fix and manipulate prices was spectacularly successful and allowed Defendants to greatly profit from their violations of Section 1 of the Sherman Act.

Highly Confidential

350.   Defendants used instrumentalities of interstate commerce and adversely affected and restrained trade and commerce through their conspiracy and effects on prices.

351.   Defendants' conspiracy to manipulate and fix the prices of NYMEX WTI crude oil futures contracts and ICE WTI crude oil futures contracts deprived Plaintiff and members of the Class of the ability to transact in a market free from manipulated and fixed prices.

352.   The conspiracy alleged herein is a *per se* violation of Section 1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the NYMEX and ICE WTI crude oil futures markets.  There is no legitimate business justification for, and no pro-competitive benefit caused by, Defendants' conspiracy and overt acts taken in furtherance thereof.  Any ostensible pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

353.   As a direct, material, and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiff and the Class suffered injury to their business and property, including but not limited to transacting at the artificial and fixed prices caused by Defendants, within the meaning of Section 4 of the Clayton Antitrust Act, 15 US.C. §12 *et seq*. ("Clayton Act").

354.    Plaintiff and the Class seek treble damages for Defendants' violations of Section 1 of the Sherman Act and under Section 4 of the Clayton Act.

## AS AND FOR A SECOND CLAIM
## <u>AGAINST ALL DEFENDANTS</u>
### (Manipulation In Violation Of The Commodity Exchange Act 7 U.S.C. §1 *et seq.*)

355.    Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

356.    Defendants Vega Capital London, Ltd., ▮Individual A▮ the Vega Trading Defendants, and John Doe Defendants 1-100 manipulated and conspired to manipulate the prices of NYMEX WTI crude oil futures contracts and ICE WTI crude oil futures contracts in violation of the Commodity Exchange Act, 7 U.S.C. §1 *et seq*. ("CEA").  Defendant Vega Capital having held or otherwise financed the manipulative trades alleged herein for each of the Vega Trading Defendants, is fully responsible for the manipulation and conspiracy to manipulate alleged herein. Defendant ▮Individual A▮ as sole director of Defendant Vega Capital who, again, held or otherwise financed the manipulative trades alleged herein, is also fully responsible for the manipulation and conspiracy to manipulate alleged herein.

357.    Plaintiff and members of the Class purchased and/or sold one or more NYMEX WTI crude oil futures contract and/or ICE WTI crude oil futures contract

Highly Confidential

during the Class Period at artificial prices caused by Defendants and were injured as a result of Defendants' intentional manipulation and conspiracy to manipulate the prices of those futures contracts in violation of the CEA, 7 U.S.C. §1 *et seq*.

358.   In addition to the previously alleged all-time record deviation between May Contract prices and June WTI contract prices, there was also an all-time record deviation between May Contract prices and the June Brent futures contract price.

359.   The spread between the May Contract and the Brent crude June futures contract price fell 80 standard deviations on April 20. This occurrence was extremely unlikely in a competitive market. But after Vega's market power was removed, the spread between the May Contract and the June Brent contract snapped back to almost exactly the same level as it had been on April 17 (-9.32 on April 21 and -9.81 on April 17).

360.   Again, there was no fundamental supply and demand explanation for these unprecedented deviations in prices of the May Contract from their normal benchmark on April 20 followed by their unprecedented snapbacks to normality on April 21, 2020.

361.   The deleterious effects of the Vega Defendants' concerted conduct and market power during April 20 were a proximate and substantial cause, as well as a contributing factor to the extraordinary widening of spreads on April 20. The

removal of Vega's concerted conduct and market power, was a substantial and proximate cause of the snapback in spreads on April 21. The supply-demand fundamentals were then again expressed in price levels, as they had been on April 17.

362.    Defendants' conduct and trading activity alleged herein constituted a manipulation of NYMEX WTI crude oil futures contract prices and ICE WTI crude oil futures contract prices in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

363.    As result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered actual damages and transacted at artificial prices to which they would not have been subject but for the unlawful conduct of Defendants as alleged herein.

364.    Plaintiff and members of the Class are each entitled to damages for Defendants' violations of the CEA alleged herein.

## AS AND FOR A THIRD CLAIM
## AGAINST ALL DEFENDANTS
### (Principal-Agent Liability In Violation Of The Commodity Exchange Act 7 U.S.C. §1 *et seq*.)

365.    Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

366.    Defendants Vega Capital London, Ltd., [Individual A] the Vega Trading Defendants, and John Doe Defendants 1-100 were principals, agents, co-venturers and/or guarantors of one another.  As agents, co-venturers and/or guarantors of one another, the Defendants engaged in a manipulative scheme and conspiracy to manipulate prices alleged herein on behalf of one another and with one another's knowledge and authorization.

367.    Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), Defendants are liable for the acts of their agents.

368.    Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A FOURTH CLAIM
## AGAINST ALL DEFENDANTS
### (Aiding and Abetting Liability In Violation Of The Commodity Exchange Act D. U.S.C. §1 *et seq.*)

369.    Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

370.    Defendants Vega Capital London, Ltd., [Individual A] the Vega Trading Defendants and John Doe Defendants 1-100 each played their component role and each knowingly aided, abetted, counseled, induced, and/or conspired or procured the violations of the CEA alleged herein.  Defendants knew of the manipulative scheme and conspiracy to manipulate alleged herein, intended to help

the other Defendants perpetrate such manipulative scheme and conspiracy to manipulate and committed one or mor acts in furtherance of such manipulative scheme and conspiracy to manipulate.

371.  Each of the Vega Trading Defendants utilized or shared trading accounts held in the name of Defendant Vega Capital London, Ltd.  Defendant **Individual A** is the sole director of Defendant Vega Capital.  As the sole director of Defendant Vega Capital, the entity that held the trading accounts used to make the manipulative trades alleged herein, Defendants **Individual A** and Vega Capital knew of the manipulative scheme and conspiracy to manipulate, intended to help the other Defendants perpetrate the manipulative scheme and conspiracy to manipulate (which generated large profits for the Defendants) and committed one or more acts in furtherance of such manipulative scheme and conspiracy to manipulate, including by holding or otherwise financing the manipulative positions and/or trades alleged herein.

372.  Each of the Vega Trading Defendants aided and abetted the manipulative scheme and conspiracy to manipulate including by conspiring to sell large volumes of May 2020 NYMEX WTI crude oil futures contracts for the purpose of depressing the price of such contract and the price of the May 2020 ICE WTI crude oil futures contract.

373. Under Section 13 of the CEA, 7 U.S.C. §13c (a), Defendants are liable for willfully intending to assist the manipulation.

374. Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

**AS AND FOR A FIFTH CLAIM**

**AGAINST ALL DEFENDANTS**

**(Manipulation In Violation of the Commodity Exchange Act,**

**7 U.S.C. §§1, *et seq*. and Regulation 180.1(a))**

375. Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

376. Defendants Vega Capital London, Ltd., [Individual A] the Vega Trading Defendants and John Doe Defendants 1-100 intentionally or recklessly, used or employed, attempted to use or employ or conspired to use or employ, one or more manipulative devices, schemes or artifices to defraud and/or engaged, attempted to engage, or conspired to engage, in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of the 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. §9, and Section 22 of the CEA, as amended, 7 U.S.C. §25, and Regulation 180.1, 17 C.F.R. §180.1.

377. Defendants engaged in a conspiracy to depress prices of the NYMEX and ICE May 2020 WTI crude oil futures contracts by selling large volumes of the

143

May 2020 NYMEX WTI crude oil futures contracts and by sending false signals to the market, including false price signals resulting from their manipulative and anti-competitive trading that was not reflective of supply and demand. Defendants' cumulative net selling pressure, aggressor sales and later their "ammo" sales sent signals to the market of a frenzy of selling. Defendants did not disclose their manipulation to the market.

378. Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market at artificial and manipulated prices during the Class Period.

379. Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A SIXTH CLAIM

## <u>AGAINST ALL DEFENDANTS</u>

## (Principal-Agent Liability In Violation Of The Commodity Exchange Act 7 U.S.C. §1 *et seq*. and Regulation 180.1(a))

380. Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

381. Defendants Vega Capital London, Ltd., ▮Individual A▮ the Vega Trading Defendants, and John Doe Defendants 1-100 were principals, agents, co-venturers and/or guarantors of one another. As agents, co-venturers and/or

guarantors of one another, the Defendants engaged in an intentional or reckless use of one or more manipulative devices, schemes or artifices to defraud and/or engagement in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of the CEA as alleged herein on behalf of one another and with one another's knowledge and authorization.

382.   Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), Defendants are liable for the acts of their agents.

383.   Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A SEVENTH CLAIM

## AGAINST ALL DEFENDANTS

**(Aiding and Abetting Liability In Violation Of The Commodity Exchange Act 7 U.S.C. §1 *et seq*. and Regulation 180.1(a))**

384.   Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

385.   Defendants Vega Capital London, Ltd., Individual A the Vega Trading Defendants and John Doe Defendants 1-100 each played their component role and each knowingly aided, abetted, counseled, induced, and/or conspired or procured the intentional or reckless use of one or more manipulative devices, schemes or artifices to defraud and/or engagement in one or more acts, practices,

or courses of business, which operated or would operate as a fraud or deceit in violation of the CEA as alleged herein. Defendants knew of the manipulative devices, schemes or artifices and/or the acts, practices or courses of business that operated as a fraud or deceit, intended to help the other Defendants perpetrate such manipulative devices, schemes or artifices and/or the acts, practices or courses of business that operated as a fraud or deceit and committed one or more acts in furtherance of same.

386.   Each of the Vega Trading Defendants utilized or shared trading accounts held in the name of Defendant Vega Capital London, Ltd. Defendant Individual A is the sole director of Defendant Vega Capital. As the sole director of Defendant Vega Capital, the entity that held the trading accounts used to make the manipulative trades alleged herein, Defendants Individual A and Vega Capital knew of the manipulative devices, schemes or artifices and/or the acts, practices or courses of business that operated as a fraud or deceit, intended to help the other Defendants perpetrate same (which generated large profits for the Defendants) and committed one or more acts in furtherance of same, including by holding or otherwise financing the manipulative positions and/or trades alleged herein.

387.   Each of the Vega Trading Defendant aided and abetted the manipulative devices, schemes or artifices and/or the acts, practices or courses of business that operated as a fraud or deceit, including by selling large volumes of

the May 2020 NYMEX and ICE WTI crude oil futures contracts and by sending false signals to the market, including false price signals resulting from their manipulative and anti-competitive trading that was not reflective of supply and demand.

388.  Under Section 13 of the CEA, 7 U.S.C. §13c(a), Defendants are liable for willfully intending to assist the manipulation.

389.  Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR AN EIGHTH CLAIM

## AGAINST ALL DEFENDANTS

### (Common Law Unjust Enrichment and Restitution/Disgorgement)

390.  Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

391.  Defendants Vega Capital London, Ltd., ███Individual A███ the Vega Trading Defendants and John Doe Defendants 1-100 greatly profited financially ███████████████████████ from their unlawful acts alleged herein to the detriment of Plaintiff and members of the Class.  In addition to being unlawful, Defendants' acts were also unfair and inequitable such that permitting Defendants' retention of their financial benefits resulting from their unlawful and unjust acts

147

Highly Confidential

alleged herein violates the fundamental principles of justice, equity, and good conscience.

392.  Defendants' unlawful, inequitable and unjust acts alleged herein caused Plaintiff and the members of Class to suffer injury, lose money and transact at artificial prices.  Each Defendant should be required to pay the full amount of its own unjust enrichment to Plaintiff and members of the Class.

