UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VITOL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 24 C 1492 |
| | ) | |
| VEGA CAPITAL LONDON LIMITED, | ) | |
| | ) | Chicago, Illinois |
| | ) | April 3, 2024 |
| Defendant. | ) | 10:32 o'clock a.m. |

TRANSCRIPT OF PROCEEDINGS -
Motion Hearing
BEFORE THE HONORABLE MANISH S. SHAH

APPEARANCES:

For the Plaintiff: LOCKE LORD, L.L.P.
BY: MR. P. RUSSELL PERDEW
MS. ISABELLA SEEBERG
111 South Wacker Drive
Chicago, Illinois 60606
(312) 443-1712

For the Defendant: AKERMAN, L.L.P.
BY: MR. MICHAEL P. KELLY
750 Ninth Street, Suite 750
Washington, D.C. 20001
(202) 824-1716

AKERMAN, L.L.P.
BY: MR. SHAWN M. TAYLOR
71 South Wacker Drive, 46th Floor
Chicago, Illinois 60606
(312) 634-5721

APPEARANCES (Continued):

For the Defendant: DOWD BENNETT, L.L.P.
BY: MS. MICHELLE NASSER
222 West Adams Street, Suite 250
Chicago, Illinois 60606
(312) 224-7006

COLLEEN M. CONWAY, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Room 1918
Chicago, Illinois 60604
(312) 435-5594
*colleen_conway@ilnd.uscourts.gov*

(Phone line open for listeners. Heard in open court:)

THE CLERK: Case number 24 CV 1492, Vitol, Inc. v. Vega Capital London Limited, et al.

THE COURT: Someone start.

MR. PERDEW: Yes, certainly. Good morning, Your Honor. Russell Perdew and Bella Seeberg on behalf of the movant, Vitol.

MR. KELLY: And good morning, Your Honor. It's Michael Kelly from Akerman on behalf of Vega Capital London Limited and Adrian Spires.

And with me today is Shawn Taylor from my firm and Michelle Nasser from the firm of Dowd Bennett.

THE COURT: Good morning, everyone. Thank you for being here.

I gather that you are still at issue and haven't figured out a resolution. And I am seeing heads nodding, and that's fine.

A couple of questions I have for Vitol.

Given the passage of time, how competitively sensitive is a short window of trading data?

MR. PERDEW: Sure. Well, I think the most important and the most sensitive information that is there -- there's a couple of things.

One is they are asking -- they have several requests, 4 through 6, that get at: What was your strategy? What was

your thinking? What did you think about negative pricing and when that would happen?

And there is no strategy document. There is no: Here's our trading strategy. There wasn't one for Vitol generally.

And Vitol doesn't make trades on its own. It has individual traders that run their own books, that are doing this on their own.

So when you're asking for strategy behind a trade, you're asking each trader to do it and then you're asking -- also relating to each single trade to do it. And so there isn't anything that says: Here's the strategy for this day, or for this trade for this trader.

So to produce those documents, what you'd have to do is: Well, what information did they have? What can --

THE COURT: Well, let me just skip to --

MR. PERDEW: Yeah.

THE COURT: -- what I was trying to get at, was the actual trading data itself, the actual trades.

Why would that be, at this point, competitively sensitive? Given that we're talking about trades that happened four years ago, and probably in response to whatever was happening at that time, likely not revealing anything about Vitol's current strategies.

MR. PERDEW: Right.

THE COURT: And we're just talking about a snapshot of trades that occurred in 2020.

Why is that so competitively sensitive?

MR. PERDEW: The most important thing is that looking at what the trades were, the dollars bought, the dollar -- versus the dollars sold, would allow somebody to determine what Vitol's profits and losses were from this period of time.

It's a privately-held company. That's information that they are very sensitive about, guard very jealously.

And simply because it is a few years old doesn't change the fact that its financial performance information is private, is confidential, and there isn't any need for it here given that -- the trading data that's available.

They have the trading data showing, on an aggregated and itemized basis, every trade that happened that day. So they can look at the whole market as opposed to a single snapshot of a single trader, or the individual traders, employed by Vitol.

So it certainly still is confidential. I would also just note that there really is no rebuttal to the fact. We submitted affidavits saying that that information is confidential, competitively sensitive, could cause competitive harm. There's been no rebuttal to that.

And these are traders. So --

THE COURT: And let me interrupt, just ask.

