UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VITOL INC., <br><br> *Movant,* <br><br> v. <br><br> VEGA CAPITAL LONDON LIMITED and ADRIAN SPIRES, <br><br> *Respondents.* | Case No. 1:24-cv-01492 <br><br> (Arising from Civil Case No. 1:20-cv-04577 in the United States District Court for the Northern District of Illinois) <br><br> Hon. Manish S. Shah |

### RESPONDENTS VEGA CAPITAL LONDON LIMITED AND ADRIAN SPIRES' MOTION FOR RECONSIDERATION BASED ON NEWLY DISCLOSED EVIDENCE

Based on newly disclosed evidence, Respondents Vega Capital London Limited ("Vega") and Adrian Spires ("Spires") respectfully request that the Court reconsider portions of its May 30, 2024 order granting, in part, Vitol Inc.'s motion to quash the document subpoena served by Vega and Spires. ECF 24. The Court was previously advised by Vitol Inc. ("Vitol") that its traders executed their own individual strategies in trading the May WTI Contract and that there was no overall "Vitol strategy." ECF 1 at 12; ECF 17 at 6; ECF 20 at 3:24-4:13. In granting part of Vitol's motion to quash, the Court relied on Vitol's argument, stating that "it doesn't make sense to group Vitol's trades, for example, under one umbrella, given that individual traders are doing their own thing." *Mish Int'l Monetary Inc. v. Vega Capital London, Ltd.*, Case No 1:20-04577 ("*Mish*"), ECF 339 at 6:20-22.

[redacted]

[redacted]

[redacted]

[redacted]

1



██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

In light of this newly disclosed evidence, Vega and Spires respectfully request that the Court reconsider its previous order and compel Vitol to produce the following documents:

(i) A fully unredacted copy of the email chains between CME Group and Vitol attached as Exhibits 1 and 3;

(ii) any application submitted by Vitol to the CME in connection with any intent to ████████████████████████████████████████████████████████████████████████████

(iii) ████████████████████████████████████████████████████████████████████████████

(iv) a document sufficient to show whether Vitol had a long or short position (and the extent of which) on the May WTI Contract at the beginning of the trading day on April 20 and at the end of the trading day on April 21;

(v) a document sufficient to show whether Vitol agreed to accept physical delivery of oil pursuant to the May WTI Contract and, if it did, how much;

(vi) a spreadsheet showing the purchases and sales of the May WTI Contract by Vitol on April 20 and 21, 2020; and

(vii) a document reflecting briefing to Vitol's executive management on how and why Vitol traded on the day it did.

All of these document categories were included in Vega and Spires' original subpoena to Vitol and are necessary to take an informed deposition of Vitol, which Vega and Spires anticipate taking before the close of discovery.

## BACKGROUND

### I. In Moving to Quash the Subpoena, Vitol Erroneously Contended that Its Traders Were Acting Independently

In its briefs, declaration, and oral argument, Vitol consistently asserted that there was no Vitol trading strategy, that each individual trader at Vitol developed his or her own strategy, and that it would be unduly burdensome for a third party like Vitol to produce documents sufficient to show how and why each of its traders traded on April 20 and 21, 2020. For instance, in its opening brief, it argued:

- "The traders at Vitol who participated in these markets are each responsible for developing their own strategy and knowledge with respect to the trades that they execute. There is no 'trade strategy' document that is required to be maintained for each and every trade." ECF 1 at 12

- "As a result, to respond to Requests 4-7, Vitol would be required to collect and review potentially each and every document created by the relevant trader during this period to try to piece together inferences regarding each trader's individual strategy as it evolved with the corresponding market conditions. This effort would require review of documents from numerous different mediums to determine each trader's strategy and knowledge for each trade, including Excel spreadsheets, emails, texts, instant messages, and other platforms." *Id.*

- "More importantly, there is a good chance that, after Vitol exerts these efforts to review every communication sent during this period, there would be no document that clearly articulates the strategy being pursued, because commodity markets are dynamic and the individual traders are each reacting to conditions as they emerge in real time." *Id.*

Vitol provided a declaration from a Commercial Analyst Manager, who contended that "[t]he trading strategy of Vitol's individual traders" is "proprietary" and "confidential." ECF 1, Ex. B, ¶ 6.

Similarly, in its reply brief, Vitol again emphasized that there was no single strategy or document of Vitol on April 20 or April 21 concerning its trading strategy. Vitol represented to the Court that:

4

> Further, on April 20 and 21, Vitol had numerous individual traders that traded the May WTI Contract. Thus, there was no single strategy or judgment of 'Vitol' on those days; each trader would have made their own decisions and judgments—which could have differed from trade to trade—regarding what trades to pursue and why. Defendants' subpoena would require Vitol to attempt to recreate the thought process of each relevant trader, including all the information Vitol made available to those traders.