393.  Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits obtained by Defendants from their unjust enrichment and inequitable conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. for a declaratory judgment that Defendants combined, conspired and agreed to manipulate and fix prices of NYMEX and ICE WTI crude oil futures contracts in violation of the Sherman Act, 15 U.S.C. §1 *et seq*.;

B. for a declaratory judgment that Defendants intentionally manipulated and conspired to manipulate NYMEX and ICE WTI crude oil futures prices, and caused such prices to become artificial, in violation of the CEA, 7 U.S.C. §1 *et seq*.;

C. for a declaratory judgment that Defendants are liable for the acts of their agents for their manipulation and conspiracy to manipulate in violation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B);

D. for a declaratory judgment that Defendants aided and abetted the manipulation and conspired to manipulate in violation of Section 13 of the CEA, 7 U.S.C. §13c(a);

E. for a declaratory judgment that Defendants intentionally or recklessly employed one or more manipulative devices, schemes or artifices to defraud and/or engaged in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of section 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. §9, and Section 22 of the CEA, as amended, 7 U.S.C. §25, and Regulation 180.1, 17 C.F.R. §180.1;

F. for a declaratory judgment that Defendants are liable for the acts of their agents for their intentional or reckless employment of one or more manipulative devices, schemes or artifices to defraud and/or engagement in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B);

G. for a declaratory judgment that Defendants aided and abetted the intentional or reckless employment of one or more manipulative devices, schemes or

Highly Confidential

artifices to defraud and/or engagement in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of Section 13 of the CEA, 7 U.S.C. §13c(a);

H. for an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on the full amount of each Defendant's unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

I. for an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as the Class representative and his undersigned counsel as Class counsel;

J. for a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the Sherman Act, including treble damages, with prejudgment interest at the maximum rate allowable by law;

K. for a judgment awarding Plaintiff and the Class damages against Defendants for each of their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

L. for a judgment awarding Plaintiff and the Class damages equal to each Defendant's unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

M. for an award to Plaintiff and the Class for their costs of suit, including

reasonable attorneys' fees and expert fees and expenses; and

N. for such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Procedure 38(b) and otherwise, Plaintiff

respectfully demands a trial by jury.

Dated: May 5, 2022
      Chicago, Illinois

                    Respectfully submitted,

                    */s/ Christopher Lovell*
                    Christopher Lovell
                    Christopher M. McGrath
                    **LOVELL STEWART HALEBIAN JACOBSON LLP**
                    500 Fifth Avenue, Suite 2440
                    New York, New York 10110
                    Telephone:  (212) 608-1900
                    Facsimile:  (212) 719-4775

                    Marvin A. Miller
                    Andy Szot
                    **MILLER LAW LLC**
                    115 S. LaSalle Street, Suite 2910
                    Chicago, Illinois 60603
                    Telephone:  (312) 332.3400

                    *Counsel for Plaintiff*

Dec 10, 2020 00:01:17

## The Essex Boys: How Nine Traders Hit a Gusher With Negative Oil

Over the course of a few hours on April 20, a guy called Cuddles and eight of his pals from the freewheeling world of London's commodities markets rode oil's crash to a $660 million profit.

By Liam Vaughan, Kit Chellel and Benjamin Bain

(Bloomberg Businessweek) -- Among the many previously unthinkable moments of 2020, one of the strangest occurred on April 20, when the price of crude oil fell below zero. West Texas Intermediate futures, the most popular instrument used to trade the commodity, had started the day at $18 a barrel. That was already low, but prices kept tumbling until, at 2:08 p.m. New York time, they went negative.

Amazingly, that meant anyone selling oil had to pay someone else to take it off their hands. Then the crude market collapsed completely, falling almost $40 in 20 minutes, to close at −$38. It was the lowest price for oil in the 138-year history of the New York Mercantile Exchange—and in all likelihood the lowest price in the millennia since humans first began burning the stuff for heat and light.

Watching this spectacle unfold were traders, energy executives, and freight company employees—whose livelihoods are tied to oil's fluctuations. Regulators with the Commodity Futures Trading Commission in Washington stared at their monitors, stunned. "The screen was just going nuts," Tom Kloza, an analyst at the research firm OPIS Ltd., told *Institutional Investor*. The experience, he said, was like watching a film by surrealist director Federico Fellini: "You're able to appreciate it, but no one really knows what's going on."

Within 24 hours the insanity was over, and oil cost money again, and it was tempting to see what happened as a blip. But WTI futures, in which buyers and sellers agree on a price to trade at some upcoming date, sit at the heart of the $3 trillion-a-year oil and gas industry. WTI is one of the main components that determines the global price of oil—whether that oil is being sold by a Middle Eastern kingdom or a fracking conglomerate in Alberta. It affects what airlines pay for jet fuel and what manufacturers pay for petroleum-based chemicals.

Beyond the physical commodity itself, billions of dollars' worth of financial products are also pegged to WTI in a specific and idiosyncratic way. Their value is determined by the WTI price at 2:30 p.m. four working days before the 25th of every month. That crucial "settlement" for the May WTI contract was on April 20.

The sudden price drop that day, which wiped out some investors who'd bet on an oil recovery, was explained as the result of a confluence of macroeconomic factors. The pandemic, and resulting economic shutdowns, had decimated demand for oil, and space to store it was rapidly running out. It seemed to be a simple case of "fundamental supply and demand," said CFTC Chairman Heath Tarbert in an April 21 interview with CNBC. Terry Duffy, chief executive officer of CME Group Inc., which owns the New York exchange, known as Nymex, saw it in similar terms. "The market worked the way the market was supposed to work," he told the network. "To perfection."

Perhaps to industry veterans like Duffy, it all made sense, but to anyone who has ever paid to fill up a car or home oil tank, a negative price was difficult to comprehend. Moreover, there had been a torrent of selling starting two hours or so before the settlement, leading to questions about whether someone had deliberately set out to push prices down. Harold Hamm, chairman of oil producer Continental Resources Inc., published a letter demanding an investigation into what he described as "failed systems" and "possible market manipulation."

After all, the May contract was back at $10 on April 21 and the outlook had barely changed. "Going into April there was chitchat about zero or even negative prices, but nobody was talking about −$40," says Dave Ernsberger, global head of pricing and market insight at S&P Global Platts, which provides benchmarks for buyers and sellers. "So what's the real story here?"

U.S. authorities and investigators from Nymex trawled through trading data for insights into who exactly was driving the action on April 20. According to people familiar with their thinking, they were shocked to discover that the firm that appeared to have had the biggest impact on prices that afternoon wasn't a Wall Street bank or a big oil company, but a tiny outfit called Vega Capital London Ltd. A group of nine independent traders affiliated with Vega and operating out of their homes in Essex, the county just northeast of London, had made $660 million among them in just a few hours. Now the authorities must decide whether anyone at Vega breached market rules by joining forces to push down prices—or if they simply pulled off one of the greatest trades in history. A lawyer for a number of the

© 2021 Bloomberg L.P. All rights reserved.

Vega traders vehemently denies wrongdoing by his clients and says they each traded based on "blaring" market signals.



Illustration: Sophy Hollington for Bloomberg Businessweek

Paul Commins started his trading career buying and selling oil in the rowdy pits of London's International Petroleum Exchange, where, according to a former colleague, he was affectionately known as "Cuddles." He had the kind of broad cockney accent that wouldn't be out of place in a Guy Ritchie movie and struggled to pronounce his r's. As a result, his three-digit badge, which everyone wore at the IPE, contained the letters "F-W-E"—pronounced "fwee," the sound that would come out of his mouth when he tried to say "three."

Opened in 1980, the IPE was riotous—400 traders and brokers in colorful jackets screaming at one another and using hand signals to strike deals that were then sealed on scraps of paper. They mostly came from working-class backgrounds, often from Essex, known for its brash culture and ostentatious displays of wealth. (The stereotypical Essex male is a soccer-loving "geezer" with a pint in his hand and an expensive "motor.")

The pits rewarded quick thinking and a tolerance for risk, and Commins—aka Cuddles, aka FWE—thrived there. After a few years filling orders for corporate clients at Trafalgar Commodities, he became a "local"—one of the elite traders in red jackets who wagered their own funds. A former colleague describes him as among the top three in the gas and oil pit where he operated.

The pits were collegial and freewheeling, a place of ethical and regulatory gray areas. If a local overheard news about a big trade that some oil major had in the works, he might try to jump ahead of it, a prohibited but pervasive practice known as front-running. The cavernous trading floor had cameras, but there were blind spots where people went to share information. A former executive struggles to remember a single meeting of the exchange's compliance committee.

One trick involved an instrument called Trade at Settlement, or TAS, an agreement to buy or sell a future at wherever the price ends up at the closing bell. The contract was aimed at investment funds, whose mandate it was to track the price of oil over the long term. But some traders figured out that they could take the other side of these TAS trades, then work together at the end of the day to push the closing price as low as possible so they could pocket a profit. The practice, while officially against the rules, was so common and effective it had a nickname: "Grab a Grand."

© 2021 Bloomberg L.P. All rights reserved.

"It was blatant, what was going on," according to former IPE Director Chris Cook, who says he learned of the practice after leaving the exchange. There's no evidence Commins or his colleagues were involved in this practice.

In the IPE's heyday, the best traders could make tens or even hundreds of thousands of pounds in a day and still hit the pub by 5:30 p.m. But the rise of electronic trading made them obsolete. The IPE pits closed in 2005, forcing Commins, then 36, and hundreds like him to either learn to trade using a computer or give up and do something else. Many struggled to make the transition and quit. Others joined banks or brokers.

Former locals who wanted to continue working for themselves banded together at so-called arcades or prop shops, trading firms where they were given a desk, some office support, and fast connections to markets in exchange for a monthly fee, a small commission on every trade, and, in some cases, a cut of any profits they made. The biggest prop firms, known as "the five families," were based in London and had dozens of traders on their books, many of whom had come from the pits. But a half-hour's train ride away, in the small Essex town of Loughton, Commins started a collective of his own.

His group was a mix of seasoned traders and novices in their 20s, usually the sons of Commins's pals or his children's peers. Among them were Dog (real name: Chris Roase), a veteran pit trader; Elliot Pickering, a skinny, awkward-looking kid who still lived with his mum and drove a Rolls-Royce convertible; and Aristos Demetriou, who went by "Ari" and was among the group's biggest earners. Ari's quick success had sparked a wild rumor circulated among London's commodity traders that he'd gotten his break while working in a supermarket parking lot, pushing shopping carts, where he spotted Dog driving in and asked how he could afford such a fancy motor.

The traders were all independent, each with his own brokerage accounts and tax returns. But trading records and people who worked alongside them indicate they frequently operated in a similar fashion, buying or selling in the same direction at key moments. Away from the markets, some members of the group did everything together—play golf, watch their soccer team, West Ham United, and take their families to the beachside town of Marbella in Spain (where the catchphrase for the body-conscious was "no carbs before Marbs"). Several bought properties in the same neighborhood, an affluent village called Theydon Bois that combines the bucolic charm of the English countryside with a short tube journey into central London. After work they frequented a bar popular with the cast of *The Only Way Is Essex*, a kind of cockney-inflected, blingier version of *Jersey Shore*.

For a long time, Commins and much of his crew traded as an off-site offshoot of Tower Trading Group, one of the five families. But when two Tower managers, Adrian "Britney" Spires and Tommy Gaunt, left to start their own outfit in 2016, Commins and about 20 other Tower traders joined them. Under the umbrella of the new firm, Vega Capital London, he continued adding to his stable, offering slots to young men with ties to his social group. One was Connor Younger, the son of a building contractor pal, who a few years earlier had been posting on social media about the adolescent pleasures of rap music and chasing girls.

It's not clear what commercial arrangement Commins had with the traders he scouted or with Vega Capital, which has dozens of individuals on its roster who have nothing to do with the Essex crew. But there were financial connections among them. Commins and Demetriou co-owned a firm called PC & AD Developments, while Commins, Demetriou, and Pickering have all been directors of an entity called PAT Developments Ltd. The companies, which don't have websites, are listed as being involved in real estate.

At the start of 2020 the big industrial economies were healthy, investors were optimistic, and West Texas Intermediate was trading at about $60 a barrel. Prices began to fall in February after the first reports of the coronavirus. That accelerated as the outbreak turned into a pandemic. By the end of March, WTI futures were at $20, the lowest they'd been since after Sept. 11. Then, after tense negotiations, the big oil producers—led by Russia, Saudi Arabia, and the U.S.—agreed to reduce production by 10% to try to stabilize prices.