MR. PERDEW: Sure.

THE COURT: Can you tell me a little bit more about the idea that these are individual traders trading on their own strategies, perhaps, and there might not be some sort of overarching Vitol strategy that's being implemented?

Give me a little bit more information about that and how that works from your client's perspective.

MR. PERDEW: Sure.

Vitol provides information and an infrastructure to allow these individuals to succeed at their trading. But the decision-making that is made and the actual assets that are purchased and sold are done at the discretion of these individual traders. They have decision-making authority to do that. And so what one person decided to do in their strategies and plans isn't going to be the same thing that another person decided to do, even though they're both employed by Vitol.

Similarly, what one person decided to do at 9:00 a.m. with respect to one transaction isn't reflective of what they decided to do at 11:00 a.m. with respect to a different transaction, because those things can change over time, or it could be because of facts and circumstances at their counterparty or something else.

So the subpoena, as it's phrased, would require going -- trying to piece together what all of those people were thinking about with respect to each of those transactions.

THE COURT: And how sensitive, in your view, would be documents or communications evincing Vitol's reaction to some notice that an outsider made or a regulator made about, "There's a problem with this contract"?

And that may be a blast notice that went out to lots of people. And maybe there are some internal communications immediately in response to that that may not be so sensitive but may shed light on, generally speaking, what people thought about what was happening in the market in response to that kind of notice.

MR. PERDEW: Right. So I think that the little category that I don't think would be an issue would be any communications with the regulator, the CFTC, about the issue.

To the extent that Vitol provided information back to them in response to that, I don't think that that would be an issue. I guess I would want to know -- I would have to see it for myself to see if there was some --

I do know that, for example, the CFTC did not request trading data from Vitol in connection with this event. But if they send out a communication and something was sent back about it and didn't -- there wasn't any, "Hey, this is confidential. We're providing this to you to cooperate with our regulator and be a good citizen, but please make sure you keep this confidential." If there was communication that wasn't like that, I don't think that that would be an issue.

The con -- but an internal reaction or a purely internal discussion about this would be a concern because, again, that reflects their own view on the market, their own -- the way that they make decisions, the sources of information they rely upon, the logistical infrastructure that they rely upon. All of that is how they get a competitive advantage, how they make decisions, when they're trading opposite people like the defendants, and want to do better than them, want to beat them. Because trading is zero sum.

So they are very uncomfortable about providing that information to anybody, but certainly to competitors.

THE COURT: Have you taken the step of looking to see what documents or communications might exist in response to the CFTC notice or communication?

Do you happen to know what kinds of things they talked about internally immediately after getting that notice?

MR. PERDEW: Internally. No, I don't know that, Your Honor.

THE COURT: And why is this particular contract from May of -- or April of 2020, why is that now so sensitive that it would reveal something important to know how they talked about it back then?

MR. PERDEW: Right. I don't think that there's anything about this particular contract that makes it more sensitive than other business that was done that day. It is

the window into how Vitol processes information, how it develops -- how its traders develop strategies, what information Vitol gives its traders.

You know, developing those sources of information is part of what enables Vitol to succeed, part of what they've invested money in. And providing information, even if it was: Four years ago, we were relying upon these reports from these sources of information. We get information from this bureau or this source of information. We like to look at this type of thing -- I don't know if it's weather data. I don't know if it's something that is good at forecasting future uses of crude oil. I don't know what it is. But I know that they develop those things very carefully. They spend a lot of money subscribing to things, evaluating them. And so -- and then coming up with tools, analytical tools to take that information and make it something worthwhile, make it something that they can make decisions on. And that is their secret sauce. That is how they compete with others in the business, to try to trade better than others.

And the fact that it's four years ago, that doesn't mean that those processes aren't still in place, those sources of information aren't still relied upon. And it just isn't something that they want to give out.

And I would note that if the defendants here thought -- and they're traders themselves. Extremely

successful traders based on the allegations here. If they thought that this information was stale, they could have said that in an affidavit easily; that, "Hey, look, we don't care at all. For our own trading, we don't care if anybody knew that. We talk about that all the time at conferences. It's not a big deal."

They could have had an industry expert come in and say that stuff goes stale after a couple of months. They haven't done that. They have not really disputed that information at all. Our affidavits describing it as confidential, you know, on this record are unrebutted.

So I think these are good questions, and I'm happy to talk about them, but I certainly don't want to lose sight of the fact that defendants have not given you anything on which to base a decision that our affidavits are wrong or incorrect or have overlooked something.