ECF 17 at 6. And at oral argument, Vitol made the same point:

> One is they are asking -- they have several requests, 4 through 6, that get at: What was your strategy? What was your thinking? What did you think about negative pricing and when that would happen?
>
> And there is no strategy document. There is no: Here's our trading strategy. There wasn't one for Vitol generally.
>
> And Vitol doesn't make trades on its own. It has individual traders that run their own books, that are doing this on their own.
>
> So when you're asking for strategy behind a trade, you're asking each trader to do it and then you're asking -- also relating to each single trade to do it. And so there isn't anything that says: Here's the strategy for this day, or for this trade for this trader.

ECF 20 at 3:24-4:13.



Nor had Vitol produced any document to that effect to Vega or Spires that would permit Vega and Spires to raise these arguments with the Court.

## II. The Court Relied on Vitol's Contentions and Granted Part of Its Motion to Quash

On May 30, 2024, the Court relied on Vitol's representations and evidence in granting Vitol's motion to quash in part. *Mish*, ECF 339 at 5:15-8:22. On one hand, the Court concluded that "Vitol's and Glencore's roles in the market make them different and increases the potential

5

relevance of their participation and their insight into the events surrounding the May 2020 WTI futures contract," *id.* at 5:16-20, and that "Vitol's and Glencore's evidence may have value that isn't already covered by other subpoena respondents," *id.* at 5:20-21. The Court also found that "the protective order can mitigate the competitive risk." *Id.* at 5:22-23.

However, the Court reasoned that "Vitol and Glencore are nonparties, and burdening them with discovery should come with some extra caution," *id.* at 6:14-15, and that "[t]he way to account for their burden, relevance, and confidentiality concerns is to sharply curtail and limit the scope of information to be provided in response to the subpoenas," *id.* at 6:15-18. The Court wrote that:

> Vega doesn't need the trades. Vega has plenty of trading data. And I am persuaded that it doesn't make sense to group Vitol's trades, for example, under one umbrella, given that individual traders are doing their own thing. What is most relevant to Vega is why the price went negative and why these oil traders didn't seize on the negative price to make profitable trades.

*Id.* at 6:19-25. The Court ultimately ordered Vitol to produce documents sufficient to show (i) Vitol's understanding of storage at Cushing for the May WTI contract as of April 20, 2020; (ii) whether and when Vitol thought the price for the May WTI contract would go negative; and (iii) Vitol's communications with CME, the New York Mercantile Exchange, or the Intercontinental Exchange about the May 2020 WTI contract, limited to notices received from those entities, Vitol's responses to those entities, and correspondence with those entities about the April 20, 2020 and April 21, 2020 trading in the May 2020 WTI contract. *Id.* at 7:19-8:8. Providing further guidance, the Court explained that "I agree with Vega that it's reasonable to expect that, for example, Vitol's CEO received some sort of briefing, and that kind of document would be sufficient to comply with my order." *Id.* at 8:14-16.

6

**III.** ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

7

███████████████████████████████████████████████████

████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████

- ██████████████████
- ███████████████████████████
- █████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

8



.

### IV.    Meet-and-Confer Efforts with Vitol Were Unsuccessful

On Friday, June 28, the parties conferred about Vitol's anticipated production, which was ultimately made on July 3.  During this conference, Vitol's counsel stated that Vitol had not attempted to look for an executive summary of the trading on April 20, 2020.  On August 15 and 27, 2024, the parties conferred by videoconference about the production, where Vega and Spires expressed concern that the newly disclosed evidence was not consistent with previous arguments and proposed a potential compromise for the parties to resolve the dispute.  However, the parties were not able to reach an agreement.

## STANDARD OF REVIEW

"During the course of litigation, however, district courts need no special authority to revisit their rulings; indeed, the purpose of contemporaneous objection rules is to allow them to fix problems promptly, thereby avoiding wasteful appeals." *Lightspeed Media Corp. v. Smith*, 830 F.3d 500, 505 (7th Cir. 2016).  "If there was no final judgment, the court needed no special authority to reconsider its earlier decision." *Id.*  Moreover, even in more rigorous contexts not present here (such as a motion for reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure), "newly discovered evidence" is a basis for reconsideration of a district court's order. *Id.* at 505-06; *see also Boyd v. Tornier, Inc.*, 656 F.3d 487, 492 (7th Cir. 2011).

9

## DISCUSSION

### Vitol's Newly Produced Evidence Changes the Calculus of the Court's May 30, 2024 Order

In determining what burdens could be fairly placed on third party subpoena recipients, the Court relied on Vitol's representation that its individual traders were exercising their own discretion and that they were not acting collectively. *Mish*, ECF 339. The Court relied on this argument in determining how to address Vitol's burden, relevance, and confidentiality objections. But the production of the newly disclosed evidence should change the calculus of the Court's May 20, 2024 ruling for each of these concerns.