The cut wasn't nearly enough. All oil futures were down, including Brent crude, which is based on oil found in Europe's North Sea, but there was a particular problem with WTI. Unlike with Brent, which allows buyers and sellers to settle what they owe one another in cash, anyone holding an expiring WTI contract at the end of a month is obliged to take possession of 1,000 barrels of light, sweet crude in Cushing, Okla. (Despite being tiny and landlocked, Cushing is known as "the Pipeline Crossroads of the World." It became a center for refining and distribution after wildcatters struck oil there a century ago.)

© 2021 Bloomberg L.P. All rights reserved.

Normally, speculators can get around this by selling out before the expiration date and buying the following month's contract, a process known as "rolling." But low prices in March and early April had attracted a rush of amateur investors into products tracking oil, including a large Chinese fund called Crude Oil Treasure, which advertised with the tagline "Crude oil is cheaper than water." These funds would all have to roll over contracts worth billions of dollars—and, thanks to the virus, buyers would be hard to find.

Meanwhile, storage tanks in Cushing were filling up fast. With so little space available, the cost of keeping oil threatened to exceed any potential profit from selling it. That combined with an abundance of frantic sellers to cripple an already fearful market. On April 3, Nymex issued an unprecedented warning that prices could go negative.

The crucial settlement day for the May WTI contract, April 20, was a Monday. In Essex, some of the Vega traders logged on before sunrise to take advantage of the big session. Britain was in lockdown, and the lights from their front rooms and studies dotted the still-dark village. Central to their strategy would be the TAS contracts that had once been popular in the pits, according to several people familiar with the matter.

Here's how it works: Imagine a trader sees that WTI is at $10 and predicts it's going to end the day at $5. To capitalize, he buys 50,000 barrels in the TAS market, agreeing to purchase oil at wherever the price ends up by 2:30 p.m. At the same time, he starts selling regular WTI futures: 10,000 barrels for $10 and then, if the market is falling as predicted, 10,000 more at $9, and again at $8. As the settlement window approaches, the trader accelerates his selling, offloading a further 10,000 contracts at $7, then another chunk at $6, helping push the price lower until, sure enough, it settles at $5. By now he is "flat," meaning he's sold as many barrels as he's bought and isn't obliged to take delivery of any actual oil.

The trader's bet has come off. His profit is $150,000, the difference between what he sold oil for (50,000 barrels at prices ranging from $10 to $6, for a total of $400,000) and what he bought it for in TAS contracts (50,000 barrels at $5 a barrel, or $250,000). All of this is perfectly legal, providing the trader doesn't deliberately try to push the closing price down to an artificial level to maximize his profits, which constitutes market manipulation under U.S. law. Manipulation can result in civil penalties such as fines or bans, or even criminal charges carrying a potential prison sentence of up to 10 years. It's also illegal in the U.S. to place trades during or before the settlement with "intentional or reckless disregard" for the impact.

Commins's traders had historically been able to make big money in a few hours on settlement days trading in the same direction, according to people who watched them work. But the strategy was risky. If an even bigger player showed up at the end of the session and made the opposite bet, it could push the market in the other direction. There were days they lost millions of dollars among them, recalls one trader who knows them. "They had balls of steel," says another. "It was quite unbelievable to see."

As China's Crude Oil Treasure fund and others sold WTI contracts in the TAS market on April 20, the Essex traders bought them, according to people familiar with their trading, committing to buy large quantities of oil at whatever the settlement price turned out to be. Between 11 p.m. U.K. time on April 19, when the market opened, and 5 p.m. (noon in New York) the following day, the price dropped from around $18 to $10 a barrel. As it fell, Commins and his friends sold batches of regular WTI contracts, just like in the example above, as well as calendar spreads, another financial instrument that allows traders to bet on the future price of oil. All they needed was for prices to keep falling, the further the better. As the day wore on, however, they became nervous. In text messages described to *Bloomberg Businessweek,* they exchanged details of their individual trades and questioned whether they were taking on too much risk.

With a little more than two hours to go until the settlement, trading activity across the futures market spiked, driving the price from $10 to $5, then all the way to zero. The shift into negative prices occurred at 2:08 p.m., at which point any remaining stragglers still brave enough to be buying oil in the hope of a rebound got out of the market. Over the next 22 minutes, under the weight of ongoing selling by Vega and others, the May contract plummeted. Nymex calculates the settlement price by taking a weighted average of trades occurring from 2:28 p.m. to 2:30 p.m. The final "print," as settlement prices are known, came in at −$37.63. In the last half-hour the nine Vega Capital traders were, as a group, by far the biggest sellers of both WTI futures and spreads, according to trading data described to *Businessweek*—a remarkable situation in a market normally dominated by the likes of BP, Glencore, and JPMorgan Chase.

© 2021 Bloomberg L.P. All rights reserved.

In a mockery of the norms of commerce, the Vega crew had ended up being paid both for the futures they'd sold when oil was positive during the day and for those they bought via TAS. That, combined with the profit from the spread trades, resulted in a total take of $660 million for the nine biggest earners, according to the trading data. Demetriou, who's 31; Pickering, 25; and Younger, 22, pocketed in excess of $100 million each, while Roase made about $90 million. Commins took home $30 million or so. Even his son, George, who's in his early 20s with little apparent trading experience, made $8 million.

Elsewhere, investors around the world counted their losses. China's Treasure fund informed its customers that everything they'd put in was now gone. "It didn't occur to us" oil could go negative, A'Xiang Chen, a 26-year-old investor from Shenzhen, told Bloomberg News. Syed Shah, a day trader in the Toronto suburbs who'd started buying crude futures when the price fell to $3 a barrel, wound up owing $9 million. Interactive Brokers, America's largest online trading service, lost $104 million because its software wasn't equipped to handle negative prices.

Rumors of a major score by a group of Essex boys spread quickly among traders on chat groups, though the winners were coy about discussing their profits, according to someone who says he saw the messages. When asked about the size of their haul, one joked that he had to go—the mobile reception was breaking up on his yacht.

If the group had made $7 million that day instead of almost $700 million, they'd probably be celebrating. But the size of their winnings, coupled with their backgrounds—and political pressure to understand what happened—means that Vega has the attention of regulators. In August, Sherrod Brown, the Ohio Democrat and ranking member of the Senate banking committee, wrote to regulators saying the incident created "the impression of a market susceptible to manipulation."

The CFTC has been investigating Vega Capital, according to people familiar with the matter. The U.S. Attorney for the Southern District of New York has started its own probe to determine whether a felony was committed, the people say. Both authorities, as well as CME Group, declined to comment on the existence of any ongoing investigation.

Even so, no authorities have accused Vega Capital or any of the traders referenced in this article of doing anything illegal. Buying TAS and offsetting it in the futures market is a common and acceptable practice, and it was no secret that prices on April 20 might fall. Where traders have gotten into trouble in the past is when they've been caught trying to deliberately push the closing price rather than simply benefiting from where it ends up. In 2012, Dutch company Optiver Holding BV was fined $14 million and three of its employees were temporarily banned from trading commodities after the CFTC accused the company of manipulating settlement prices. Email and phone records showed Optiver's traders talking about trying to "hammer" and "bully" the settlement after accumulating TAS. Such clear-cut evidence of intent is rare. Since the CFTC was founded in 1974, it has won just one manipulation case at trial.

"Each of our clients regularly puts his own money at risk to try to make a profit. Sometimes it works sometimes it doesn't," the law firm Simkins, which represents eight of the nine traders, said in statement. "On 20 April blaring market signals—including the exchange's repeated warnings that prices could go negative—led market participants ranging from small proprietary traders to large financial institutions to trade on the assumption that prices would drop. And while no one could have predicted just how far they'd drop, each of our clients, like many others around the world, traded on his own view of the market. They don't intend to comment on speculation about their profits."

Whatever happens with Vega, its wild trading day has laid bare the vulnerabilities of the TAS mechanism, which also exists in markets for gas, cattle, and other commodities. Craig Pirrong, a finance professor at the University of Houston, published a paper last year suggesting that market participants can build a large position through TAS with very little impact on prices, then offset it in the regular market in a way that moves prices—an "asymmetry," he argued, that invites manipulation. Senior officials at the CFTC are now considering whether TAS is in need of reform. Last month the agency published what it described as an interim report on the events of April 20 that focused on macroeconomic conditions but didn't take into account the issue of potential manipulation because of the ongoing investigation. It drew criticism from one of the agency's own commissioners, Dan Berkovitz, a Democrat who is seen as a candidate to take over as chairman in January. He described the interim report as "incomplete and inadequate."

"The commission must undertake and provide a meaningful analysis so that it can take whatever remedial or corrective actions may be appropriate to ensure the integrity of this critically important market," Berkovitz says. "This was one of the most extraordinary events in any commodity market in decades." Michael Short, a CFTC spokesman, says that the agency is limited in what it can share and

© 2021 Bloomberg L.P. All rights reserved.

Case 1:21-cv-00792 Document #713 Filed 05/29/22 Page 302 of 373 Page ID #2186

that criticisms seem to "miss the point that it is an interim report." He also says that the regulator was prepared for April 20 and that "large market swings are not new for CFTC staff."

Back in Theydon Bois, Commins and his crew are keeping a low profile. Some have stopped trading monthly settlements, according to people familiar with their work. Several have registered new companies, and it's not clear what has happened to their winnings. After April 20, Vega Capital parted with G.H. Financials Ltd., the clearinghouse that held its trading accounts and had a degree of responsibility for overseeing its activities. The firm has a new clearinghouse and continues to trade.

News of the win has been met with a mixture of incredulity and pride among London's trading community—and has even led to a new nickname: "the fifth Beatle," for Vega co-founder Gaunt, who left the firm a few months before the big day. "It's funny how if it was BP or Goldman Sachs that made the money, no one would bat an eyelid, but when it's a bunch of working-class lads, people say they're cheating," says one trader who knows them, expressing a widely held sentiment. "I say good luck to them." —*With Alex Longley*

*Read next: The Work-From-Home Trader Who Shook Global Markets*

To contact the authors of this story:
Liam Vaughan in London at lvaughan6@bloomberg.net
Kit Chellel in London at cchellel@bloomberg.net
Benjamin Bain in Washington at bbain2@bloomberg.net

To contact the editor responsible for this story:
Max Chafkin at mchafkin@bloomberg.net
Jim Aley

© 2021 Bloomberg L.P. All rights reserved.

Aug 04, 2020 14:23:05

## London Traders Hit $500 Million Jackpot When Oil Went Negative (2)

Regulators look into a small group of investors who got rich on the unprecedented drop.

By Liam Vaughan, Kit Chellel and Benjamin Bain

(Bloomberg Businessweek) -- On April 20 the price of a barrel of oil for delivery the following month plummeted $40 in an hour, settling at –$37. It was the first time crude had ever crossed into negative territory. Regulators, oil executives, and investors have struggled to understand how a commodity at the heart of almost every aspect of global trade had fallen so far that sellers had to pay counterparties to take it off their hands.

But for a small group of veteran traders at a tiny London firm called Vega Capital London Ltd., the mystery mattered less than the results: They pocketed as much as $500 million that day, according to people familiar with the matter, who spoke to *Bloomberg Businessweek* on condition of anonymity.

Vega's jackpot, which hasn't been previously reported, involved about a dozen traders aggressively selling oil in unison before the May West Texas Intermediate contract settled at 2:30 p.m. in New York, the people say. It's a tactic Vega's traders used regularly, according to another person familiar with the firm's strategy, but that day its trading coincided with a period of unprecedented volatility, when demand for fuel was wiped out by the coronavirus pandemic, and storage space in Cushing, Okla., where buyers take physical delivery of WTI crude, had all but disappeared.



Crude Oil

Price per barrel of West Texas Intermediate

Data: Compiled by Bloomberg

Now regulators at the U.S. Commodity Futures Trading Commission, the U.K.'s Financial Conduct Authority, and CME Group Inc., owner of the Nymex exchange where the trading took place, are examining whether Vega's actions may have breached rules on trading around settlement periods and contributed to oil's precipitous fall, according to people with knowledge of the probes.