THE COURT: Well, I will ask some questions of them now.

MR. PERDEW: Okay.

THE COURT: If these trades by people at Vitol are really just individual judgments by individual traders, and there might not be some sort of overarching Vitol approach to things, why do you need their information when you have the information from everybody who traded?

MR. KELLY: Well, Your Honor, I think what we are

trying to do with the subpoena is to obtain evidence from a variety of industry sources as to why they traded the way they did on that particular day.

And we're doing this, in part, because we, of course, intend to present an expert witness.

The plaintiffs will have an expert witness who will have diametrically-opposed views. And, frankly, it sounds like Vitol's views are more similar to ours than they are to the plaintiffs' experts.

And the reason that you need a variety of different sources is for a jury, or potentially the Court on summary judgment, when they look at this issue and they say: Well, this just seems to be a battle of the experts, when you look at traders that are actually having to make decisions in realtime based on their personal knowledge, as to whether there's enough storage available, whether or not -$37 is a fair price or not, you need to know.

Now to the question about burden. You know, we are happy to negotiate with Vitol about the number of traders.

You know, if they have a hundred separate traders doing this, we could agree on a representative sample size that will give us the sense of the perspective of at least some traders from Vitol.

Because Vitol is uniquely situated. They are trading, by their -- as their briefs indicate, seven million

barrels of oil per day, and they are going to have a unique perspective on the market that some of the other folks that we have subpoenaed, financial institutions, oil companies, they may have a different perspective. And so --

THE COURT: Well, why can't that perspective come from other sources that are more public, more readily available, the way people in the industry talk to each other publicly in response to either regulators or public conferences and the like, or industry experts who analyze the markets and provide reports at or near the time of these events? Why aren't those sources of information just as good as what some trader might have thought about trading that one particular day?

MR. KELLY: Because those individuals are talking a more general and summary level. They're not talking based on their own personal knowledge, knowing the decisions that they had to make in realtime.

That is a more tangible and more persuasive piece of evidence as to: Why was there no demand for oil when it was -$37? Why would a company like Vitol, which would get paid to accept oil and then they could get paid to resell it, why would they not do that and be guaranteed a profit?

That's a question that only the individual traders can really answer in a persuasive way. Experts can sort of surmise, they can reason as to why someone would do it, but

only the traders can explain in a persuasive way why they didn't do it, because that's within their personal knowledge, which others won't have.

THE COURT: And what about going to sources of information at Cushing, Oklahoma and the consequences of delivery there?

That sheds light on what the market was thinking at the time. And if information about the storage capacity there is relevant, you can get that information from them, I would think, and you wouldn't need a trader to say, "Well, I thought that there would be storage issues or delivery issues, so that's why I was not interested in even participating in this ostensibly-profitable transaction."

MR. KELLY: Well, Your Honor, there are two issues with that.

One is the issue of how much storage was actually available. And there's the amount that was reported as occupied and then there was the amount that was reserved.

And you're right, you would go to the folks in Cushing to get, sort of, the details on that.

But there's a separate issue of: Did the demand fall? Because there was a perception -- regardless of reality, was there a perception that there was no room in Cushing?

And that's information you have to get from the traders. The folks in Cushing can't testify as to what a

trader would think about whether or not there was sufficient storage that you would want to buy oils futures at -$37 per barrel.

THE COURT: And how would experts go about opining about market perception if they don't have access to information from specific traders engaged in those trades?

Typically, what would you expect an expert to do? And if you're going to have an expert do something like that, why isn't that good enough?

MR. KELLY: Well, yes, an expert can give, we think, admissible testimony on that. They can draw from sources like some of the sources that Vitol's expert, proposed expert, drew from.

But the reason why that's not necessarily good enough is, you know, we, again, need to refute what the plaintiffs' expert is claiming. He's claiming that there was a flash crash between 124 and 130, and that that was caused by an extreme lack of liquidity.

Well, a company like Vitol which made, purportedly, $3 billion in profits in 2020, that doesn't explain why Vitol wouldn't have wanted to buy oil when there was potentially a large profit to be made. And you really need to get the answer from Vitol.

And there's nobody else, there's no expert that can explain what was in Vitol's mind, or at least some of the

traders' minds, when they were deciding not to buy in sufficient quantities to drive that price up from -37 back to zero.