**I.** **The Newly Disclosed Evidence Shows that the Requested Documents Impose No Meaningful Burden on Vitol**

First, this newly disclosed evidence changes the calculus on burden, because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10

There is no appreciable burden in producing a single document identifying whether Vitol had a long position or short position beginning on April 20 and ending on April 21 and whether Vitol agreed to accept physical delivery of the oil pursuant to the May WTI Contract. Even the production of a single spreadsheet showing the purchases and sales of the May WTI Contract on April 20 and 21 would not be burdensome. Other subpoena recipients have been able to produce this type of information without undue burden. *See, e.g.*, *BP Products North America, Inc. v. Vega Capital London Ltd. and Adrian Spires*, Case No. 24-cv-4226, ECF 20 at 1 (acknowledgement by BP Products that "[t]he documents bp produced encompass all trades on the relevant market, as well as communications with the CME Group. Inc., . . . and a summary document on the events of April 20, 2020"); *Shell Trading (U.S.) Company v. Vega Capital London Limited and Adrian Spires*, Case No. 1:24-cv-5206, ECF 1 at 19 (Shell Trading acknowledging that it "has produced a summary list of trades made by [Shell Trading] on the WTI Contract on April 20, including the volume and price of the trades").

**II.     The Newly Disclosed Evidence Also Shows the Relevance and
         Necessity of the Documents Sought by the Subpoena**

Second, the newly disclosed evidence changes the calculus on relevance and necessity.

[redacted]

11

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

This newly disclosed evidence shows that the subpoena sought documents directly relevant and necessary to Vega and Spires' defenses. ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████

The Court had concluded that "Vega doesn't need the trades" and "Vega has plenty of trading data." *Mish*, ECF 339 at 6:19-20. However, the trade data of Vitol for the May WTI Contract on April 20-21 is needed to understand both ████████████████████████ ████████████████████████████████████████████ Vitol has conceded that, without the production of the trade data, there is no way for defense counsel to

12

understand what trading was done by Vitol and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ In particular, Zach Wilson, Commercial Analyst Manager of Vitol Inc., affirmed that "[w]hile the amount and price of each trade of WTI futures contracts during the relevant time period is known by (and obtainable from) the exchanges in which the trades occur (i.e., NYMEX, ICE), the identity of the trading party and that party's trading strategy . . . are not generally known or readily ascertainable from the exchanges or other sources." ECF 1, Ex. B at ¶ 6. Without the information sought in this motion for reconsideration ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Because the identities of the trading parties are not generally known to the exchanges, efforts to obtain trading data have become a recurring issue in the case. Even Plaintiff Mish International Monetary Inc. recently sent a notice about its intent to serve subpoenas on 52 companies, including several who previously received subpoenas from Vega and Spires. Ex. 4. In the subpoenas, Plaintiff seeks the production of information identifying purchases and sales of the May WTI Contract by those entities, including the time, volume, and price. Ex. 5, Schedule A, p. 7 (subpoena from Plaintiff to BP Products North America, Inc.). These subpoenas are a concession by Plaintiff Mish International Monetary Inc. that the relevant trade data cannot be obtained fully from the CME and that the data sought by Vega and Spires are not duplicative of what has already been produced by the CME. Because Vitol has made the same concession about the unavailability of trader data from the CME, and because this data is necessary for a deposition of Vitol, Vega and Spires respectfully submit that the Court should reconsider that

13

portion of its order granting a motion to quash based on the conclusion that Vega has enough trade data.

**III. The Newly Disclosed Evidence Shows There Is No Confidentiality Issue that Should Result in Quashing of the Subpoena**



And the protective order, which would prevent defense counsel from sharing any of Vitol's highly confidential information with their clients in any event, protects Vitol's remaining confidentiality interests in the trading data for one contract on two days from over four years ago.

## CONCLUSION

For the foregoing reasons, Respondents Vega Capital London Limited and Adrian Spires respectfully request that the Court reconsider its May 30, 2024 order and enter an order compelling Vitol Inc. to produce the following seven categories of documents:

(i) A fully unredacted copy of the email chains between the CME Group and Vitol attached as Exhibit 1 and 3;

(ii) █████████████████████████████████████

(iii) █████████████████████████████████████

14

(iv)    a document sufficient to show whether Vitol had a long or short position (and the extent of which) on the May WTI Contract at the beginning of the trading day on April 20 and at the end of the trading day on April 21;

(v)    a document sufficient to show whether Vitol agreed to accept physical delivery of oil pursuant to the May WTI Contract and, if it did, how much;

(vi)    a spreadsheet showing the purchases and sales of the May WTI Contract by Vitol on April 20 and 21, 2020; and

(vii)    a document reflecting briefing to Vitol's executive management on how and why Vitol traded on the day it did.

Dated: September 10, 2024

Respectfully submitted,

VEGA CAPITAL LONDON LIMITED
and ADRIAN SPIRES

By: */s/ Michael P. Kelly*
Michael P. Kelly
**AKERMAN LLP**
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 824-1716
michael.kelly@akerman.com

Shawn M. Taylor
**AKERMAN LLP**
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700
shawn.taylor@akerman.com

*Attorneys for Vega Capital London Limited and Adrian Spires*