Within 24 hours of the crash, the May WTI contract had bounced back to about $10 a barrel. And oil futures prices have continued to climb, with the active contract trading as high as $42.08 a barrel on August 4. But the plunge, however brief, created some big losers. They include thousands of Chinese and American retail investors who, lured by oil's recent slump, had piled into instruments whose value was pegged to the contract's April 20 settlement price.

Whether Vega's windfall was a result of savvy trading, blind luck, or something else, the idea that a relative minnow could have such a profound impact calls into question CME Chief Executive Officer Terry Duffy's April 22 declaration that the futures market had "worked to perfection."

"The idea that the anomalies that day were a function solely of supply and demand is fanciful at best," says Joe Cisewski, special counsel to Better Markets, a lobbying group that advocates for tougher regulation. "Oil producers, brokers, and other market participants have been sent into serious financial distress. Regulators need to objectively and thoroughly investigate what happened."

© 2021 Bloomberg L.P. All rights reserved.

Spokespeople for the CFTC, FCA, and CME declined to comment. The CFTC has said it's looking to release a report on the crash later this year. Vega didn't return emails seeking comment.

Prop-trading firms like Vega give independent traders access to the world's exchanges, back-office services, and extra capital to trade with in exchange for a desk fee, a commission on every trade, and sometimes a share of any profits. In a trillion-dollar energy ecosystem dominated by the likes of BP, Glencore, and Royal Dutch Shell, prop firms are bit players.

Vega was started in 2016 by Adrian Spires and Tommy Gaunt, friends who'd worked together on the management team at another London prop firm, Tower Trading Group, before branching out on their own. In 2017 about 20 of Tower's energy traders quit to join Vega, sparking a legal dispute that was settled out of court. Gaunt quit as a director last year, and Spires, 44, now owns all of the business. He left school at 18 to take a job in the trading pits of the London International Financial Futures and Options Exchange. Some of Vega's traders spent time at the International Petroleum Exchange, buying and selling barrels of oil using hand signals, before commodities trading migrated from open outcry onto screens.

The firm has an office a short walk from Liverpool Street station, above one of London's All Bar One pubs, which it shares with a group of mostly recent college graduates trading cryptocurrencies for another company also owned by Spires. But most of Vega's traders work from home, according to people familiar with the firm, even more so since the U.K.'s lockdown came into force.

While more than two dozen individuals trade through Vega's omnibus account, finding information about them is difficult. Only a few list Vega as their employer on LinkedIn. The company's website has remained under construction since Vega was founded.

One oil investor describes the firm as something of a throwback to the days of the pits, when rowdy so-called locals made or lost fortunes before heading to the pub to celebrate their winnings or drown their sorrows. Many of Vega's traders know each other socially, playing golf and taking ski trips. They also trade together during key periods to maximize their impact on the market, the people familiar with the firm say.

To understand how Vega wound up making so much money that day, it's helpful to consider some of the idiosyncrasies of the oil market. Among the most popular ways to trade oil is Nymex's WTI futures contract, which allows buyers and sellers to agree on a price for 1,000 barrels of light sweet crude for delivery at a future date. New contracts are released every month, and they settle at 2:30 p.m. on or near the 20th of the month.

Nymex also offers a corollary instrument called Trading at Settlement, or TAS, in which buyers and sellers agree to transact at whatever the settlement price turns out to be. The settlement price is based on a volume-weighted average of trades occurring in the two minutes before 2:30 p.m. While it might seem curious that anyone would agree to buy something without knowing the price, the TAS market is popular among exchange-traded funds and other funds whose mandate is to track the price of oil rather than to get the best deal. It was also central to Vega's strategy.

One of the quirks of the oil futures market is that to take a long-term position, investors must keep buying new monthly contracts, then sell them before they expire and buy future months' contracts, a process known as rolling. A significant proportion of the market's participants are speculators with no interest in taking possession of any oil, so before each contract expires they have to close out any residual positions, creating a flurry of buying and selling.

In the lead-up to the April 20 settlement, rumors were circulating that there would be significant downward pressure on the May contract. The recent slump in prices had attracted bargain-hunting retail investors into funds that track oil, including the Bank of China Ltd.'s Treasure, a vehicle linked to the price of oil. To manage its position after the influx, Bank of China and the banks it uses to help execute trades needed to sell large numbers of the May contracts and buy June ones. Two weeks before the settlement, CME, which monitors market activity, issued a rare public warning that negative prices were a possibility.

On April 20, as Bank of China and others were selling May contracts, Vega's traders were hoovering them up in the TAS market, according to people familiar with the matter, agreeing to buy oil at whatever the settlement price turned out to be. Then, as the settlement time approached, they aggressively sold outright WTI contracts and other related instruments, contributing to the downward pressure on the price. Vega stood to profit if it managed to buy oil through the TAS market more cheaply than the oil it sold through the day.

© 2021 Bloomberg L.P. All rights reserved.

Vega's selling collided with an exodus of buyers, and the May contract tumbled from about $10 at noon to zero at 2 p.m., then all the way down to settle at –$37. Oil's dive into negative territory meant that Vega ended up being paid for many of the contracts it sold as the market was falling—and for all those it bought at the –$37 settlement price via TAS, locking in a huge profit.

Buying TAS and selling outrights before and during the settlement is a well-known strategy that dates back to the pits, according to market participants, but it carries considerable risk. Selling futures can quickly turn into losses if a bigger player shows up and starts buying. "It's a big poker game," says Greg Newman, founder of energy-trading firm Onyx Capital Group.

There are also rules that forbid trading with the goal of deliberately affecting the settlement. In 2008, Dutch firm Optiver was sanctioned by the CFTC for abusing the TAS mechanism and boasting about its exploits in emails. And in 2011 the agency introduced a rule prohibiting a practice known as "banging the close," which it defines as trading heavily during the settlement period in one market to influence a larger position elsewhere.

But proving manipulation requires the government to demonstrate intent, which is difficult without incriminating communications such as text messages. And winning cases has been difficult, even with the new rules. "They're not in any way slam-dunks," says Aitan Goelman, a former head of the CFTC's enforcement division and now a partner at Zuckerman Spaeder.

It seems unlikely that Vega's traders could have predicted just how far oil would fall on April 20. Its selling that day met a whirlwind of other factors that spooked potential buyers and exaggerated all participants' impact on the market. As a result, Vega's traders made more money than they could have dreamed of—and found themselves in the authorities' spotlight. That may explain why its traders, usually active on settlement days, weren't active in May, June, and July, according to a person familiar with the firm's trading. –With Jack Farchy

*Read next: When Tesla Hits the S&P 500, It'll Spark the Wildest Passive Trade Ever*

(Updates with oil futures pricing. A previous update corrected "buyers" to "sellers" in first paragraph)

Related tickers:
3988 HK (Bank of China Ltd)
CME US (CME Group Inc)

To contact the authors of this story:
Liam Vaughan in London at lvaughan6@bloomberg.net
Kit Chellel in London at cchellel@bloomberg.net
Benjamin Bain in Washington at bbain2@bloomberg.net

To contact the editor responsible for this story:
Robert Friedman at rfriedman5@bloomberg.net
Eric Gelman

© 2021 Bloomberg L.P. All rights reserved.

# Exhibit 3

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

MISH INTERNATIONAL MONETARY INC.,
on behalf of itself and
all others similarly situated,

    *Plaintiff*,

  v.

VEGA CAPITAL LONDON, LTD., *et al.*,

    *Defendants.*

Case No. 1:20-cv-04577

Hon. Manish S. Shah

Magistrate Judge Jeffrey T. Gilbert

## DEFENDANTS VEGA CAPITAL LONDON LIMITED AND ADRIAN SPIRES' MOTION TO EXTEND DEADLINES IN COURT'S SCHEDULING ORDER

Pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, Defendants Vega Capital London Limited ("Vega") and Adrian Spires ("Spires") respectfully move for an order extending the deadlines in the scheduling order by three months. There is good cause for the extension, as Vega and Spires are pursuing discovery that will provide important evidence that should be considered in opposition to Plaintiff's forthcoming motion for class certification. From October 26, 2023 through December 14, 2023, Vega and Spires served subpoenas on 28 companies ██████████████████████████ with respect to the May 2020 West Texas Intermediate crude oil futures contract ("May WTI Contract") at issue in this case. Vega and Spires expect that the evidence obtained from these subpoenas will show, among other things, that individual issues will predominate over common issues, that Plaintiff is not an appropriate class representative, that there was no artificial price for the May WTI Contract, and that the normal laws of supply and demand were being followed that day.

Moreover, Vega and Spires have acted diligently in pursuing this discovery within the Court's scheduling deadlines and have been negotiating with 28 separate sets of internal and

external counsel over when the document productions will be received. A three-month extension is reasonable and appropriate under these circumstances.

Vega and Spires have conferred with counsel for Plaintiff and the Trader Defendants about this motion on multiple occasions and provided a draft of this motion to them. Plaintiff opposes the motion for a three-month extension of all deadlines in the scheduling order. Instead, Plaintiff proposed that it receive a three-week extension from the January 22, 2024 deadline to file its motion for class certification, and that the parties subsequently meet and confer about the length of time needed to complete the discovery Vega and Spires are pursuing and to respond to Plaintiff's motion and discuss any other adjustments to the scheduling order. Plaintiff's counsel has represented it will not argue against a further extension for Vega and Spires simply because its motion for class certification has been filed at the time it requested (with a three-week extension). However, given the substantial discovery that still must be completed with 27 companies (including responding to a motion to quash filed two days ago in the U.S. District Court for the Southern District of Texas), Vega and Spires believe that the more efficient and appropriate option is to seek the extension of three months now.

Counsel for the Trader Defendants stated that they do not oppose the extension sought by Vega and Spires and also do not oppose the alternate plan proposed by Plaintiff's counsel.

## BACKGROUND

On December 28, 2022, the Court decided the motions to dismiss the Second Amended Complaint. Dkt. 189 (opinion issued by the Honorable Gary Feinerman). On January 27, 2023, the Court set a scheduling order. Dkt. 201. The scheduling order included the following deadlines:

- The parties may issue written discovery beginning on 1/31/23;

2

- Plaintiff's motion for class certification, including any supporting expert reports, is due 1/22/24;

- Defendants' (joint) opposition to class certification, including any supporting expert reports, is due 3/4/24; and

- All fact discovery, including any foreign discovery, must be noticed in time for completion by 12/30/24.

*Id.* The Court stated that it "will set deadlines for amendment of the pleadings, merits expert discovery, and dispositive motions when the parties get closer to completing fact discovery." *Id.*

Following the Court's entry of the scheduling order, the parties have engaged in extensive party and non-party discovery. *See, e.g.*, Dkts. 244, 282 (joint status reports describing the status of discovery). Among other things, Plaintiff and the Trader Defendants served subpoenas on CME Group Inc. (the owner of the New York Mercantile Exchange), seeking trading information for the May WTI Contract bought or sold on April 20, 2020. In July and August 2023, the CME produced information about the trading, but masked the identities of the traders. The Trader Defendants and the CME further conferred, and the CME agreed to unmask data related to some of the traders. On November 13, 2023, the CME made a supplemental production with that unmasking information. However, the CME represented to counsel for the Trader Defendants that it cannot necessarily track trader information to individual companies because traders trade through a process in which the individual traders are identified through their individual Tag50 ID[1] and not necessarily through their corporate affiliation. Vega and

---

[1]     Tag50 IDs are used by the CME to "identify trading participants (individual or ATS Group) that access and submit messages to/from CME Globex and are used to identify authorized individuals. . . ." https://www.cmegroup.com/tools-information/webhelp/cme-customer-center/Content/tag50.html (last visited on January 2, 2024).

Spires understand that the meet-and-confer and production process between the CME and the Trader Defendants is still ongoing.