THE COURT: And you don't think your own witnesses are good enough to make that point? Your own traders?

You're the party in the litigation, and they're third parties, and you want to bring them and their information into the evidence in the case, but maybe the evidence should be what your traders say they were thinking and they were perceiving.

MR. KELLY: Well, I think, first, we represent Vega Capital and Adrian Spires, not the individual traders that were making decisions.

And yes, our -- Vega's information is going to be discussed at summary judgment and at trial. But someone might look at Vega or Adrian Spires or any of the traders and say, "Well, you have a self-interest now because you've been the subject of a class-action lawsuit." Better to get it from nonparty traders.

And that's the point that Judge Pauley made in the *Parnon* case in the Southern District of New York, almost exactly the same or very similar facts to this one.

And we actually handed up to Your Honor a brief. And if you look at page 14, Vitol was making all the same arguments that they're making today. And Judge Pauley said that, A, this is high probative, what nonparty traders think in terms of why

the market is acting the way that it does. He also concluded that the protective order would alleviate any concerns about information would be misused. And he chided Vitol somewhat by saying: Well, you can't just speculate that someone's going to violate the protective order that's in place.

But to circle back to your question of: Well, why do you need it from a third party and not from just the traders? That's the answer to the question, is the reasons that Judge Pauley laid out in the Southern District of New York.

Vitol appealed that decision to the Second Circuit, and the Second Circuit affirmed Judge Pauley, in requiring -- or allowing Vitol's 1.4 million documents, which is far more than what we're talking about here --

THE COURT: Let me --

MR. KELLY: Sure.

THE COURT: -- interrupt with a different question.

You mentioned in your brief that you don't need the data, if you get it, to be cross-checked and verified.

I was a little surprised at that, because this kind of data, there can be problems with it when it first gets turned over. And to not go through the exercise of cross-checking and verifying, you might very well not be able to count on what you get.

So are you -- why are you so confident that you wouldn't need them to go through the exercise of cross-checking

and verifying?

MR. KELLY: Well, for a few reasons.

First of all, I'm confident Vitol does have a system of internal controls that would track that information accurately.

Secondly, Vitol, as it acknowledges in its brief, is trading through futures commissions merchants which provides statements about what trading was done and when.

With respect to other subpoena recipients, we've told them that: If you can provide us with those statements from your futures commission merchant, which is going to be a separate entity, that gives us the comfort that that's going to be presumptively accurate.

We were responding to the suggestion that it would take 170 or potentially 800 hours. That seemed not realistic to us in terms of how long it would take Vitol to find that.

THE COURT: And do you have any sense of what a reasonable sampling of individual traders would be from your perspective?

MR. KELLY: Well, if there was a principal basis for it -- you know, it could be as few as three to five to ten. It depends on how many traders Vitol has.

But if it has -- if they were to say, "Well, look, these were our most three prolific traders on the day of April 20th," that's something that we would likely agree to. But we

would want to make sure that it's principled and it's based on sort of a process as opposed to just sort of three people randomly picked out.

THE COURT: Do you want to reply to the point of the protective order not being adequate from Vitol's perspective?

MR. PERDEW: Yes. Thank you, Your Honor.

I have a few other things to say in response to what Mr. Kelly has said, but let me start with that, since that's what you asked about.

I mean, we cite cases in our brief, pages 12 to 13 of our reply, where courts recognize that for third parties who are not in litigation, the mere existence of a protective order should not end the inquiry.

Rule 45 -- as you said, we're nonparties to this. This is not a normal Rule 26 party discovery dispute where we think: Well, what's relevant? And, you know, we can sort it out with an admissibility determination.

We're nonparties to this. We get extra protection. Part of that is that it puts a burden on them to show that what they want is necessary when we're dealing with our confidential information.

And what those courts have said -- cases including a Northern District case, *Suture Express*, what they've said is: For a nonparty, they shouldn't -- the existence of a protective order doesn't eliminate their burden, the requesting party's

burden to show that it is necessary and it is unavailable.

And so that's number one, that you still do the same analysis on that. But number two is, there are specific places where there are concerns in the protective order.

I think the most -- and we talk about those in our reply. We list some of them. But I think the most notable one is trial. Because when trial starts, if that evidence is discussed -- and Mr. Kelly has talked about his intention to want to present it to the jury, to say, "Look, this trader did this. And so you could know that our traders are doing okay because other people did something similar," Vitol or otherwise -- that information is then going to be revealed to the world.