During this process, Vega and Spires became concerned that the CME discovery could not answer critical questions in the case: why other traders traded the way they did or even the amounts and times at which they traded. As a result, Vega and Spires issued subpoenas seeking this information directly from the trading companies themselves. ███████████████████ ██████████████████████████████████████████████████ Vega and Spires selected 28 companies from this list and issued subpoenas to them. The first subpoena was served on Bank of China Limited on October 27, 2023. Subpoenas were served on 12 companies during the month of November, while the remaining 15 subpoenas were served in December. The last subpoena was served on December 14, 2023. An example of the subpoenas (which are largely identical) is attached as Exhibit 1 to the Declaration of Michael P. Kelly.

One subpoena recipient, SOCAR Trading (North America) LLC, has already complied with and produced documents in response to the subpoena. However, in light of the holiday season, many of the 27 sets of counsel for other subpoena recipients requested extensions for filing objections or complying with the subpoenas, and/or reported that their in-house counterparts were not available to discuss the subpoena or conduct searches for information. Others have responded with objections to the subpoenas, and counsel for Vega and Spires are in the process of conferring with them to narrow the issues as much as possible before seeking court intervention on any motion to compel. On January 3, 2024, one subpoena recipient, Vitol Incorporated, filed a motion to quash the subpoena in the United States District Court for the Southern District of Texas. *Vitol Inc. v. Vega Capital London Limited*, Case No. 4:24-mc-00010

(S.D. Tex.) (filed Jan. 3, 2024). Vega and Spires plan to oppose the motion and to seek the transfer of the motion to this Court.

## DISCUSSION

There is good cause to extend the deadlines in this case by three months.

### A.    The Evidence Sought Will Be Important to Consider on the Motion for Class Certification

First, the information sought will have direct relevance to the motion for class certification. The Second Amended Complaint seeks to define the class comprising of "[a]ll persons and entities that purchased and/or sold during the period from at least April 20, 2020 through at least April 21, 2020 a May 2020 light sweet crude oil (WTI) futures contract traded on the NYMEX and/or the ICE."[2] Dkt. 130 at ¶ 334. Among the issues that will be disputed for class certification are whether Plaintiff is an appropriate class representative, whether Plaintiff's claims are typical of other proposed class members, and whether common issues will predominate over individual issues. "An individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof." *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843–44 (7th Cir. 2022).

When deciding a dispute between Plaintiff and the Trader Defendants about the number of depositions that could be taken of Trader Defendants before class certification, the Court observed that "testimony about the existence of a conspiracy, the functioning of the marketplace (particularly on April 20, 2020), and the intent behind trades could lead to evidence in support of

---

[2]    Plaintiff's class definition excludes "Defendants and their officers, directors, management, employees, subsidiaries, or affiliates and all federal governmental entities." *Id.*

identifying common questions amenable to Rule 23 certification." Dkt. 271 at 1. The subpoenas issued by Vega and Spires seek information about the functioning of the marketplace on April 20, 2020 in support of identifying individual issues not amenable to Rule 23 certification. On the last trading day of the month (April 21, 2020 for the WTI May Contract), holders of WTI futures contracts were obligated to accept physical delivery of the oil covered by those contracts in Cushing, Oklahoma. *See* Ex. 2 at 2 (CFTC Interim Staff Report stating that "[f]or the WTI Contract May expiry, market participants who were not intending to make or take delivery of the crude oil underlying the futures contract were expected to close out of their positions by April 21 . . . "). For those traders intending on accepting physical delivery of the oil, they had to accept it in Cushing, Oklahoma, which was quickly running out of storage space. *Id.* (CFTC Interim Staff Report finding that "[b]y March 2020, the working storage available at the Cushing facility was near capacity.").

This evidence will bear on whether other traders were differently situated from Plaintiff Mish International Monetary Inc., the nature and scope of individual issues, whether there was an artificial price, and why there was no demand for crude oil futures contracts on April 20, 2020, even amongst the largest traders in the market. 

Ex. 3 at 25:14-16.

*Id.* at 293:14-294:1.

Ex. 4 at 6.

Ex. 3 at 209:4-8.



█████████ *Id.* at 272:21-25; 368:5-369:18.

█████████ Ex. 5 at 234:21-23; 336:24-337:15. █████████

█████████ *Id.* at 320:1-9.  At 1:08 pm (CT), the prices for WTI futures contracts went negative.  Ex. 2 at 8. █████████

█████████ Ex. 4 at 6.

Once the prices went negative, at 1:14 pm (CT), █████████

█████████ Ex. 6 at 1.

█████████ *Id.* █████████

█████████ *Id.* █████████

█████████ Ex. 7 at 128:1-20; 141:11-142:4; *see, e.g.*, Ex. 8.

Meanwhile, other traders were in far different circumstances.  SOCAR Trading's production demonstrates that its circumstances were very different from Plaintiff.  SOCAR Trading is the international marketing and development arm of SOCAR, the State Oil Company of Azerbaijan.

- In contrast to Plaintiff, ██████████████████
  ████████ Ex. 9 at 1.

- In contrast to Plaintiff, ██████████████████
  ████████████████████████
  ████████████████████████
  ████████████ Ex. 10 at 1.

- In contrast to Plaintiff, ██████████████████
  ████ Ex. 11 at 1.

- In contrast to Plaintiff, ██████████████████
  ████████████████████████
  ████ Ex. 12 at 2.

These types of documents (along with deposition testimony) will help to show how traders were differently situated from Plaintiff, why individual issues will predominate over common issues, why there was no demand for crude oil futures markets on April 20, and why the fall in price was the product of normal laws of supply and demand.

Vega and Spires expect that the document productions of 27 other major traders will further illustrate the differences between Plaintiff, a rare coin dealer with little experience in trading crude oil futures commodities, and many of the world's largest traders on the market that day. Even with an extension of three months, Vega and Spires recognize that they will need to move quickly, resolve any outstanding discovery disputes, file any motions to compel, and schedule and take any depositions that are necessary following the completion of document productions. These efforts will be particularly challenging when there are 27 separate subpoena recipients.

**B.** **Vega and Spires Acted Diligently in Seeking The Information**

Vega and Spires have acted diligently in pursuing this discovery. Once it became clear that the CME productions would not provide the necessary information about the individual trading circumstances, from October 27 through December 14, 2023, Vega and Spires served the subpoenas on the 28 companies. Each subpoena required the recipients to respond within 30 days, such that Vega and Spires would receive the necessary information well in advance of the schedule for Plaintiff's motion for class certification and would have permitted depositions before Defendants' response to the motion for class certification. However, in light of the extensions requested by the vast majority of the subpoena recipients, the delays inherent in the holiday season, the necessity to meet and confer with 27 subpoena recipients (not including SOCAR), the probable need to file a motion to compel, and the need to conduct depositions of a number of the subpoena recipients, it is unlikely that Vega and Spires will obtain the information needed before their opposition to the motion for class certification is due. Vega and Spires are seeking this extension weeks before the due date for Plaintiff to file its motion for class certification to ensure that no party will be unfairly prejudiced by the modest three-month extension. Under these circumstances, there is good cause to extend the deadlines in the Court's scheduling order.

## **CONCLUSION**

For the reasons stated above, Defendants Vega Capital London Limited and Adrian Spires

respectfully request that the Court extend the deadlines in its January 27, 2023 scheduling order

by three months.

Dated: January 5, 2024

Respectfully submitted,

VEGA CAPITAL LONDON LIMITED
and ADRIAN SPIRES

By: */s/ Michael P. Kelly*
Michael P. Kelly
**AKERMAN LLP**
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 393-6222
michael.kelly@akerman.com

Amy Graham Doehring
**AKERMAN LLP**
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700
amy.doehring@akerman.com

Joel S. Forman
**AKERMAN LLP**
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
(212) 880-3800
joel.forman@akerman.com

*Attorneys for Vega Capital London Limited
and Adrian Spires*

Michelle D. Nasser
**DOWD BENNETT LLP**
222 West Adams Street, Suite 250

Chicago, IL 60606
(314) 889-7345
mnasser@dowdbennett.com

10

# Exhibit 4

 

March 16, 2021, 1:25 PM EDT

World's Top Oil Trader Vitol Smashed Profit Record in 2020

Jack Farchy
Bloomberg Editorial

Javier Blas
Bloomberg Editorial

---

- Trading house is said to have made around $3 billion net
- Oil traders enjoyed bonanza year on wild price gyrations

By Jack Farchy and Javier Blas

(Bloomberg) --

Vitol Group reaped record profits of around $3 billion last year as the world's largest independent oil trader surfed the dramatic moves in energy markets, according to people familiar with the matter.

The results are the latest indication of the bonanza that oil traders enjoyed in 2020, when the commodity plunged amid a Saudi-Russian price war in the early days of the pandemic and then staged a sharp recovery as OPEC+ cut production.

Vitol hasn't yet closed its 2020 accounts, and the final profit figure may still change, the same people said, asking not to be named because the information isn't public. The company may also use some of last year's earnings for write-downs, reducing the final net income figure. Still, the trading house expects to show a net profit of around $3 billion in 2020, significantly higher than the previous record of $2.3 billion booked in both 2009 and 2019, the same people said.



A Vitol fuel storage facility in Johor, Malaysia.

Photographer: Munshi Ahmed/Bloomberg

Vitol, which is owned by about 350 of its partner-traders, made a significant chunk of its profits during the second quarter, when oil demand collapsed, allowing traders to buy cheap crude and store it, while locking in a profit by selling forward the oil on the futures market at higher prices.

The so-called contango storage plays saw the big oil traders hoard crude and refined petroleum products in onshore tank farms and even on tankers, which they turned into temporary floating storage facilities.

New Leadership

Each day, Vitol moves 8 million barrels of crude and petroleum products -- enough to meet the demand of Germany, France, Italy, Spain and the U.K. combined. The company, which operates from offices in London but is ultimately controlled through a holding company in Luxembourg, doesn't announce its results publicly, but shares them with bankers and others.

A Vitol spokeswoman declined to comment.

**Search by People**

Ian Roper Taylor

Emma Ross-Thomas

Miguel A Loya "Mike"

Javier Blas

Jack Farchy

Hui Meng Kho

**Search by Topics**

All Hot Stories

First Word Europe Equity News

First Word Oil

Business News

Commodities Markets

Financials

Energy

Energy Trading

Oil

Key Oil News

More Topics (2)

Vitol is navigating one of its most significant changes in leadership, after the death of long-time Chief Executive and Chairman Ian Taylor last year. Battling cancer, Taylor moved to the role of chairman in 2018, and one of his longtime lieutenants Russell Hardy took over as CEO.

Other top executives have also taken a step back from day-to-day operations, including Mike Loya, who ran the Americas business from Houston and left the company last year, and David Fransen, who was head of the Geneva office. Kho Hui Meng, the long-time head of Asia, also retired in 2020.

The strong results at Vitol echo a trend across the industry. Trafigura Group, the second-largest independent oil trader by volume, reported record profits of $1.6 billion in its financial year to September 2020, while Glencore Plc said its oil traders had also had a record year.

Among the Big Oil companies, Royal Dutch Shell Plc, which handles 12 million barrels of crude oil and refined petroleum products a day in its in-house trading division, said last week that its oil profits had doubled in 2020 to $2.6 billion. As the independent oil traders, Shell told investors last year it had made significant gains thanks to contango storage plays.

To contact the reporters on this story:
Jack Farchy in London at jfarchy@bloomberg.net;
Javier Blas in London at jblas3@bloomberg.net

To contact the editors responsible for this story:
Will Kennedy at wkennedy3@bloomberg.net
Emma Ross-Thomas

**Exhibit 5**

CORPORATE | 06.04.2021

# Vitol 2020 volumes and review

- Turnover of $140 billion in 2020 (2019 $225bn)
- 7.1 million barrels a day of crude and products traded in 2020 (2019 8mb/d)
- $1+ billion new capital already committed to identified renewable projects

Statement from Russell Hardy, CEO, Vitol:

It is impossible for us to look back on 2020 without remembering the loss of our chairman, friend and colleague Ian Taylor. At the same time, we are mindful that many others have sadly lost family, friends and colleagues over the past year.