The Court, I expect, is going to be reluctant about telling all the individual defendants they have to clear the courtroom during the trial on which they're being asked to pay tens or hundreds of millions of dollars in damages. The defendants are presumably going to be able to sit here and hear that testimony, see those exhibits, as will anybody else that comes into the court. Courts are typically reluctant to bar the public from civil trials like this, especially simply because a nonparty's documents are at issue.

So that's going to be a time when the stuff will certainly be at issue.

When it gets filed, we have to rely on them to ask,

and we have to rely on the Court to agree, to seal things. Courts are often reluctant to seal documents as well.

They can share documents with witnesses at their discretion. They're allowed to talk to their clients about the documents generally when providing advice. We're not going to be part of that.

I'm sure -- I don't question their good faith, but when they're talking to their clients, what they think is referring to things generally and what we think is will probably be two different things.

So the overall -- and these are issues that have come up. The court in *Suture Express* specifically said: Yeah, but what happens at trial?

THE COURT: And let me interrupt just to circle back to Vega for a question I forgot to ask you, with respect to the point that they made earlier about how you're not saying this is stale. I am the one who's wondering, why isn't this stale information that no one should really be so competitively sensitive about? And they're pointing out: Well, that's not an argument that Vega was making.

So let me ask, do you think information about a reaction to a market event four years ago is stale anyway and shouldn't have competitively-sensitive value?

MR. KELLY: Your Honor, we've tried to take a consistent position. We'd asked for our information to be kept

under seal because we think that there is confidential information.

We think Vitol is in the same position, but we think that can be covered by the protective order.

THE COURT: Okay. That's helpful. Thank you.

You wanted to raise a couple of other points in response?

MR. PERDEW: Another thing is -- you know, the burden on them is -- and I appreciate Mr. Kelly's candor in that last response.

With confidential information, the burden is necessity and unavailability. Your Honor asked: Well, what about the market-wide data? And he says: No. We need individual examples that's more powerful, that's more meaningful to a jury. The market-wide data isn't going to be good enough. For our expert analysis, it isn't going to be good enough.

But since we filed our reply, they filed a joint status report on March 1st saying that 15 of the 28 subpoena recipients have made at least a partial production.

And I asked Mr. Kelly this morning for an update on that, and he very graciously and candidly told me that that number's now up to 20.

So 20 of those subpoena recipients have produced that individual trader information. And let me be clear, it's

partial or full. I don't know exactly the details of what has been produced.

But necessity and unavailability from other sources is their burden. And if they already have it from 20 others, why is Vitol the magic 21st -- or its three traders the magic 21st to 23rd that are going to tip the scales?

They've gotten this from a lot of individual traders who, for whatever reason, have made the decision to produce. It doesn't bear on Vitol's decision. But that's the decision that they have made to the benefit of the defendants.

And it isn't clear why it is that they still need more. And the person that could tell us that would be their expert. They have hired an expert, certainly, at this point, to do an analysis.

The plaintiffs submitted an expert report with their class certification motion. I'm sure they have an expert looking at that.

So it would have been easy for the defendants to meet their burden, to say to the expert, "Please explain why your analysis cannot proceed, is incomplete, is less than you would like it to be because Vitol's data is missing." And they have not provided anything like that.

We're the only party to provide an expert affidavit, even though it's their burden to show it. And I do think that's telling.

And I'm not saying that every motion to compel needs an expert affidavit. That's impractical. This case is different, though. The issue is highly technical. There are experts here.

The amount in controversy. They're accused of having made hundreds of millions of dollars off of the conduct. Certainly warrants an extra step.

And there's this vast amount of other information that they're -- if they want to compel the production of confidential information from us, the least they can do is have an expert say why all of that is inadequate and they really need our stuff to complete the work. But they haven't done that to meet their burden, and I think they should be held to that burden.

THE COURT: And you don't think the fact that others have produced in response to a subpoena is a sign that it's actually not that big of a deal? And --

MR. PERDEW: Right.

THE COURT: -- you're the ones being unreasonable, whereas everyone else --

MR. PERDEW: Sure, right.

THE COURT: -- has got a calm or cooler head about them, and they know that, "This is not that big of a deal. We can comply"?

MR. PERDEW: If there was something about those

entities that was in the record, that they could make that argument, that would -- you know, for example, Vitol is privately held. They don't have to disclose as much as other companies do. We don't know that about the other recipients.