It is just over 12 months since Covid-19 was declared a pandemic. The virus shaped our business and our lives in 2020. The extraordinary market conditions in the initial stages of lockdown and sudden drop in demand resulted in huge logistical challenges and market opportunities. With stocks building by over one billion barrels in the early part of the year, the industry had to manage unprecedented circumstances, restructuring supply chains to handle the crude oil and products that neither producers nor consumers could contain. Whilst much demand has returned and the outlook is positive, the recovery has been slower than many anticipated and near-term uncertainties remain.

Our focus remains on growing our business whilst maintaining a conservative approach to financial and operational risks. We continue to invest in energy segments that are likely to grow as the world transitions to cleaner energy solutions and, to date, have committed over $1 billion of capital to renewable projects worldwide. Alongside this growing portfolio, we are expanding our capabilities in LNG, gas, power and carbon trading. Later this quarter we will publish our first ESG report, in which we provide detail about our refocused business strategy and decarbonisation projects.

Our senior team has also evolved with both Kho Hui Meng and Mike Loya retiring from Vitol during 2020. Whilst their experience will be greatly missed, it is a credit to the strength and depth of talent across the company that the business has continued to perform well in both the Americas and Asia.

Crude oil and products

Total global oil demand fell by 8.8 million barrels per day in 2020 and our traded volumes fell commensurately to 7.1 mb/d (2019 8 mb/d) or 339.2 million MT (2019 382.8) for the whole year. As mentioned, the sudden loss of demand in March / April resulted in extraordinary market conditions. Our inventories grew markedly as we absorbed customer cargoes when demand collapsed and the market moved into a steep contango. Looking at the year as a whole, demand across the barrel was mixed and reflected the performance of the wider

*Top*

economy: light ends used in manufacturing outperformed, our naphtha volumes increased 18% year-on-year, but transportation fuel volumes fell. Unsurprisingly, our traded jet fuel volumes were the most affected, dropping 39% year-on-year to 11.3 million MT.

Crude continues to represent our largest volumes. Notwithstanding a fall in volumes of 14% compared with 2019, we traded 174.6 million MT. The collapse in demand impacted all producers, but US shale, with its proportionately higher marginal cost and high decline rates, was notably affected. For the first time, a major oil price benchmark turned negative, whilst this was largely caused by an exceptional interaction of the physical and financial markets, it negatively affected US producer sentiment. Longer term, the increased discipline we are seeing from US producers will be better for the sector. We have expanded capability in this area to consider mature investment opportunities.

Gasoline and gasoil traded volumes were down by 6.1% and 1.4% respectively. The impact of lockdowns for both fuels was tempered by the increasing use of personal vehicles versus public transport and a growth in home deliveries.

Looking forward, whilst we expect a recovery in most sectors in the second half of this year, aviation demand is likely to remain below 2019 levels for some time. We see business opportunities in particular sectors, such as bunkering in growth markets, including Asia and the Middle East, and are expanding our offering to capture these.

Transitional energy

Longer term we anticipate a shift in energy demand away from liquid hydrocarbons towards power. We anticipate that, in the medium term, demand for hydrocarbons such as LNG, natural gas and LPG will grow as economies move away from coal and other solid fuels. At present, and until large scale battery capacity has grown significantly, there will be a need for gas fired generation to help manage the intermittency associated with renewable solar and wind generation; hence our recent acquisition, through VPI Holding, of four CCGTs in the UK from Drax. VPI is leading the company's first large-scale industrial decarbonisation project, Humber Zero, which aims to remove 8 million MT of $CO_2$ annually by the mid-2020s.

In this context we have been growing our capacity across all these areas with investments in both assets and people. A long-standing participant in the LNG market, which we entered in 2006, last year we traded 10 million MT. We continue to lead innovation and recently launched a 'Green LNG' offering, enabling our customers to offset emissions associated with their cargoes, from wellhead to DES delivery, through the surrender and cancellation of Verified Emissions Reductions (VERs) and International Renewable Energy Certificates (IRECs).

Such offerings enable us to leverage our expertise in carbon markets. We have been building a portfolio of carbon-mitigating solutions for fifteen years, as well as being an active participant in both voluntary and compliance carbon markets in Europe and the Americas. We anticipate an increased integration of this business with the mainstream energy businesses as customers look to offset emissions as part of their day-to-day business.

We are an established participant in biofuels markets in the Americas and we are also investing in other circular economy solutions, such as Wastefront which recycles tyres to make liquid hydrocarbons.

Renewables and new energy solutions

Our investment in renewables is growing and to date we have committed over $1 billion of new capital to identified projects in this sector. We are predominantly focused on wind, solar and renewable natural gas projects (purified biogas produced in biodigesters which convert organic waste to pipeline gas). Our largest presence is in the US, though our portfolio is growing in Europe and Asia.

More broadly we are looking at our investment portfolio and working with management teams to identify opportunities for reducing emissions, alongside strategic opportunities to grow the business through the energy transition. We are identifying sectors, such as the electrification of transport, where we believe we can deploy our capital and expertise to grow compelling offerings which, where possible, complement our existing trading businesses.

The energy transition requires our business to change. We continue to believe that demand for oil will not peak for another decade, but nonetheless we must position our business for a lower emissions world. This change cannot be made overnight, so we will steadily build our transitional and new energy offering and portfolio, serving our clients as their needs evolve.

We are also working hard to mitigate compliance risks across the business. Late last year we reached agreement with US and Brazilian authorities in respect of certain conduct in Brazil and other jurisdictions. Whilst we are pleased the matter has been resolved, we fully appreciate the seriousness of the situation.

Finally, we thank all our customers and banks for their continued support, and I thank all my colleagues for their hard work and professionalism over the last year in what have been, for many, very challenging circumstances.

# Exhibit 6

Energy

# Trader Vitol posts record $15 bln profit in 2022 on energy crisis -FT

Reuters

March 30, 202312:18 PM EDTUpdated 10 months ago

March 30 (Reuters) - Global commodities trader Vitol posted a record net profit of almost $15 billion in 2022, reaping the benefits of the energy crisis and leaving behind its competitors, the Financial Times reported on Thursday, citing people familiar with the matter.

Last week, the energy trader disclosed an 80% jump on the year in its 2022 turnover at $505 billion, saying it delivered 7.4 million barrels per day (bpd) of crude oil and products last year.

Its profits for 2022 matched its combined earnings for the previous six years, rewarded by large price swings in global energy markets in the aftermath of Russia's invasion of Ukraine, the FT said.

The company told Reuters on Thursday it had no comment on the FT report.

Rival trader Mercuria logged a net profit of nearly $3 billion last year, while Trafigura made around $3.5 billion in the first quarter of its current financial year.

The windfall for Vitol was also boosted by earnings in power markets, power generation, refining and liquefied natural gas (LNG) trading, the FT added.

The company last week said its traded LNG volumes rose to 17.6 million tonnes of oil equivalent, due to increased demand from Europe, with European destinations accounting for two-thirds of its LNG volumes in the fourth quarter of 2022.

Vitol's crude oil volumes fell slightly to 199.5 million metric tonnes last year, down from 2021 owing to the company stepping away from more than 90% of the Russian oil business it previously did.

"Less than 100,000 barrels per day (bpd) of our traded volume now is Russian business. Will that move up with some slightly stronger guidance? Yes, maybe," Vitol CEO Russell Hardy told the FT Global Commodities Summit last week.

For the rest of 2023, it expects oil demand to grow by 2 million bpd, driven primarily by the aviation sector globally and recovering demand in China, with the tightness in LNG to continue until 2026.

Reporting by Deep Vakil in Bengaluru Editing by Marguerita Choy

Our Standards: The Thomson Reuters Trust Principles.

# Exhibit 7

| From: | CME Global Command Center[na2@na2.mx.xmatters.com] |
|---|---|
| Sent: | Mon 4/20/2020 12:05:37 PM (UTC-05:00) |
| To: | jfelag@vfmarkets.com[jfelag@vfmarkets.com] |
| Subject: | May 2020 Energy Limits |

> EXTERNAL: This email originated from outside our email system. Please exercise caution when opening any attachments or links.

The following May 2020 Energy products (CLK0, HOK0, QHK0, QMK0, QUK0, RBK0, HCLK0, RTK0, WSK0, RLXK0, TCSK0, MPXK0, 23K0, CSXK0, 26K0) have no low limit and may trade negative.

If you have any questions, please contact the CME Global Command Center in the U.S. at +1 800 438 8616, in Europe at +44 20 7623 4747 or in Asia at +65 6532 5010.

The sender provided the following contact information.

Sender's Name: CME Global Command Center

Sender's Email: gcc@cmegroup.com

Sender's Contact Phone: 1 800 438 8616

**Exhibit 8**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MISH INT'L MONETARY INC., | x | |
| on behalf of itself and | : | |
| all others similarly situated, | : | |
| | : | Case No. 20-cv-04577 |
| *v.* | : | |
| | : | Judge Gary Feinerman |
| VEGA CAPITAL LONDON, LTD. | : | Magistrate Judge Jeffrey T. Gilbert |
| and JOHN DOES 1-100. | : | |
| | x | |

## STIPULATED PROTECTIVE ORDER

WHEREAS, Plaintiff Mish International Monetary Inc. ("Plaintiff" or "Mish"), through its undersigned counsel, and Defendant Vega Capital London, Ltd. ("Defendant" or "Vega"), through its undersigned counsel, have agreed to the terms of this Stipulated Protective Order ("Order") in order to facilitate the exchange of confidential information in connection with the above captioned action;

WHEREAS, the Court has reviewed the terms of this Order and finds the terms herein fair and reasonable;

WHEREFORE, it is hereby ORDERED as follows:

1. **SCOPE.**

1.1. **Any information produced in the course of discovery of this case will be used solely for the purpose of this litigation and for no other purpose.**

1.2. All documents produced in the course of discovery, including initial disclosures, all responses to discovery requests, all deposition testimony and exhibits, other materials which may be subject to restrictions on disclosure for good cause, and information derived directly therefrom (hereinafter collectively "Discovery Material"), shall be subject to this Order

1

concerning confidential information as set forth below.  The Order is also subject to the Local Rules of this District and the Federal Rules of Civil Procedure on matters of procedure and calculation of time periods.

1.3.     The protections conferred by this Order cover not only Protected Material (as defined below), but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by parties or counsel in settings that might reveal Protected Material.  However, this Order shall not be construed to cause any counsel to produce, return, and/or destroy their own attorney work product, or the work product of their co-counsel.

2.     **DEFINITIONS.**

2.1.     <u>Confidential Information</u>:  Documents, information (regardless of how generated, stored or maintained) or tangible things that, in good faith, qualify for protection under standards developed under Fed. R. Civ. P. 26(c), including but not limited to confidential personal information, medical or psychiatric information, personnel records or other sensitive commercial information that is not publicly available.  Public records and other information or documents that are publicly available may not be designated as Confidential Information.

2.2.     <u>Highly Confidential Information</u>:  Documents, information (regardless of how generated, stored or maintained) or tangible things that contain trade secrets or other highly sensitive competitive or highly sensitive confidential information the disclosure of which is reasonably likely to result in demonstrable harm to the Designating Party, such as financial information relating to costs, unpublished pricing information, unpublished plans to buy or sell a business or business unit, and the like, or in demonstrable harm to individuals who are not parties to this suit, such as, but not limited to the identity of the individual traders.

2.3.     <u>Receiving Party</u>:  a party that receives Protected Material from a Producing Party.

2.4.     <u>Producing Party</u>:  a party or non-party that produces Protected Material in this action.

2.5.     <u>Designating Party</u>:  a party or non-party that designates information or items in this litigation as "Confidential" or "Highly Confidential."

2.6.     <u>Protected Material</u>: any Discovery Material that is designated as "Confidential" or as "Highly Confidential."

2.7.     <u>Outside Counsel</u>:  attorneys, along with their paralegals, and other support personnel, who are not employees of a party but who are retained to represent or advise a party in this action.

2.8.     <u>In-House Legal Personnel</u>:  attorneys and other personnel employed by a party to perform legal functions and who are responsible for overseeing this litigation for the party.