Now, we have looked, and at least 17 of those 28 are publicly-traded companies. So they're already disclosing more information in the ordinary course than Vitol.

What do those companies do to develop their trading information? How do they run? How big of a part of their business is trading? We don't know any of that.

It is their burden. So if they wanted to argue: Vitol should fall in line like everybody else, I would hope that they could give us some reason to think Vitol is comparable to them.

We know that there are some others who haven't, who are -- there will be motions to compel about.

So I think Vitol should be allowed to make its own decision about that. Certainly present the evidence that's needed to satisfy its burden to do that. But shouldn't be assumed to be incorrect simply because others have made a litigation judgment to cooperate rather than fight.

THE COURT: May I ask Vega for an update on the other motion to compel that got transferred, I think, recently?

MR. KELLY: Yes, Your Honor.

THE COURT: Where is that at?

MR. KELLY: This morning, it was assigned to Judge Blakey this morning.

And, Your Honor, if it's okay with the Court, we'll file a motion to reassign, as we did before.

THE COURT: That's fine. Do you happen to have the new case number?

MR. KELLY: I can provide it to the Court.

THE COURT: That's fine. I'll see it when you file your motion.

Are there others coming?

MR. KELLY: There might be, Your Honor.

There are a number of subpoena recipients who have told us that they're watching to see what happens with respect to Vitol's motion to quash.

So, as an example, ExxonMobil told that to me, Goldman Sachs told that to Ms. Nasser; that they want to see what happens on the motion to quash before they commit to producing information.

So yes, there are likely going to be others in the pipeline.

THE COURT: And in the newly-filed case that just got assigned to Judge Blakey, are you in discussions with that subpoena respondent as to timing of -- are there going to be briefs? Are we -- or I guess all the briefs have already been filed in the Southern District of New York, and are they

getting transferred here? Is that motion to compel fully briefed?

MR. KELLY: No, the motion to compel is not fully briefed. The motion to compel was filed and then Judge Polk Failla transferred it four days later. So the -- Glencore did not get a chance to respond.

They have reached out to us, and we have agreed on a potential briefing schedule. One of their lawyers is traveling to Italy, so we agreed to, I think, push it out, which we can include in our motion to reassign, the agreement as to potential briefing for that.

THE COURT: And do you have a -- I don't need the specific dates, but what kind of timetable are you thinking about for that motion?

MR. KELLY: I think they asked for three weeks to respond to the brief from this Friday.

THE COURT: Your colleague is wanting to chime in.

MR. TAYLOR: Yes.

MR. KELLY: Is that right?

MR. TAYLOR: Three weeks.

MR. KELLY: Three weeks from this Friday. And then we would ask for two weeks to file a reply to that brief.

And, Your Honor, Glencore is similarly situated to Vitol in the sense they are one of the few of the 28 who are actually trading oil, moving oil in the way that Vitol

described in their brief.

There are many companies -- there are some oil companies that we're still trying to get a sense of whether they're do that, too.

But that's kind of the unique aspect of this contract. It isn't in other contracts where there's a physical delivery component of it, and who can take it on and who can't.

So that's why Vitol and Glencore are important to us, among the 28.

THE COURT: One other question for you, Vega. Just to put a finer point on your response to their argument that they're third parties here and that they really shouldn't be subjected to this kind of discovery since they are third parties.

MR. KELLY: Your Honor, we would be missing an important part of our defense if we couldn't point to individual traders, particularly in Vitol's situation who could take physical possession of the oil, who can testify as to why they traded the way that they did on that day.

Experts can --

THE COURT: Are you thinking that you'll then also want to take depositions?

MR. KELLY: Of some, yes.

THE COURT: Anything else that you think I might be misapprehending or misunderstanding about the dynamic here that

you want to make sure I'm not wrong about or confused about?

MR. KELLY: Well, the last point I would make is the idea that we need to present a declaration in order to show that we need this information.

We obviously vehemently disagree that we have to provide a declaration. We think having a case in the Southern District of New York that's pretty much on all fours with this case is the support that we need to show that this can be highly probative of why the market did what it did, and that it wouldn't be, you know, a burden on Vitol.

We think that Vitol is overstating its concerns about the confidentiality agreement. If you look at that brief that I sent you, on page 14, Vitol wrote that: "If persons outside the Vitol companies have access to confidential business information, the Vitol companies' competitive advantages will be undermined, if not eviscerated."