2.9.     <u>Designated Business Personnel</u>: senior business personnel employed by or formerly employed by a party and who are responsible for making decisions with regard to management of this litigation or who have knowledge critical to this litigation.

2.10.    <u>Counsel (without qualifier)</u>:  Outside Counsel and In-House Legal Personnel (as well as their support staffs, including but not limited to attorneys, paralegals, secretaries, law clerks, contractors and investigators).

2.11.    <u>Expert and/or Consultant</u>:  a person with specialized knowledge or experience in a matter pertinent to the litigation, along with his or her employees and support personnel, who has been retained by a party or its counsel to serve as an expert witness or as a consultant in this action.  This definition includes a professional jury or trial consultant retained in connection with this litigation.

2.12.    <u>Professional Vendors</u>:  persons or entities that provide litigation support services (e.g., photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, retrieving data in any form or medium; etc.) and their employees and subcontractors.

3.    **DESIGNATING PROTECTED MATERIAL.**

3.1    <u>Exercise of Restraint and Care in Designating Material for Protection</u>.  Each party or non-party that designates "Confidential" or "Highly Confidential" information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards and avoid indiscriminate designations.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all Receiving Parties that it is withdrawing or changing the mistaken designation.

3.2    <u>Form and Timing of Designations</u>.  Except as otherwise provided in this Order, or as otherwise stipulated or ordered, material that qualifies for protection as "Confidential" or "Highly Confidential" under this Order must be clearly so designated before the material is disclosed or produced.  Notwithstanding the preceding sentence, should a Producing Party discover that it produced Discovery Material that was not designated as Protected Material or that it produced Discovery Material designated in the incorrect category of Protected Material, the Producing Party may notify all Receiving Parties, in writing, of the error and identify (by bates number or other individually identifiable information) the affected documents and their new designation or re-designation.  Thereafter, the material so designated or re-designated will be treated as Protected Material.  Promptly after providing such notice, the Producing Party shall provide re-labeled copies of the material to each Receiving Party reflecting the change in

4

designation.  The Receiving Party will replace the incorrectly designated material with the newly

designated materials and will destroy the incorrectly designated materials.

Designation in conformity with this Order requires:

1.  <u>for documents (apart from transcripts of depositions or other pretrial or trial
    proceedings)</u>, that the Producing Party affix the legend "CONFIDENTIAL -
    SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL -
    SUBJECT TO PROTECTIVE ORDER" on each document that contains protected
    material.

2.  <u>for testimony  given in deposition</u>, that a party, or a non-party that sponsors, offers,
    gives, or elicits the testimony, designate any portion of the testimony as
    "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY
    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER," either on the record
    before the deposition is concluded, or in writing on or before the later of (i) thirty
    (30) days after the final transcript is received or (ii) the date by which any review
    by the witness and corrections to the transcript are to be completed under Fed. R.
    Civ. P. 30(e).  The entire testimony shall be deemed to have been designated Highly
    Confidential until the time within which the transcript may be designated has
    elapsed.  If testimony is not designated within the prescribed time period, then such
    testimony shall not be deemed Confidential or Highly Confidential except as
    ordered by the Court.  Transcripts containing testimony designated Confidential or
    Highly Confidential shall have the following notation on the cover page:  NOTE:
    THIS DEPOSITION IS SUBJECT TO PROTECTIVE ORDER and contain a copy
    of the Party's or Non-Party's designations as part of the official transcript.  Any

reproductions of a transcript or portion of a transcript containing designated information shall be appropriately labeled.

c.  <u>for information produced in electronic or video format, and for any other tangible items</u>, that the Producing Party affix in a prominent place on the exterior of the container or containers or in any electronic repository or electronic document in which the information or item is stored the legend "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER", as appropriate, in addition to the information or tangible items themselves.

3.3  <u>Failures to Designate</u>.  If corrected, a failure to designate Discovery Material or items as "Confidential" or "Highly Confidential" does not waive the Designating Party's right to secure protection under this Order for such Discovery Material.  If Discovery Material is re-designated as "Confidential" or "Highly Confidential" after such material is initially produced, the Receiving Party, upon notification of the designation, must make reasonable efforts to assure that such material is treated in accordance with the provisions of this Order.

4.  **ACCESS TO AND USE OF DISCOVERY AND PROTECTED MATERIAL.**

4.1  <u>Basic Principles</u>.  A Receiving Party may use and disclose Discovery Material only in connection with prosecuting, defending, or attempting to settle this action, including any appeal thereof, and not for any other business, commercial or other purpose.  Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order.

Discovery Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

For purposes of this Order, a secure website, or other internet-based document depository with adequate security, shall be deemed a secure location.

    4.2    <u>Protection of "CONFIDENTIAL" Discovery Material</u>. Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any Discovery Material designated "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" only to:

a.    <u>Counsel</u>. The Receiving Party's Counsel, as well as employees and contractors of said counsel to whom it is reasonably necessary to disclose the information for this litigation;

b.    <u>Parties</u>. The parties to this action, as well as the parties' employees, and, with respect to "CONFIDENTIAL" Discovery Material that was produced by a non-party, also to such non-party and its employees;

c.    <u>Court</u>. The Court and its personnel;

d.    <u>Court Reporters and Recorders and Vendors</u>. Stenographers, their staffs, and Professional Vendors to whom disclosure is reasonably necessary for this litigation;

e.    <u>Consultants, Investigators and Experts</u>. Experts and/or Consultants with respect to each of whom agree to be bound by this Protective Order and have completed the certification contained in Attachment A;

f.    <u>Others</u>. (1) The author, addressees, or recipients of the document, (2) any other natural person whom there is a good faith basis to believe did review such document during his or her employment as a result of the substantive nature of his or her employment position, or who is specifically identified in the document, or whose conduct is purported to be specifically identified in the document, or (3) any other

person whom the Producing Party or Designating Party agrees in writing may have access to "CONFIDENTIAL" Discovery Material;

g.    <u>Witnesses</u>.  Any witness who counsel for a party in good faith believes may be called to testify at trial, hearing or deposition in this action or is called to testify at trial, hearing or deposition in this action, provided such person, prior to disclosure, either completes the certification contained in Attachment A, in which the witness agrees to be bound by this Protective Order, or is provided with a copy of this Protective Order and advised they are bound by the terms of this Order.

4.3    <u>Protection of "HIGHLY CONFIDENTIAL" Discovery Material</u>.  Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" only to:

a.    <u>Counsel</u>.  The Receiving Party's Counsel, as well as employees and contractors of said counsel to whom it is reasonably necessary to disclose the information for this litigation;

c.    <u>Court</u>.  The Court and its personnel;

d.    <u>Court Reporters, Recorders and Vendors</u>.  Stenographers, their staffs, and Professional Vendors to whom disclosure is reasonably necessary for this litigation;

e.    <u>Consultants, Investigators and Experts</u>.  Experts and/or Consultants with respect to each of whom agree to be bound by this Protective Order and have completed the certification contained in Attachment A;

f.    <u>Witnesses</u>.  Plaintiff and Defendant will meet and confer concerning the use of any Highly Confidential Information at depositions with witnesses whose depositions have been noticed in this action.

f.    <u>Others</u>.   (1) The author, addressees or recipients of the document; or (2) any other person whom the Producing Party or Designating Party agrees in writing may have access to "HIGHLY CONFIDENTIAL" Discovery Material.

4.4    <u>Persons Bound by Protective Order</u>.  An agreement to be bound by this Protective Order under subsections 4.2(e) and 4.3(d) shall be accomplished by the execution of the Acknowledgment and Agreement To Be Bound by Protective Order (Exhibit A).  An agreement to be bound by this Protective Order under subsection 4.2(g)  shall be accomplished either by the execution of the Acknowledgment and Agreement To Be Bound by Protective Order (Exhibit A), or by providing persons under subsection 4.2(g) with a copy of this Protective Order and advising them they are bound by its terms, in which case those persons shall be bound by the terms of this Order.  Outside Counsel for the Party that obtains signed agreements (Exhibit A), as required above, shall retain them for one year following the final termination of this action, including any appeals.

4.5    <u>Retention of Protected Material</u>. Persons who have been shown Protected Material pursuant to Section 4.2 (f) or (g) or Section 4.3(e)  shall not retain copies of such Protected Material except as reasonably necessary for this litigation and as subject to Paragraph 10 of this Order. Persons shown Protected Materials pursuant to Section 4.2(g) shall not retain such Protected Materials after their testimony, except that (i) such persons may retain an official copy of the transcript of their own testimony, including exhibits made part of the official transcript, as reasonably necessary for this litigation while the litigation is ongoing, and (ii) such persons may

retain an official copy of the transcript of their own testimony, excluding exhibits made part of the official transcript, once the litigation has concluded.

4.6     Copies.    Prior to production to another party, all copies, electronic images, duplicates, extracts, summaries or descriptions (hereinafter referred to collectively as "copies") of documents designated as Protected Material under this Order, or any individual portion of such a Protected Material, shall be affixed with the appropriate designation if the designation does not already appear on the copy.  All such copies shall thereafter be entitled to the protection of this Order.  The term "copies" shall not include indices, electronic databases, or lists of documents provided these indices, electronic databases or lists do not contain substantial portions or images of the text of Protected Material or otherwise disclose the substance of the confidential information contained in the Protected Material.

4.7.     Initial Regulatory Production.  For purposes of Defendant Vega's initial regulatory production that has been ordered by the Court (ECF No. 21), the parties agree to treat the identities of traders associated with Defendant Vega reflected in such production as Highly Confidential pursuant to the terms of this Order.  Accordingly, to the extent any party seeks to make a submission to the Court that concerns the identities of the traders (including, without limitation, an amended complaint), such identities will be redacted or otherwise masked (*e.g.*, Trader 1, Trader 2, etc.) for purposes of public filings unless the Court orders otherwise; however, the identities of the traders may be filed under seal with the Court.  The identities of the traders will remain redacted or otherwise masked unless and until such time as the Court finds that Plaintiff's complaint (or amended complaint) survives a motion to dismiss either in whole or in part.  If Defendant Vega's motion to dismiss is denied, any party may seek to remove the Highly Confidential designation, either through agreement of the parties or by motion to the Court.

5.    **CHALLENGING CONFIDENTIALITY DESIGNATIONS.**

5.1    <u>Timing of Challenges</u>.    A Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

5.2    <u>Meet and Confer</u>.    Before filing any motions regarding or objections to a confidentiality designation with the Court, the objecting party shall have an obligation to meet and confer in a good faith effort to resolve the objection by agreement.    If agreement is reached confirming, changing or waiving the confidentiality designation as to any Protected Material subject to the objection, the Designating Party shall serve on all parties a notice specifying the Discovery Material and the nature of the agreement.    The Designating Party shall also produce copies of all materials with the agreed designation at the expense of the Designating Party.

5.3    <u>Action by the Court</u>.    Applications to the Court for an order relating to the designation of any Protected Material shall be by motion under Local Rule 26.2 and any other procedures set forth in this Court's standing orders or orders in this action.    Nothing in this Order or any action or agreement of a party under this Order limits the Court's authority to make any orders that may be appropriate with respect to the use and disclosure of any Discovery Material produced or used in discovery or at trial.

6.    **DISCOVERY MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION.**

If a Receiving Party is served with a discovery request, subpoena or an order issued in other litigation that would compel disclosure of any Discovery Material, the Receiving Party must so notify the Designating Party, in writing (by electronic mail, if possible), along with a copy of the discovery request, subpoena or order, as soon as reasonably practicable (and no later than ten days

before the date by which any disclosure is made pursuant to the discovery request, subpoena or order).

The Receiving Party also must promptly inform the person who caused such discovery request, subpoena or order to issue in the other litigation that some or all the material covered by the request, subpoena or order is the subject of this Protective Order.  In addition, the Receiving Party must deliver a copy of this Order promptly to the person in the other action that caused the discovery request, subpoena or order to issue.