Vitol made $3 billion in profit after the judge rejected this argument in 2020. They made $15 billion in profit in 2022.

So the idea that if Vitol has to produce information about one contract on two days from four years ago, that that's going to undermine their business, we don't think is a realistic description of the situation. So that's --

THE COURT: And you don't think you're getting enough from the people who have complied with the subpoenas?

MR. KELLY: Not given their unique position with possession of the oil.

THE COURT: Anything that you think I am misunderstanding or misapprehending that you want to make sure I am not confused about?

MR. PERDEW: I wouldn't say it that way, Your Honor, but a couple of other points that I'd make.

This case that Mr. Kelly referred to about -- the *Parnon* case, he characterized it as being on all fours. I would say it's a fair amount different. Most significantly, the legal standard was different. *Parnon* was analyzed under Rule 26, a general discovery standard, not a Rule 45 standard.

Vitol was a nonparty there. But it was a unique factual scenario where Vitol had already produced 1.4 million pages to the CFTC. Said, "Please keep it confidential."

The CFTC then looks at that and other information, sues Parnon, saying, "Our investigation shows you've done something wrong." Parnon says, "Well, can we see the documents you're relying on?" So the CFTC produces documents, including Vitol's documents, to Parnon.

Private parties later sue Parnon for the same misconduct. And they serve discovery, asking Parnon, the party, to produce the discovery. Vitol's allowed to intervene to say why that shouldn't be produced further.

But the court, Judge Pauley, analyzed it purely under

Rule 26, put the burden on Vitol to show why the discovery shouldn't proceed.

Here, the burden is on them to show why it is necessary and why it's unavailable from other sources. That was never discussed, not one time, in *Parnon*.

And I think what *Parnon* does say -- does show is that Vitol has consistently taken the position that this type of information is confidential and proprietary.

The mere fact that that order didn't put them out of business doesn't mean that it's not harmful. Putting us out of business is not the standard. A competitive harm is the standard. And we have shown that through affidavit. They don't rebut that.

I do think it's fair to hold them to their burden. They have experts that are working on this case. Obviously, they're competent counsel. Asking them to say why they need it wouldn't have been a significant burden.

The last point that I'll make, as this is raised in our brief but hasn't been talked about, is the fact courts do impose limits on discovery on putative class members, which Vitol is. Vitol doesn't want to be. Vitol would --

THE COURT: Let me just interrupt to say --

MR. PERDEW: Yes.

THE COURT: -- I think that concern is really more weighty when it's an unrepresented class member, and that's

less of a concern for me.

But I appreciate the point. I know it's out there.

MR. PERDEW: Okay. That's fair.

THE COURT: Okay.

MR. PERDEW: The last point I would make is they make a lot of statements about we're overstating our burden. While we've provided evidence, they're just -- it's just their say-so.

So if we're weighing an affidavit versus the lawyer's say-so, that doesn't seem right. I think the affidavit should control in that situation.

So I think we've met our burden of showing confidentiality. I don't think they've met their burden of showing necessity and unavailability.

THE COURT: Okay. I had come out here thinking I would give you a ruling, but I'd want to think about it a little bit more, particularly in light of another motion coming.

The idea that other subpoena respondents might be thinking or wanting to see how I resolve this suggests to me that let me just see if I can't craft something that is actually helpful for the other subpoenas that are out there and not just this particular dispute.

So bear with me a little bit and I'll try to get you a ruling when I can.

I may decide to wait to see the briefs in the other case as well and resolve them both at the same time, understanding that that's just maybe slowing down what the other subpoena respondents are looking at or waiting for. But it seems like that's coming anyway, so I might as well try and treat similarly-situated subpoena respondents similarly.

So I appreciate everyone's comments. I appreciate you being here this morning. I'll keep the motion under advisement.

MR. KELLY: Okay.

THE COURT: Thank you.

MR. KELLY: Thank you, Your Honor.

(Proceedings concluded.)

C E R T I F I C A T E

I, Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Motion Hearing proceedings had in the above-entitled case before the HONORABLE MANISH S. SHAH, one of the Judges of said Court, at Chicago, Illinois, on April 3, 2024.

*/s/ Colleen M. Conway, CSR, RMR, CRR* *04/10/2024*

Official Court Reporter Date
United States District Court
Northern District of Illinois
Eastern Division