The purpose of imposing these duties is to alert interested persons to the existence of this Order and to afford the Designating Party in this case an opportunity to protect its confidentiality interests in the court from which the discovery request, subpoena or order is issued.  The Designating Party shall bear the burdens and the expenses of seeking protection in that court of its Discovery Material.  Nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

## 7.    UNAUTHORIZED DISCLOSURE OF DISCOVERY MATERIAL.

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Discovery Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosure, (b) use its best efforts to retrieve all copies of the Discovery Material, (c) inform the person or persons to whom unauthorized disclosure was made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement To Be Bound by Protective Order" that is attached hereto as Exhibit A.

## 8.  INADVERTENT PRODUCTION OF PRIVILEGED MATERIAL.

The inadvertent production of any Discovery Material constituting or containing attorney-client privileged information, attorney work product or other privileged information shall be governed by Rule 26 of the Federal Rules of Civil Procedure, Rule 502 of the Federal Rules of Evidence, and this Order.

A party or non-party may request the return of any privileged document that it inadvertently produced (an "Inadvertently Produced Privileged Document") by identifying the Inadvertently Produced Privileged Document and stating the basis for withholding such document from production.  If a party or non-party requests the return, pursuant to this section, of such an Inadvertently Produced Privileged Document then in the custody of one or more parties, the possessing parties shall within five (5) business days destroy or return to the requesting party or non-party the Inadvertently Produced Privileged Document and all copies thereof and shall make reasonable efforts to expunge from any other document or material information solely derived from the Inadvertently Produced Privileged Document, consistent with Fed. R. Civ. P. 26(b)(5)(B). A party may move the Court for an order compelling production of the document and may present the document to the Court under seal within five (5) business days of receiving a request to return the document, but said party may not assert as a ground for the entering of such an order the facts or circumstances of the inadvertent production, including whether the Producing Party took reasonable care to prevent disclosure.  Nothing in this Order shall preclude a party from arguing that the Inadvertently Produced Privileged Document does not constitute or contain attorney-client privileged information, attorney work product or other privileged information, or that the Producing Party has waived any applicable privilege through its conduct outside of this litigation.

### 9. FILING PROTECTED MATERIAL.

The parties are required to comply with the Federal Rules of Civil Procedure and the Local Rules of this District, including but not limited to, Local Rule 26.2, and on matters of procedure for filing documents under seal.

### 10. FINAL DISPOSITION.

Unless otherwise ordered or agreed in writing by the Producing Party, upon written request of the Producing Party, after the final conclusion of all aspects of this action by judgment not subject to further appeal or by settlement, all Discovery Material, including copies as defined in Paragraph 4.6, shall be returned or destroyed by the Receiving Party, unless it has been offered into evidence or filed without restriction as to disclosures. Within thirty-five days of the Producing Party's written request, counsel for the Receiving Party shall certify in writing to the Producing Party that all such Discovery Material has been destroyed. Notwithstanding this provision, counsel are entitled to retain an archival copy of all pleadings, motion papers, transcripts, legal memoranda, correspondence and all attorney work product, even if such materials contain Discovery Material. Any such archival copies that contain or constitute Discovery Material remain subject to this Protective Order. In addition, counsel may retain attorney work product, including an index which refers or relates to Discovery Material, so long as that work product does not duplicate verbatim substantial portions of the text or images of the Discovery Material. This work product shall remain subject to this Protective Order.

After dismissal or entry of final judgment not subject to further appeal, the Clerk may elect to return to counsel for the parties, or after notice, destroy documents filed or offered at trial under seal or otherwise restricted by the Court as to disclosure.

## 11.     ATTORNEY RENDERING ADVICE.

Nothing in this Order will bar or otherwise restrict an attorney from rendering advice to his or her client with respect to this matter or from relying upon or generally referring to Discovery Material in rendering such advice; provided however, that in rendering such advice or in otherwise communicating with his or her client, the attorney shall not reveal or disclose the specific content thereof if such disclosure is not otherwise permitted under this Order.

## 12.     DISPOSITIVE MOTION HEARINGS AND TRIAL.

The terms of this Order shall govern in all circumstances except for presentations of evidence and argument at hearings on dispositive motions and at trial.  The parties shall meet and confer in advance of such proceedings and seek the guidance of the Court as to appropriate procedures to govern such proceedings.

## 13.     MISCELLANEOUS.

13.1     Right to Further Relief.  This Order shall be subject to modification by the Court on its own motion or on motion of a party or any other person with standing concerning the subject matter.  Motions to modify this Order shall be served and filed under Local Rule 5.9 and this Court's standing orders or other orders in this action.

13.2     Prior Judicial Determination.  This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery.  Nothing herein shall be construed or presented as a judicial determination that any documents or information designated as Protected Material by counsel or the parties is subject to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific document or issue.

13.3   <u>Persons Bound</u>.  This Order shall take effect when entered and shall be binding upon all counsel and their law firms, the parties and the persons made subject to this Order by its terms.

Dated: November 3, 2020

Respectfully submitted,

*/s/ Marvin A. Miller*
Marvin A. Miller
Andy Szot
**Miller Law LLC**
115 S. LaSalle Street, Suite 2910
Chicago, Illinois 60603
312.332.3400
mmiller@millerlawllc.com
aszot@millerlawllc.com

Christopher Lovell
Christopher M. McGrath
**Lovell Stewart Halebian Jacobson LLP**
500 Fifth Avenue, Suite 2440
New York, New York 10110
212-608-1900
clovell@lshllp.com
cmcgrath@lshllp.com

*Counsel for Plaintiff Mish International Monetary Inc.*

*/s/ Amy Graham Doehring*
Amy Graham Doehring
**Akerman LLP**
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700
amy.doehring@akerman.com

Michael P. Kelly
**Akerman LLP**
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 393-6222
michael.kelly@akerman.com

Joel S. Forman
Meghan K. Boland
**Akerman LLP**
520 Madison Avenue, 20th Floor
New York, NY 10022
(212) 880-3800
joel.forman@akerman.com
meghan.boland@akerman.com

*Counsel for Defendant Vega Capital London, Ltd.*

**IT IS SO ORDERED**.

_____
HONORABLE GARY S. FEINERMAN
**UNITED STATES DISTRICT JUDGE**

Date: 11/5/2020

**EXHIBIT A TO STIPULATED PROTECTIVE ORDER**

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MISH INT'L MONETARY INC., | x | |
| on behalf of itself and | : | |
| all others similarly situated, | : | |
| | : | Case No. 20-cv-04577 |
| v. | : | |
| | : | Judge Gary Feinerman |
| VEGA CAPITAL LONDON, LTD. | : | Magistrate Judge Jeffrey T. Gilbert |
| and JOHN DOES 1-100. | : | |
| | x | |

**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

I, _____ [print full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of Illinois, Eastern Division on _____ [date] in the above-referenced case.

I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of Illinois for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

Date: _____


City and State where sworn and signed: _____


Printed name: _____


Signature: _____

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| VITOL INC., | |
| *Movant*, | |
| v. | Misc. Case No. 4:24-mc-00010 |
| VEGA CAPITAL LONDON LIMITED, et al., | |
| *Respondents.* | |
| MISH INTERNATIONAL MONETARY INC., on behalf of itself and all others similarly situated, | Civil Case No. 1:20-cv-04577 |
| *Plaintiff,* | (Related action pending in the United States District Court for the Northern District of Illinois) |
| v. | |
| VEGA CAPITAL LONDON, LTD., et al., | |
| *Defendants.* | |

## DECLARATION OF SHAWN M. TAYLOR IN SUPPORT OF
## VEGA CAPITAL LONDON LIMITED AND ADRIAN SPIRES' OPPOSITION TO
## VITOL INC'S MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS

I, Shawn M. Taylor, hereby declare as follows:

1.       I am an attorney with Akerman LLP and licensed to practice in the State of Illinois. I represent Vega Capital London Limited ("Vega") and Adrian Spires ("Spires") in the case captioned *Mish Int'l Monetary Inc. v. Vega Capital London, Ltd.*, No. 20-cv-04577, which is pending in the U.S. District Court for the Northern District of Illinois ("Illinois case").

2.       This declaration is made to authenticate the documents that are attached as exhibits to Vega and Spires' opposition to Vitol's motion to quash the subpoena that was served on Vitol in connection with the Illinois case.

1

3.      The statements set forth in this declaration are based on my own personal knowledge of the documents and facts referenced herein.

4.      **Exhibit 1** to the opposition is a true and correct copy of the Interim Staff Report, Commodity Futures Trading Commission, *Trading in NYMEX WTI Crude Oil Futures Contract up to, on, and around April 20, 2020* (Nov. 23, 2020), available at

https://www.cftc.gov/PressRoom/PressReleases/8315-20.

5.      **Exhibit 2** to the opposition is a true and correct copy of the publicly available version of the corrected Second Amended Complaint that plaintiff Mish International Monetary Inc. ("Mish") filed in the Illinois case on May 19, 2022, which contains redactions pursuant to the Protective Order.

6.      **Exhibit 3** to the opposition is a true and correct copy of the publicly available version of the motion to extend deadlines that Vega and Spires filed in the Illinois case on January 5, 2024, which contains redactions pursuant to the Protective Order.

7.      **Exhibit 4** to the opposition is a true and correct copy of the Bloomberg article, *World's Top Oil Trader Vitol Smashed Profit Record in 2020* (Mar. 16, 2021), available to subscribers at https://www.bloomberg.com/news/articles/2021-03-16/world-s-top-oil-trader-vitol-smashed-profit-record-in-2020.

8.      **Exhibit 5** to the opposition is a true and correct copy of the statement of Vitol CEO Russell Hardy, *Vitol 2020 volumes and review* (June 4, 2021), available at

https://www.vitol.com/vitol-2020-volumes-and-review/.

9.      **Exhibit 6** to the opposition is a true and correct copy of the Reuters article, *Trader Vitol Posts Record $15 bln Profit in 2022 on Energy Crisis* (Mar. 30, 2023), available to subscribers at https://www.reuters.com/article/idUSL4N3623W4/.

10.  **Exhibit 7** to the opposition is a true and correct copy of an e-mail sent from CME Global Command Center, dated April 20, 2020, with the subject line "May 2020 Energy Limits," which a nonparty market participant produced in connection with discovery in the Illinois case. This nonparty market participant did not assert that this email was Confidential or Highly Confidential pursuant to the Protective Order.

11.  **Exhibit 8** to the opposition is a true and correct copy of the Protective Order entered in the Illinois case on November 5, 2020, which governs the exchange and use of confidential and highly confidential discovery materials in the Illinois case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 24, 2024, in Chicago, Illinois.

/s/ Shawn M. Taylor
Shawn M. Taylor

## **CERTIFICATE OF SERVICE**

I hereby certify that, on January 24, 2024, a true and correct copy of the foregoing

Declaration was served via the Court's ECF filing system to the following counsel of record:

> Christopher Verducci
> Locke Lord LLP
> 600 Travis Street
> Houston, TX 77002
> cverducci@lockelord.com
>
> Russell Perdew
> Locke Lord LLP
> 111 S. Wacker Drive
> Chicago, IL 60606
> rperdew@lockelord.com
>
> M. Isabel Campos
> Locke Lord LLP
> 600 Travis Street
> Houston, TX 77002
> isabel.campos@lockelord.com

/s/ Shawn M. Taylor
Shawn M. Taylor

## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| VITOL INC., | § | |
| | § | |
| Movant, | § | |
| | § | |
| vs. | § | MISC. ACTION NO. 4:24-00010 |
| | § | |
| VEGA CAPITAL LONDON LIMITED | § | |
| AND ADRIAN SPIRES, | § | |
| | § | |
| Respondents, | § | |

## ORDER

After carefully considering Vitol Inc.'s Motion to Quash the Subpoena of Vega Capital

London Limited and Adrian Spires, and all responses and replies thereto, the Court hereby

DENIES the motion and ORDERS Vitol Inc. to comply with the subpoena issued by Vega

Capital London Limited and Adrian Spires within ten business days.

It is so ORDERED.


_____                    _____

Date                                                                          The Honorable Alfred H. Bennett
                                                                                 United States District Judge